IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Civil Action No. 4:05-CV-55-D

| | | |
|---|---|---|
| PCS PHOSPHATE COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF PCS PHOSPHATE** |
| v. | ) | **COMPANY INC.'S MEMORANDUM** |
| | ) | **OF LAW IN SUPPORT OF MOTION** |
| NORFOLK SOUTHERN CORP. AND | ) | **FOR SUMMARY JUDGMENT** |
| NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY INC., | ) | |
| | ) | |
| Defendants. | ) | |

## NATURE OF THE CASE

Plaintiff PCS Phosphate Company, Inc. ("PCS") owns and operates the world's largest phosphate mine near Aurora in Beaufort County, North Carolina (the "Aurora Facility"). In 1965 and 1966, Defendants (and their predecessors in interest) obtained easements to construct rail lines across PCS property to serve the Aurora Facility. In obtaining the easements, Defendants entered into five Deeds of Easement (the "Relocation Agreements"), which require Defendants to relocate a portion of the rail lines at Defendants' sole expense if PCS invoked the Relocation Agreements to allow mining operations to continue over the railroad right of way.

PCS invoked the Relocation Agreements in 2003 so that it could continue its mining operations under and beyond the existing track. Defendants' corporate representatives have admitted that the Relocation Agreements are valid and enforceable, but have simply decided not to perform their stated obligations. Following Defendants' refusal to fulfill their

contractual obligations, PCS commenced the relocation project on its own at a cost of $15,849,000 to mitigate much greater harm should operations at the Aurora Mine cease. PCS then filed this lawsuit on May 6, 2005, following Defendants' refusal to fulfill their contractual obligations and following Defendants' retaliatory and baseless threats that they can and will abandon the only rail service to the Aurora Facility.

PCS seeks damages for breach of contract, breach of covenant, violations of the North Carolina Unfair and Deceptive Trade Practices Act and other claims. As set forth below, there is no genuine issue as to any material fact, and PCS is entitled to judgment as a matter of law on its claims for breach of contract and breach of deed covenants.

## STATEMENT OF FACTS

### A. PCS Operates Phosphate Mine Relying on Defendants' Rail Service For Forty Years.

The Aurora Facility sits on 70,000 acres located near Aurora, North Carolina in Beaufort County. *See* Affidavit of I.K. "Tex" Gilmore, attached as Exh. 1 (hereinafter "Exh. 1"), at ¶3. The Aurora Facility consists of mining and processing operations situated on land owned in the mid-1960s by two companies – Texas Gulf Sulphur Company ("TGS") and North Carolina Phosphate Corporation ("NCPC"). *Id.* at ¶4. Thus, PCS is the successor in interest to both TGS and NCPC.[1]

The mining operations at the Aurora Facility have the capacity to produce 6 million tons of phosphate concentrate per year. PCS estimates that PCS land surrounding the Aurora Facility contains hundreds of millions of tons of phosphate ore. PCS estimates that it will continue to operate the Aurora Mine for several more decades. *Id.* at ¶3.

---

[1] As used in this Memorandum of Law, references to PCS shall mean PCS Phosphate Company, Inc., including PCS' predecessors in interest TGS and NCPC.

From the mid-1960s to the present, the Aurora Facility has relied heavily on rail access for the inbound transportation of raw materials and for the outbound shipment of its products to the marketplace. *Id.* at ¶5. The Aurora Facility ships and receives by rail more than 2 million tons of raw materials and products annually. *See* Affidavit of Keith Schniering, attached as Exh. 2, at ¶6. Defendants received almost $16 million in revenues for traffic to and from the Aurora Facility for calendar year 2004. Answer, at ¶13.

**B.      Defendants Negotiate Relocation Agreements with PCS.**

In 1963, Defendants' predecessors in interest filed with the United States Interstate Commerce Commission (the "ICC") a Request for Authorization to construct and operate a rail line in Beaufort County, North Carolina to serve the requirements of the Aurora Facility. *See* ICC Report, Certificate and Order, attached as Exh. 3. On October 26, 1964, the ICC entered an Order providing that "[t]he present and future public convenience and necessity require construction and operation by the Norfolk Southern Railroad Company of a line of railroad in Beaufort County, N.C…" *Id.* at 30.

Based on submissions by Defendants' predecessor and others, the ICC observed in its Order that the initial plan for the Aurora Facility was "extensive phosphate producing activity," which would initially produce 3 million net tons of phosphate rock annually. *Id.* at 2. The ICC also found that between two and three billion tons of recoverable phosphate ore resided in the immediate vicinity of the Aurora Facility. *Id.* at 6. Thus, as of 1964, at a recovery rate of 3 million tons annually, the ICC and Defendants' predecessors in interest knew that phosphate recovery was likely to continue for many years.

After obtaining ICC approval, Defendants negotiated with PCS the right to construct a rail line over PCS land to the Aurora Facility (the "Lee Creek Rail Line"). PCS required

that as an express condition to Defendants obtaining rail line easements and constructing the Lee Creek rail line, Defendants agree to relocate the rail line -- at Defendants' expense -- upon a determination by PCS that the easement interferes with anticipated mining or processing operations. *See* Exhs. 4 through 8, ¶ (1). Defendants agreed that they would relocate the rail line in five Deeds of Easement, each addressing a different segment of Defendants' rail line and each containing a relocation obligation (the "Relocation Agreements"). *See id*.

As evidenced by contemporaneous correspondence from Defendants' counsel, Defendants knew at the time the Parties entered into the Relocation Agreements that the relocation would not be necessary for many years. *See* Letter from John M. Sims, dated June 16, 1965, attached as Exh. 9, at 3. Defendants' counsel wrote that: "[w]ith reference to the changing of the last part of the relocation paragraphs, we pointed out that in all likelihood the relocation…will be at some distant time in the future…." *Id.*

The first two Relocation Agreements, dated June 29, 1965, contain the following provision:

> If, after ten (10) years from the date of this instrument, either Grantor determines that all or any part of said right of way and easement interferes with its anticipated mining or processing operations in the Beaufort County, North Carolina area, then said Grantor shall notify Grantee in writing of its desire that the right of way and track be moved, specifying in said notice the date on which it requires said track to be relocated which date shall not be less than one year from the date of said notice and designating in the notice a new location for the right of way and relocation of the said track, and Grantors shall provide Grantee with a right of way and easement over said new location **and Grantee at its expense shall relocate the said track on the said new right of way**; provided, however, that the new location for the right of way and relocation of said track shall be determined by engineering representatives of Grantors and

RAL 340489v6

> Grantee and shall be over such land as will provide a track subgrade elevation between elevations nine feet and thirteen feet above mean sea level, and be such land as will avoid excessive curvature, grade and distances for the relocated track.

> Exhs. 4 and 5, ¶ (1) (emphasis added).

A subsequent Relocation Agreement, dated October 12, 1965, provides that PCS may request that Defendants relocate the rail line if PCS "determines that all or any part of said right of way and easement interferes with its anticipated mining or processing operations…" Exh. 6, at ¶ (1). In the event that PCS provides "written notice indicating that [PCS]…has elected to proceed with relocation**…[PCS] shall provide [the Defendants] with a 60 feet right of way and easement over said new location and [the Defendants], at [their] expense, shall within one year relocate the said track on the said new right of way.**" *Id.* (emphasis added).

In 1965 and 1966, PCS and Defendants entered into five agreements containing similar relocation obligations. Exhs. 4 through 8. In drafting the Relocation Agreements, Defendants included provisions to limit the expense of relocating the rail line, including limitations on the curvature, grade, and distance of the relocated rail line. *See* Exh. 9, at 3.

In addition to receiving an easement over which Defendants agreed to construct a rail line and the other mutual promises exchanged in the Relocation Agreements, Defendants received over four decades a revenue stream of many millions of dollars. *See* Exh. 2, at ¶7. For example, in the last five years alone, Defendants have received more than $65 million in payments from PCS, excluding fees paid to Defendants by third party shippers and a third party carrier that also operates over the Lee Creek Rail Line. *Id.* The Parties executed the

Relocation Agreements, had them notarized, and then recorded them with the Beaufort County Register of Deeds.  *See* Exhs. 4 through 8.

      **C.**    **PCS Determines That Relocation of the Lee Creek Rail Line Is Necessary for Continuing Mining and Processing Operations at the Aurora Facility.**

PCS' ability to mine at the Aurora Facility requires permits and approvals from various federal and state agencies.  Exh. 1, at ¶6.  The permits that currently authorize PCS mining operations expressly authorize mining the phosphate reserves located below a portion of the Lee Creek Rail Line and surrounding areas.  *Id.*

By 1999, PCS had begun conducting preliminary studies regarding additional mining reserves accessible at the Aurora Facility.  *Id.* at ¶7.  PCS confirmed from those studies that the Lee Creek Rail Line impairs recovery of phosphate ore and would interfere with the mining operations at the Aurora Facility if Defendants did not relocate the Line by mid-2007.  *Id.*  PCS also concluded that to avoid interruption of PCS operations, it would be necessary to begin relocating the Lee Creek Rail Line by early 2005.  *Id.*

On April 28, 1999, H. Michael Breza, PCS' Mine Manager, and Robert M. Chiles, PCS' engineering contractor, met with Defendants' System Engineer and other representatives.  *Id.* at ¶8; Letter from H. Michael Breza, attached as Exh. 10.  PCS informed Defendants of the progress of PCS' mine plan and of the need to relocate the Lee Creek Rail Line by 2006.  *Id.* at ¶10.  In that meeting, PCS provided plans for a proposed relocated rail line.  In a subsequent letter, Mr. Breza wrote:

> Although the actual construction of the railroad relocation is several years in the future, our meeting of yesterday was important in order to allow both of our companies to include this need for railway relocation in our business planning.  The information you provided during our meeting will allow PCS Phosphate to proceed with mine pit layout to best accommodate the future

6

railway relocation. PCS Phosphate will provide your office with details of this
design as the planning is finalized.

*Id.* The information Defendants provided included Defendants' specifications for railroad
construction. Exh. 1, at ¶8.

Between 1999 and 2001, PCS conducted an exhaustive study to allow PCS to prepare
a cost-effective and technically sound proposal for relocating the Lee Creek Rail Line. PCS
considered various alternatives for relocating the rail line. *Id.* at ¶9. After considering
information from the North Carolina Department of Transportation regarding highway
relocation, from Carolina Power & Light regarding power line relocation, and from
Defendants regarding rail line relocation, PCS arrived at a final relocation proposal, which
PCS memorialized in engineering drawings. *Id.*

On July 25, 2002, PCS mine managers and engineers met with Defendants'
representatives at Defendants' regional office in Raleigh. *Id.* at ¶10. PCS explained during
the meeting that relocating the rail line was necessary to allow PCS to continue mining
operations at the Aurora Facility and that PCS expected Defendants to perform their
obligations under the Relocation Agreements. *Id.* PCS provided maps, an aerial photograph,
and engineering drawings of the proposed rail line. *Id.* The Parties agreed to schedule a
subsequent meeting after Defendants had an opportunity to review the specifications and to
revisit the language in the Relocation Agreements. *Id.*

### D. Defendants Admit that the Relocation Agreements are Valid and Enforceable, but Refuse to Perform their Relocation Obligations.

PCS and Defendants reconvened on December 19, 2002 at the PCS Mine Office in
Aurora to discuss the relocation project. Exh. 1, at ¶11. At the meeting, Defendants verbally
acknowledged that the Relocation Agreements were valid and that the financial

RAL 340489v6

responsibility to relocate the railroad belonged to Defendants as outlined in the Relocation Agreements. *Id.* Defendants explained, however, that they did not wish to shoulder the relocation expense and that they wished to explore alternative funding options. *Id.* Defendants claimed that if they failed to identify a viable third party funding source, that Defendants would request that the United States Surface Transportation Board ("STB") allow them to abandon the rail line. *Id.*

The PCS representatives at the meeting were surprised by Defendants' response. *Id.* at ¶12. Because a successful abandonment by Defendants would also preclude the existing third party carrier, CSX, from providing rail service, PCS understood that Defendants' threat, if acted upon and successful, would terminate rail access to the Aurora Facility. *Id.* PCS knew that losing rail access would force PCS to halt or substantially decrease operations at the Aurora Facility. *Id.* A plant shutdown would cause PCS to lose tens of millions of dollars in annual revenues and force PCS to terminate many of its more than 1,000 employees at the Aurora Facility. *Id.*

On September 11, 2003, during a subsequent meeting between the Parties, Defendants' representatives made a presentation flatly admitting that "the old NS agreed to the track relocation language ('**railroad will pay if asked to move**')." *See* September 11, 2003 Presentation, attached as Exh. 11, at NS 0000100 (emphasis added). A subsequent presentation slide states: "[n]o apparent contractual obligation by either PCS or [third party carrier] CSXT to contribute toward the track relocation." *Id.* at NS 0000103.

Tom Brugman, who attended that meeting and whom Defendants identified to testify on behalf of Defendants in response to a 30(b)(6) deposition notice, testified under oath that based on "everything that [he has] heard inside the company," the Relocation Agreements

mean that "[r]ailroad will pay if asked to move." Deposition of Thomas J. Brugman, attached as Exh. 12, at 10. Mr. Brugman also testified as follows:

> Q. …did anybody in this group of people [Defendants' team dealing with PCS regarding the relocation] ever express any doubt that Norfolk Southern had that obligation dating back to 1966 to pay for the relocation?
>
> A. No, I never – I don't think so. They –
>
> Q. So –
>
> A. -- they would – people would turn to Tom Ambler and to Jim Paschall [Defendants' in-house counsel] and say, **'Jim, is there any way out of this?' And I think Jim was pretty clear, 'No, it's pretty airtight.'**
>
> Q. So, there was no doubt about the enforceability of that contract when people are having these discussions?
>
> A. Yep.
>
> Q. So, why are we having to litigate it?
>
> A. Because people are people and they get stubborn and they don't want to cooperate.

Exh. 12, at 166-67 (emphasis added). *See also id.* at 49 ("I agree that there was consensus on the 1966 agreement and the way it worked and the way it committed NS"). As Mr. Brugman testified, "We'd like it to go away, but no, we're not disputing it." *Id.* at 74.

In response to questions regarding another presentation he and other representatives of Defendants made to PCS, Mr. Brugman testified as follows:

> Q. First bullet point [of Defendants' presentation] is acknowledging once again that the 1966 relocation obligation exists, correct?
>
> A. Yes.
>
> Q. And like you said earlier, it just wouldn't go away, correct?
>
> A. It would not go away.

Q.      …And again, you were telling PCS that you acknowledged that obligation, correct?

A.      Yes.  Yes, straight-up in the presentation.

*Id.* at 92; July 30, 2004 Presentation, attached as Exh. 13, at 3.

Despite conceding that the Relocation Agreements are valid and enforceable, Defendants explained that they did not wish to allocate their capital expenditures budget to the cost of relocating the rail line.  Exh. 1, at 14.  Defendants took the position that they would not live up to their contractual obligations despite having an annual budget for such capital expenditures exceeding $1.1 billion.  Deposition of Marcellus Kirchner, attached as Exh. 14, at 197.

Defendants likewise have not disputed the fact that PCS' proposal for the relocation of the Lee Creek Rail Line is feasible and the most cost-effective proposal for relocating the rail line.  On March 13, 2003, Defendants wrote in a letter that "[a]s long as it is understood that NSR has made no commitments whatsoever about a track relocation, I am able to write that the route proposed by PCS Phosphate is in general terms acceptable to NSR, although NSR will obviously need to review and approve detailed plans as they become available." *See* Exh. 15.  PCS continued to provide detailed plans from 2003 through the present, and Defendants have never indicated that the route and specifications are unacceptable.  Exh. 1, at ¶16.

In a letter dated November 20, 2003, PCS formally notified Defendants that PCS was invoking the Relocation Agreements.  *See* Exh. 16.  The Parties' subsequent discussions of the Relocation Agreements were not fruitful.  Notwithstanding Defendants' recurring

admissions that they were obligated to perform the relocation, in a letter dated December 16, 2004, Defendants wrote:

> As we discussed at our July and previous meetings, since alternative funding sources have been sought but cannot be found, Norfolk Southern now needs to know if PCS will fund the relocation project. Norfolk Southern cannot economically justify bearing the costs of the relocation project. There is no guarantee, and no apparent likelihood under current rates, traffic levels and traffic commitments, that Norfolk Southern could recover those costs.

Exh. 17.

The Relocation Agreements, however, do not permit Defendants to avoid their obligations to relocate the Lee Creek Rail Line at their expense or to shift the expense of relocating the Lee Creek Rail Line to PCS or any third party. Exh. 11, at NS 0000103; Exhs. 4 through 8. Despite the acknowledged obligations, Defendants reiterated their position on February 11, 2005 that Defendants "cannot justify such a capital investment." Exh. 18.

### E. PCS Begins Relocating the Lee Creek Rail Line to Mitigate Its Damages.

When Defendants refused to relocate the Lee Creek Rail Line, PCS immediately began working to mitigate its damages by relocating the Lee Creek Rail Line at its own expense. Exh. 1, at ¶17. These actions were necessary to minimize any interruption to mining operations, which would cause it to suffer millions of dollars of additional damages. *Id.* As of September 30, 2006, PCS has spent $11,589,318.26 to relocate the rail line. *Id.* at ¶18. PCS has contracted with third parties who will complete the rail relocation project by approximately April 1, 2007 at a cost of $14,449,000. *Id.* In addition, PCS will incur $1.4 million of additional expenses to remove the existing track. Affidavit of Robert M. Chiles, attached as Exh. 27, at ¶4.

RAL 340489v6

Defendants previously represented that $15 to $20 million was a reasonable cost to perform the relocation. *See* Message from S. Eisenach, dated Sept. 25, 2003, attached as Exh. 19, at NS 0000193. Defendants also submitted a sworn statement to the Surface Transportation Board acknowledging that a preliminary cost estimate by PCS of $12,218,929 for relocating the Lee Creek Rail Line "appeared to be of reasonable magnitude" based upon Defendants' "potential project costs utilizing available information, a reasoned assumption of quantities, and NS's typical unit costs." Statement of David Becker, attached as Exh. 20, at 251.

F. **Defendants Threaten to Abandon the Lee Creek Rail Line and Make False Statements to PCS to Coerce PCS to Perform Defendants' Contractual Obligations.**

Defendants first threatened PCS with the prospect of abandonment in December, 2002. Exh. 1, at ¶15. In responding to PCS' request that Defendants bear the cost of relocation, Defendants stated that they would abandon the Lee Creek Rail Line before bearing such an expense. *Id.* at ¶11. Defendants explained to PCS that a successful abandonment by Defendants would not only mean that Defendants would cease providing rail service to PCS, but would also mean that the only other carrier on the line, CSX, would likewise be forced to cease serving the Aurora Facility. In Defendants' words, "rail service could go from 2 to 0." Exh. 11, at NS 0000108; Exh. 1, at ¶12.

Defendants reiterated the abandonment threats during face-to-face meetings and in written correspondence between 2002 and 2005. *See, e.g.*, Exh. 1, at ¶15. As revealed in discovery, Defendants internally characterized their efforts to avoid the relocation obligations as an "abandonment threat" or "exit market threat." *See, e.g.*, Exh. 21, at NS

RAL 340489v6

00000841 ("we have the leverage at this point (the exit market threat) to get an acceptable economic result").  Defendants' corporate representative designated to testify regarding the Parties' meetings acknowledged he used the term "threat" to describe the manner in which his colleagues in the Strategic Planning Department were approaching abandonment.  Exh. 12, at 37-38.  In an e-mail message produced in discovery, Defendants' Director of Strategic Planning wrote:

> the 1966 agreement that the old NS signed commits the rr (now NSR) for the entire cost of the project, including preparatory work, and the 1977 agreement that brought Seaboard into Lee Creek was not tied to the 1966 agreement, so contractually, both PCS and CSX are completely off the hook for any of the cost. That's why we're threatening abandonment unless all three parties contribute.

*See* Exh. 18, at NS 00000193.

Mr. Brugman's sworn testimony confirms that was the reason Defendants had threatened to abandon the rail line:

> Q.    So the threatened abandonment, was it because Norfolk Southern was responsible for the entire cost and the other two parties were not obligated to join in that cost, correct?
>
> A.    Yes, and we felt that we needed help.

Exh. 12, at 47.

Mr. Brugman also testified as follows:

> Q.    In terms of tools, probably the strongest tool that you would have is the threat of abandoning a line, correct?
>
> A.    It wouldn't be a tool from my perspective.  It did give us an advantage in that we could say to PCS, 'Hey, look guys, we've got to turn this around a little bit here to try and, you know, have an opportunity to try and work out some sort of a compromise.'

*****************************

13

Q.      Even though you don't like to use it, it serves as one of those tools, doesn't it?
        I mean, essentially you're painting them into a corner because you have the
        ultimate threat of, 'You're not going to have any line.'

A.      Uh-huh.

Q.      Correct?

A.      Well, the – I guess the railroad is entitled to make a profit.

Q.      …But in terms of the message going to PCS the message was clear in that
        Power Point presentation back in Exhibit Number 1.

A.      Uh-huh.

Q.      Is that the threat is to go from two carriers to zero.

A.      The possibility to go from two carriers to zero, yeah.  Well, I think that was
        mentioned.  Yeah.

Exh. 12, at 68-69.

Defendants routinely litigate abandonment matters before the STB.  *See, e.g.,* Exh.
14, at 39-40.  Defendants' internal abandonment expert testified under oath that Defendants'
subsequent abandonment filing was unusual and unprecedented for several reasons.  *Id.* at
77-78.  First, the Lee Creek Rail Line abandonment has "considerable traffic" compared to a
typical abandonment case.   He also admitted under oath that he is not aware of **any**
abandonment case with the volume of traffic that travels over the Lee Creek Rail Line.
Defendants' expert also testified under oath that he is not aware of any other abandonment
case in which the carrier seeking to abandon realizes profit on the line as Defendants do here.
*Id.* at 45-47.  The same witness conceded that a central premise of the abandonment filing
was an effort by Defendants to avoid having to pay to relocate the rail line.  *Id.* at 85.

Although Defendants' internal abandonment expert knew that the proposed
abandonment proceeding for the Lee Creek Rail Line was unusual and unprecedented,

Defendants nevertheless decided to utilize the abandonment threat to gain advantage over PCS. For example, in high level discussions involving Defendants' current Chief Executive Officer, Wick Moorman, Defendants explained the strategy behind the abandonment threat:

> Sounds like the time for talking is over and we need to go ahead and put the abandonment case together. The next meeting should be a courtesy call to PCS stating that this is the way we are heading. Then we simply do not call anymore and when they ask the status it is "the case is being prepared for filing on X date. **See you in court**."
>
> We had to use this approach on [another abandonment]. Folks did not think that we were serious so we did all the work, then made the rounds with the very impressive filing and said "we are willing to talk for another month, then we file." It was only then that we really got their attention. **While our case was far from airtight, it looked impressive enough to get folks to the table**.

Message from J. McClellan, dated Oct. 30, 2003, attached as Exh. 22 (emphasis added).

In addition to utilizing the abandonment threat as a tool to pressure PCS into giving up contractual rights, Defendants falsely represented to PCS that Defendants' rail traffic along the Lee Creek Rail Line was unprofitable. For example, in correspondence reiterating Defendants' abandonment threats, Defendants' executives stated that "I hope to hear from you that PCS will fund the relocation, and when I do, I will stop the abandonment process **even though Norfolk Southern operates the line at a loss**." *See* Exh. 18 (emphasis added). In fact, Norfolk Southern was not operating the Lee Creek Rail Line at a loss. As revealed in Defendants' filings with the STB and the sworn testimony of Defendants' representatives and expert, Defendants operate the Lee Creek Rail Line at a substantial profit. *See, e.g.,* Exh. 12, at 142-43 ("McQuade's statement that 'Norfolk Southern operates the line at a loss'"

"might seem a bit out of line with what we were looking at earlier"); Exh. 14, at 204-05 (McQuade's statement that NS operates the line at a loss is inconsistent with the abandonment application that NS subsequently filed); Deposition of B. Fisher, attached as Exh. 23, at 11-12 (showing, for example, a 26 percent return on ratio of revenue to variable cost for outgoing traffic).

### G. Defendants File an Abandonment Application, Which the STB Promptly Denies.

Having failed to deter PCS from enforcing the Relocation Agreements with their abandonment threat, on November 17, 2005, Defendants filed an application with the STB to abandon a portion of the Lee Creek Rail Line. Twenty days later, the STB rejected the application on the grounds that the application was substantially incomplete or otherwise defective. *See* Exh. 24. Defendants' internal abandonment expert testified at his deposition that this was the first time Norfolk Southern has received an adverse ruling from the STB in only twenty days. Exh. 14, at 79.

## ARGUMENT

### Standard of Review

Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Although the movant bears the burden of establishing a lack of disputed facts and law, the non-moving party must respond with more than a mere scintilla of evidence to avoid summary judgment. *Anderson*, at 252. Summary judgment is proper unless the non-movant produces evidence

sufficient for a reasonable jury to return a favorable verdict; merely colorable evidence will not preclude summary judgment. *Id*. at 248-50.

## I. PCS IS ENTITLED TO SUMMARY JUDGMENT FOR DEFENDANTS' BREACH OF THE RELOCATION AGREEMENTS.

There is no genuine dispute as to the facts relevant to PCS' breach of contract claim, and PCS is entitled to judgment as a matter of law. Summary judgment should therefore be entered in favor of PCS on that claim.

Only two elements are necessary to prevail on a breach of contract claim: (1) the existence of a valid contract, and (2) a breach of the terms of that contract. *Poor v. Hill*, 138 N.C. App. 19, 530 S.E.2d 838 (2000). As set forth below, there is no genuine issue of material fact as to either of these elements, and PCS is entitled to judgment as a matter of law.

A court may "properly interpret [a] contract as a matter of law and enter summary judgment," when the contract is unambiguous. *World-Wide Rights Limited Partnership v. Combe, Inc.*, 955 F.2d 242, 245 (4th Cir. 1992); *Carolina Place Joint Venture v. Flamers Charburgers, Inc.*, 145 N.C. App. 696, 699, 551 S.E.2d 569, 571 (N.C. Ct. App. 2001) ("[W]here an agreement is clear and unambiguous, no genuine issue of material fact exists and summary judgment is appropriate."). Moreover, "the most fundamental principle of contract construction [is] that the courts must give effect to the plain and unambiguous language of a contract." *Johnston County v. R.N. Rouse & Co.*, 331 N.C. 88, 414 S.E.2d 30, 34 (1992). In doing so, the job of the court is not to make the contract for the parties, but to construe it. *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962).

17

**A.** **The Relocation Agreements Are Valid and Enforceable Contracts, and Defendants' Obligation to Relocate the Lee Creek Rail Line Is Clear and Unambiguous.**

There is no dispute that the Relocation Agreements are genuine, that they represent the mutual assent of the Parties, that they are supported by consideration, and that Defendants have an unambiguous obligation to relocate portions of the Lee Creek Rail Line. Thus, as a matter of law, the Relocation Agreements are valid and enforceable.

Under North Carolina law, to be valid, a contract must be supported by mutual assent between the parties, consideration, and an obligation. *Elliot Bldg Co. v. City of Greensboro*, 190 N.C. 501, 130 S.E. 200, 202 (1925). An exchange of mutual promises generally satisfies both the consideration and obligation elements. *Penley v. Penley*, 314 N.C. 1, 16, 332 S.E.2d 51, 60 (1985). Mutual assent is reflected in the contract itself; if the language of the contract is clear and unambiguous, the court must interpret the contract as written. *Robbins v. C.W. Myers Trading Post, Inc.,* 253 N.C. 474, 117 S.E.2d 438 (1960).

Consideration is presumed if a deed —serving as the contract— states that consideration was paid and received. *Fulcher v. Golden*, 147 N.C. App. 161, 554 S.E.2d 410 (2001). A court "cannot grant relief from a contract merely because it is a hard one." *Durant v. Powell*, 215 N.C. 628, 633, 2 S.E.2d 884 (1939). In fact, "the slightest consideration is sufficient to support the most onerous obligation." *Young v. Board of Comm'rs of Johnston County*, 190 N.C. 52, 57, 128 S.E. 410 (1925).

The five Relocation Agreements set out clearly the obligations of the Parties. The Relocation Agreements grant Defendants easements and rights of way "for railroad purposes" over land that is described in the Agreements and shown in surveys and drawings

included in the Agreements. *See* Exhs. 4-8. The Relocation Agreements reflect mutual promises exchanged between the Parties as consideration for the Agreements. *Id.* Moreover, the Relocation Agreements state that "consideration of Ten Dollars ($10.00) and other good and valuable consideration [was] paid by" Defendants. *Id.* The Relocation Agreements reflect the signatures of each party to the Agreements. *Id.* The Relocation Agreements reflect that they have been recorded with the Beaufort County Register of Deeds. *Id.*

Although there are some differences in the language used in each Agreement, the operative relocation language in each Agreement could not be more clear. Each Agreement contains provisions requiring that the easement grantee, Norfolk Southern Railway Company, relocate the right of way and easement at Norfolk Southern Railway Company's sole expense if the grantors determine "that all or any part of said right of way and easement interferes with its anticipated mining or processing operations in the Beaufort County, North Carolina area." *Id.*

Defendants have admitted that the Agreements are genuine. Answer, at Paragraph 16. Defendants have admitted that Defendant Norfolk Southern Railway Corporation is "a successor to the interests, rights and liabilities of a former railroad company known during 1965 and 1966 as Norfolk Southern Railway Company and referred to by Plaintiff as Grantee Railroad Company." Answer, at Paragraph 4. Defendants have admitted that the Parties "executed, notarized, and recorded" the Relocation Agreements with the Beaufort County Register of Deeds. *Id.* at 23. Under North Carolina law, the parties' execution of an agreement manifests the mutual assent of the parties to the terms of the signed agreement. *See, e.g., Thomco Realty, Inc. v. Helms*, 107 N.C.App. 224, 228, 418 S.E.2d 834, 837 (1992) ("an essential contractual term, mutual assent, is evidenced by the signatures of defendants").

19

Defendants claim in their Answer that they dispute that the Relocation Agreements do not reflect a meeting of the minds between the Parties and are not supported by valid consideration. However, following more than a year of discovery, Defendants have presented no evidence to support their contentions.

Rather, Defendants concede in their Answer that "the [Relocation Agreements] in their entirety speak for themselves." Answer, at ¶52. Also, PCS served an interrogatory requesting that Defendant "[i]dentify each person who may have personal knowledge regarding the drafting and formation of the Relocation Agreements, and summarize the knowledge of each such person." *See* Exh. 25, at Interrogatory No. 7. Defendants responded that "Defendant knows of no one currently alive who would have such information." *Id.* PCS also served a 30(b)(6) deposition notice requesting that Defendant Norfolk Southern Railway Company identify a corporate representative to testify regarding "[a]ll matters relating to the Relocation Agreements (as defined in the Complaint), including the authenticity of the Relocation Agreements and the consideration the parties paid in connection with entering into the Relocation Agreements." Exh. 26. Defendants, however, declined to offer a witness on this subject because they do not have a witness knowledgeable concerning such matters. Thus, Defendants have adduced no evidence that the Relocation Agreements do not reflect the mutual assent of the Parties and are not supported by consideration.

Moreover, discovery demonstrates overwhelmingly that Defendants do not truly dispute the enforceability of the Relocation Agreements. The corporate representative Defendants identified to testify on their behalf testified unequivocally that based on "everything that [he has] heard inside the company," the Relocation Agreements mean that

"[r]ailroad will pay if asked to move." Exh. 12, at 10. Mr. Brugman also testified as follows:

> Q. …did anybody in this group of people [Defendants' team dealing with PCS regarding the relocation] ever express any doubt that Norfolk Southern had that obligation dating back to 1966 to pay for the relocation?
>
> A. No, I never – I don't think so. They –
>
> Q. So –
>
> A. -- they would – people would turn to Tom Ambler and to Jim Paschal [Defendants' in-house counsel] and say, 'Jim, is there any way out of this?' And I think Jim was pretty clear, 'No, it's pretty airtight.'
>
> Q. So, there was no doubt about the enforceability of that contract when people are having these discussions?
>
> A. Yep.
>
> Q. So, why are we having to litigate it?
>
> A. Because people are people and they get stubborn and they don't want to cooperate.

*Id.* at 166-67. See also *id.* at 49 ("I agree that there was consensus on the 1966 agreement and the way it worked and the way it committed NS"). As Mr. Brugman testified, "We would like it to go away, but no, we're not disputing it." *Id.* at 74.

Because Defendants designated Mr. Brugman to testify regarding these matters, his testimony is binding on them. *See, e.g., United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) ("testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the corporation…The designated witness is 'speaking for the corporation.'")

Thus, the record clearly demonstrates that there is no genuine issue of fact as to the validity and enforceability of the Relocation Agreements.

**B. Defendants Have Breached Their Obligations Under the Relocation Agreements.**

The record is equally clear and undisputed that Defendants have breached their obligations under the Relocation Agreements.

Under North Carolina law, a party's failure to perform on a contract when it becomes due constitutes a breach. *See, e.g., Millis Construction Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C.App. 506, 510, 358 S.E.2d 566, 569 (1987). Likewise, a party's communication to another party that it will not perform a contractual obligation constitutes a repudiation that gives rise to liability. *Id.* Repudiation is "a positive statement by one party to the other party indicating that he will not or cannot perform his contractual duties." *Id.* Where, as here, a party to a contract states that he cannot perform except on a condition that is outside the contract's terms, the statement constitutes a repudiation. *Id. See also Messer v. Laurel Hill Assocs.*, 93 N.C.App. 439, 443, 378 S.E.2d 220, 223 (1989) ("When the promisor to an executory agreement for the performance of an act in the future renounces its duty under the agreement and declares its intention not to perform it, the promisee may treat the renunciation as a breach and sue at once for damages").

Following a series of studies regarding PCS' mine advance, PCS determined that Defendants' rights of way and easements will interfere with PCS' anticipated mining operations by 2007. Exh. 1, at ¶7. PCS therefore concluded that it would be necessary to remove and relocate portions of the existing Lee Creek Rail Line no later than 2007. *Id.* PCS then provided notice of its intent to invoke the Relocation Agreements in 2002 in face-to-face meetings and other communications. *See, e.g., id.* at ¶¶10-11. PCS then formally

invoked the Relocation Agreements on November 20, 2003. *See* Exh. 16. Defendants, however, without any legal or proper basis to do so refused to perform the relocation project and communicated unequivocally that they would not perform. In the words of Defendants' corporate representative, the only reason PCS is having to litigate this dispute is "[b]ecause people are people and they get stubborn and they don't want to cooperate." Exh. 12, at 167.

Defendants have adduced no evidence that they have performed their obligations or that their breach is otherwise excused. Therefore, PCS is entitled to summary judgment.

### C.     PCS is Entitled to Damages of $15,849,000 as a Matter of Law.[2]

In a breach of contract case, "the injured party is to be placed in as near the position he or she would have occupied absent the breach." *Coble v. Richardson Corp. of Greensboro*, 71 N.C.App. 511, 517, 322 S.E.2d 817, 822 (1984). Thus, "the injured party is to be compensated 'for the loss which fulfillment of the contract could have prevented or the breach of it has entailed.'" *Id.* at 518, 322 S.E.2d at 822 (quoting *Norwood v. Carter*, 242 N.C. 152, 155, 87 S.E.2d 2, 4 (1955)). Damages may be awarded on summary judgment "where the moving party sufficiently establishes by competent documents that a liquidated amount is owing him, and the opposing party fails to show facts which dispute that evidence." *Frank H. Conner Co. v. Spanish Inns Charlotte, Ltd.*, 294 N.C. 661, 678, 242 S.E.2d 785, 795 (1978) (awarding damages on summary judgment where moving party submitted certified document that sum certain was due under terms of contract and where non-moving party could not dispute such evidence).

---

[2] PCS expressly reserves the right to seek additional damages, including consequential damages and lost profits, should Defendants' continuing breach subsequently force PCS to shut down its operations or suffer other consequential harm.

Here, Defendants have refused to relocate the Lee Creek Rail Line in breach of their contractual obligations to do so. Without relocating the existing rail line, PCS would be forced to cease or significantly reduce operations at the Aurora Facility at a cost of many millions of dollars. PCS has instead mitigated much greater harm by constructing a new rail line at its own expense. To date, PCS has spent $11,589,318.26 to relocate the rail line. On or before April 1, 2007, PCS will spend a total of $15,849,000 to complete the relocation. *See* Exh. 1, at ¶¶17-18; Exh. 27, at ¶4.

Defendants have adduced no evidence to contradict that PCS will in fact spend $15,849,000 to relocate the Lee Creek Rail Line. In fact, Defendants internally estimated that a reasonable cost for the relocation project would likely range between $15 million and $20 million if Defendants were forced to perform the relocation project themselves. *See* Exh. 19.

There is no triable issue as to the quantity of PCS' damages for breach of contract. PCS is therefore entitled to summary judgment on the breach of contract claim and damages in the amount of $15,849,000.

## II. PCS IS ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF REAL COVENANT CLAIM.

PCS is entitled to summary judgment on the real covenant claim alleged in the Complaint because there is no genuine issue of fact as to the elements of that claim, and PCS is entitled to judgment as a matter of law.

To prevail on a breach of real covenant claim, the owner of the dominant estate must establish that an enforceable real covenant exists and that the covenant has been breached to the detriment of the dominant estate. *See Runyon v. Paley*, 331 N.C. 293, 299, 416 S.E.2d

RAL 340489v6

177, 183 (1992). The remedies available to the dominant estate for breach of a real covenant include monetary damages. *See Runyon*, 331 N.C. at 299, 416 S.E.2d at 183 (1992). The measure of damages for breach of a real covenant are determined in the same manner as damages for breach of contract. *See Norwood v. Carter*, 242 N.C. 152, 155, 87 S.E.2d 2, 4 (1955).

North Carolina law recognizes that establishing breach of a real covenant follows the same analysis as a breach of contract claim. *See Karner v. Roy White Flowers Inc.*, 351 N.C. 433, 527 S.E.2d 40 (2000) ("The court will enforce [a covenant's] restrictions and prohibitions to the same extent that it would lend judicial sanction to any other valid contractual relationship."); *Higdon v. Davis*, 315 N.C. 208, 213, 337, S.E.2d 543, 548 (1985) ("An easement deed…is, of course, a contract.").

PCS is entitled to summary judgment on the breach of real covenant claim for all the reasons PCS established in Section I above that Defendants have breached their contractual obligations as a matter of law. The only remaining issue with respect to the breach of real covenant claim is to demonstrate that the relocation provision is an enforceable real covenant.

To establish that the relocation covenant is enforceable, PCS must show that (1) PCS and Norfolk Southern are successors in interest to the original Relocation Agreements that created the relocation covenant and (2) the relocation covenant in the Relocation Agreements runs with the land. *See Starmount Co. v. Greensboro Mem. Park*, 233 N.C. 613, 65 S.E.2d 134 (1951); *Runyon v. Paley*, 331 N.C. 293, 299-300, 416 S.E.2d 177, 183 (1992). There is no genuine dispute of fact regarding either of these issues.

25

### A. PCS and Defendants are Successors in Interest to the Original Parties to the Deeds of Easement.

PCS and Defendants are successors in interest of the original parties to the Deeds of Easement. The original parties to the Deeds of Easement were Norfolk Southern Railway Company, Texas Gulf Sulphur Company ("TGS") and North Carolina Phosphate Corporation ("NCPC"). PCS is a successor in interest to TGS and NCPC. In 1985, TGS and NCPC merged and became known as Texasgulf, Inc. Potash Corporation of Saskatchewan subsequently acquired Texasgulf, Inc., which then changed its name to PCS in 1995. *See* Exh. 1, at ¶4. Defendants have admitted that they are without knowledge regarding this issue, and therefore they cannot controvert these undisputed facts. Answer, at Paragraph 10. Thus, PCS is the successor in interest and owner of the dominant estate under the Relocation Agreements.

Defendant Norfolk Southern Railway Company, Inc. ("Defendant NSR") admits that it is a successor in interest to the former Norfolk Southern Railway Company. Answer, at Paragraph 2. Thus, there is no disputed issue that PCS and Defendants are the successors in interest to the original parties to the Deeds of Easement.

### B. The Relocation Covenant in the Relocation Agreements Runs with the Land.

To show that the relocation covenant runs with the land, PCS must show that (1) the covenant touches and concerns the land, (2) there is privity of estate between the parties, and (3) the original covenanting parties intended the benefits and burdens of the covenant to run with the land. *Runyon v. Paley*, 331 N.C. 293, 299-300, 416 S.E.2d 177, 183 (1992). This test applies whether the covenant is an affirmative covenant, such as the relocation covenant, or a negative covenant, such as a restrictive covenant. *See Raintree Corp. v. Rowe*, 38 N.C.

RAL 340489v6

App. 664, 669-70, 248 S.E.2d 904, 908 (1978). There is no genuine issue of fact as to any of these elements, and thus the relocation covenant runs with the land.

### 1. The Relocation Covenant Touches and Concerns the Land.

To touch and concern the land, the object of the covenant must be annexed to, inherent in, or connected with, land or other real property or related to the land granted or demised. *See Raintree Corp. v. Rowe*, 38 N.C. App. 664, 669-70, 248 S.E.2d 904, 908 (1978). Where a party establishes that a covenant impacts the legal rights or economic interests in land, the covenant touches and concerns the land and is enforceable. *Runyon v. Paley*, 331 N.C. 293, 300, 416 S.E.2d 177, 183 (1992) (citing 7 George W. Thompson, *Commentaries on the Modern Law of Real Property* § 3155, at 84 (1962)).

The relocation covenant touches and concerns the land. The consideration PCS' predecessors received when they entered into the Relocation Agreements with Defendants' predecessors in interest included the condition that the railroad would relocate the railroad facilities on the granted easements when requested to do so to permit the grantors to mine the land beneath the rail line. *See* Exhs. 4-8. This express condition inextricably linked the intended long-term use of the land by the easement grantors and their successors in interest to the performance by the railroad. Defendants' breach of that promise impaired PCS' economic interests as owner of the encumbered land and PCS' legal right to use its own property as the Parties contemplated at the time they entered into the Relocation Agreements. Thus, it is undisputed that the relocation covenants touch and concern the land.

### 2. Privity Exists Between the Parties.

For a covenant to run with the land, there must be privity of estate between the party who wishes to enforce the covenant and the party against whom enforcement is sought. Both

vertical and horizontal privity must be shown. Vertical privity requires a showing of a succession in interest between the original covenanting parties and the current owners. *See id.* at 302-03, 416 S.E.2d at 184. In this case, vertical privity exists between PCS and Defendants as demonstrated by Defendants' admission that it is a successor in interest to the original easement grantees and by PCS' uncontroverted evidence that PCS is the successor in interest to the original easement grantors. Answer, at Paragraph 10; Exh. 1, at ¶4.

To establish horizontal privity, it is only necessary to show that there was some connection of interest between the original covenanting parties, such as a conveyance of an estate in land. *See Runyon*, 331 N.C. at 303, 416 S.E.2d at 184-85. The Relocation Agreements represent a conveyance of an easement, which is an estate in land, between the predecessors in interest of PCS and Defendants, which establishes horizontal privity.

### 3. The Parties Intended for the Relocation Covenant to Run with the Land.

To establish that a covenant runs with the land, the original covenanting parties must have intended for the benefits and burdens of the covenant to run with the land and to be enforceable by a successor in interest. The original parties' intent is ascertained by examining the language of the deed creating the covenant. *Id.* at 305, 416 S.E.2d at 186. When the language is clear and unambiguous, its terms are to be taken in their plain, ordinary and popular sense, and effect must be given to those terms. *Higdon v. Davis*, 315 N.C. 208, 213, 337, S.E.2d 543, 548 (1985).

The plain language of the Relocation Agreements clearly indicates that the parties to the Relocation Agreements acknowledged that the relocation covenant would not be exercised until many years in the future and would be enforceable by and against their

successors in interest. The Relocation Agreements expressly provide that the relocation covenant may not be exercised until at least ten (10) years after the effective date of the agreements. The Relocation Agreements also set out that the purpose of the relocation covenant is to relocate the rail line built pursuant to the agreement to avoid interference with the PCS' "anticipated mining or processing operations," which are, by their very nature, long-term enterprises. Exhs. 4-8.

### C.   There is No Triable Issue as to Breach or Damages.

As demonstrated in Section I above, Defendants have breached their obligations under the Relocation Agreements, and PCS has been damaged in the amount of $15,849,000. Thus, for the same reasons that PCS is entitled to judgment as a matter of law for breach of contract, PCS is likewise entitled to judgment as a matter of law for breach of the relocation covenants.

### CONCLUSION

Defendants entered into valid agreements and easement covenants, which obligated them to relocate a portion of the Lee Creek Rail Line. Defendants have breached those obligations. PCS' out-of-pocket cost to relocate is not disputed. PCS therefore requests that the Court enter summary judgment in favor of PCS and against Defendants on PCS' breach of contract and breach of deed covenant claims as to liability and award damages in the amount of $15,849,000.

PCS requests that the Court schedule the trial of this matter as to PCS' other claims, including its claim for Defendants' violation of the North Carolina Unfair and Deceptive Trade Practices Act, which supports treble damages and attorneys' fees in favor of PCS Phosphate Company, Inc.

This the  16th  day of October, 2006.

By:      /s/ Charles E. Raynal, IV
         R. Bruce Thompson II
         N.C. State Bar No. 21468
         Jeffrey A. Bandini
         N.C. State Bar No. 24923
         Charles E. Raynal, IV
         N.C. State Bar No. 32310
         PARKER POE ADAMS & BERNSTEIN, L.L.P.
         150 Fayetteville Street Mall, Suite 1400
         Post Office Box 389
         Raleigh, North Carolina  27602-0389
         Telephone: (919) 828-0564
         Facsimile:   (919) 834-4564

         **Attorneys for Plaintiff PCS Phosphate, Inc.**

30

# CERTIFICATE OF SERVICE

I, Charles E. Raynal IV, hereby certify that a copy of the foregoing **PLAINTIFF PCS PHOSPHATE COMPANY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** on all parties to this action by United States mail, addressed as follows:

> Odes L. Stroupe, Jr.
> John S. Byrd, II
> Bode, Call & Stroupe, L.L.P.
> Post Office Box 6338
> Raleigh, North Carolina  27628-6338

This the 16th day of October, 2006.

By:  /s/ Charles E. Raynal, IV
R. Bruce Thompson II
N.C. State Bar No. 21468
Jeffrey A. Bandini
N.C. State Bar No. 24923
Charles E. Raynal, IV
N.C. State Bar No. 32310
PARKER POE ADAMS & BERNSTEIN, L.L.P.
150 Fayetteville Street Mall, Suite 1400
Post Office Box 389
Raleigh, North Carolina  27602-0389
Telephone: (919) 828-0564
Facsimile:  (919) 834-4564

**Attorneys for Plaintiff PCS Phosphate, Inc.**