IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil Action No. 4:05-CV-55-D

PCS PHOSPHATE COMPANY INC.,      )
                                 )
                Plaintiff,       )
                                 )
        v.                       )      **PCS PHOSPHATE COMPANY'S**
                                 )      **MEMORANDUM OF LAW IN**
                                 )      **OPPOSITION TO NORFOLK**
NORFOLK SOUTHERN CORP. AND       )      **SOUTHERN RAILWAY COMPANY,**
NORFOLK SOUTHERN RAILWAY         )      **INC.'S MOTION FOR SUMMARY**
COMPANY, INC.,                   )      **JUDGMENT**
                Defendants.      )

Defendant Norfolk Southern Railway Company, Inc.'s ("NSRC") motion for summary judgment should be denied because:

- **This court is the proper forum to litigate the contractual obligations.**

- **Real covenants without specific limitation as to duration are enforceable.**

- **Even if a "reasonable time" limitation applies, enforcing the agreements today is well within the time reasonably contemplated by the parties.**

- **The Rule Against Perpetuities does not apply in this case.**

- **The doctrine of laches does not apply here.**

- **Defendants utilized a sham abandonment proceeding to coerce PCS into surrendering its contractual rights.**

There are numerous genuine issues of material fact that preclude entry of judgment in favor of NSRC. Norfolk Southern Corporation ("NS Corporation") also purports to incorporate NSRC's summary judgment arguments into NS Corporation's motion to dismiss and alternative motion for summary judgment. NS Corporation's motion for summary judgment should be denied as well.

## NATURE OF THE CASE

Plaintiff PCS Phosphate Company, Inc. ("PCS") owns and operates the world's largest phosphate mine near Aurora, North Carolina (the "Aurora Facility"). In 1965 and 1966, Defendants'

predecessors in interest obtained easements to construct rail lines across PCS property to serve the Aurora Facility. In obtaining the easements, Defendants entered five Deeds of Easement (the "Relocation Agreements"), which require Defendants to relocate a portion of the rail line at Defendants' sole expense to allow mining to continue through the railroad right of way.

PCS invoked the Relocation Agreements in 2003 so that it could continue mining operations under and beyond the existing track. Defendants have admitted that the Relocation Agreements are valid and enforceable, but have simply decided not to perform their obligations. Defendants also retaliated with baseless threats to terminate rail access to the Aurora facility and made false statements regarding financial performance of the rail line. Defendants intended for their threats, misrepresentations and a filing before the Surface Transportation Board to coerce PCS into abandoning its rights. Defendants succeeded at great cost to PCS, which has now substantially completed the relocation at its own expense.

PCS seeks damages for breach of contract, breach of covenant, violations of the North Carolina Unfair and Deceptive Trade Practices Act and unjust enrichment.

## STATEMENT OF FACTS

### A. PCS Operates Phosphate Mine Relying on Defendants' Rail Service For Forty Years.

The Aurora Facility consists of mining and processing operations situated on 70,000 acres of land in Beaufort County, North Carolina formerly owned by Texas Gulf Sulphur Company ("TGS") and North Carolina Phosphate Corporation ("NCPC"). *See* Aff. of I.K. "Tex" Gilmore, attached as Exh. 1, at ¶¶3-4. PCS is the successor in interest to both TGS and NCPC.[1] *Id.*

From the 1960s to the present, the Aurora Facility has relied mainly on rail access for the transportation of raw materials and products. *Id.* at ¶5. The Aurora Facility utilizes rail to ship and receive more than 2 million tons of raw materials and products annually. *See* Aff. of K. Schniering,

---

[1] As used in this Memorandum of Law, references to PCS shall mean PCS Phosphate Company, Inc., including PCS' predecessors in interest TGS and NCPC.

attached as Exh. 2, at ¶6. Defendants received almost $16 million in revenues for traffic to and from the Aurora Facility for calendar year 2004. Answer, at ¶13.

**B.** **Defendants Negotiate Relocation Agreements with PCS.**

In 1963, Defendants' predecessors in interest filed with the Interstate Commerce Commission (the "ICC") a Request for Authorization to construct and operate a rail line to serve the Aurora Facility. *See* ICC Report, attached as Exh. 3. In 1964, the ICC entered an Order providing that the "public convenience and necessity require construction and operation by the Norfolk Southern Railroad Company of a line of railroad in Beaufort County, N.C." *Id.* at 30.

Based on submissions by Defendants' predecessor and others, the ICC observed in its Order that the initial plan for the Aurora Facility was "extensive phosphate producing activity," which would initially produce 3 million net tons of phosphate rock annually. *Id.* at 2. The ICC also found that between two and three billion tons of recoverable phosphate ore resided in the immediate vicinity of the Aurora Facility. *Id.* at 6. Thus, as of 1964, at a recovery rate of 3 million tons annually, the ICC and Defendants' predecessors in interest recognized that phosphate recovery would continue for several decades and possibly more than 100 years.

After obtaining ICC approval, Defendants negotiated the right to construct a rail line over PCS land to the Aurora Facility (the "Lee Creek Rail Line"). PCS required that as an express condition to Defendants obtaining rail line easements and constructing the line, Defendants agree to relocate the rail line at Defendants' sole expense when the easement interfered with anticipated mining operations. *See* Exhs. 4 - 8. Defendants agreed that they would relocate the rail line in five Deeds of Easement. Each addresses a different segment of the rail line and contains a relocation obligation. *See id.*

As evidenced by a contemporaneous letter from Defendants' counsel, Defendants knew at the time they entered into the Relocation Agreements that the relocation would not be necessary for many years. *See* Letter from J. Sims, attached as Exh. 9, at 3. Defendants' counsel wrote, "[w]ith reference to

3

the changing of the last part of the relocation paragraphs, we pointed out that **in all likelihood the relocation ... will be at some distant time in the future**." *Id.* (emphasis added).

The first two Relocation Agreements, dated June 29, 1965, contain the following provision:

> If, after ten (10) years from the date of this instrument, either Grantor determines that all or any part of said right of way and easement interferes with its anticipated mining or processing operations in the Beaufort County, North Carolina area, then said Grantor shall notify Grantee in writing of its desire that the right of way and track be moved, specifying in said notice the date on which it requires said track to be relocated which date shall not be less than one year from the date of said notice and designating in the notice a new location for the right of way and relocation of the said track, and Grantors shall provide Grantee with a right of way and easement over said new location **and Grantee at its expense shall relocate the said track on the said new right of way**; provided, however, that the new location for the right of way and relocation of said track shall be determined by engineering representatives of Grantors and Grantee and shall be over such land as will provide a track subgrade elevation between elevations nine feet and thirteen feet above mean sea level, and be such land as will avoid excessive curvature, grade and distances for the relocated track.

Exhs. 4 and 5, ¶ (1) (emphasis added).

A subsequent Relocation Agreement, dated October 12, 1965, provides that PCS may request that Defendants relocate the rail line if PCS "determines that all or any part of said right of way and easement interferes with its anticipated mining or processing operations..." Exh. 6, at ¶ (1). In the event that PCS provides "written notice indicating that [PCS] ... has elected to proceed with relocation ... **[PCS] shall provide [the Defendants] with a 60 feet right of way and easement over said new location and [the Defendants], at [their] expense, shall within one year relocate the said track on the said new right of way.**" *Id.* (emphasis added).

In drafting the Relocation Agreements, Defendants included provisions to limit the expense of relocating the rail line, such as restricting the curvature, grade, and distance of the relocated rail line. *See* Exh. 9, at 3. The Parties executed the Relocation Agreements and recorded them with the Beaufort County Register of Deeds. *See* Exhs. 4 through 8.

In addition to receiving an easement over which Defendants agreed to construct a rail line and other promises exchanged in the Relocation Agreements, Defendants received a revenue stream of many

4

millions of dollars over four decades. *See* Exh. 2, at ¶7. For example, in the last five years alone, Defendants have received more than $65 million in payments from PCS, excluding fees paid to Defendants by third party shippers and a third party carrier that also operates over the Line. *Id.*

### C. PCS Determines That Relocation of the Lee Creek Rail Line Is Necessary for Continuing Mining and Processing Operations at the Aurora Facility.

By 1999, PCS had begun conducting studies regarding mining reserves accessible at the Aurora Facility. *Id.* at ¶7. PCS confirmed from the studies that the Lee Creek Rail Line impairs recovery of phosphate ore and would interfere with the mining operations at the Aurora Facility if Defendants did not relocate the Line by mid-2007. *Id.* PCS concluded that to avoid interruption of operations, it would be necessary to begin relocating the Lee Creek Rail Line by 2005. *Id.*

Between 1999 and 2001, PCS conducted studies to allow it to prepare a cost-effective and technically sound proposal for relocating the Lee Creek Rail Line. *Id.* at ¶9. After meeting with Defendants in 1999 and after considering information that Defendants provided regarding the relocation, PCS prepared engineering drawings and a final relocation proposal. *Id.*

On July 25, 2002, PCS representatives met with Defendants at Defendants' Raleigh office. *Id.* at ¶10. PCS explained during the meeting that relocating the rail line was necessary for PCS to continue mining operations and that PCS expected Defendants to perform the relocation. *Id.* PCS engineering drawings and other materials for the proposed relocated rail line. *Id.* The Parties agreed to schedule a subsequent meeting after Defendants reviewed the specifications. *Id.*

### D. Defendants Admit that the Relocation Agreements are Valid and Enforceable, but Refuse to Perform their Relocation Obligations.

PCS and Defendants reconvened on December 19, 2002, in Aurora to discuss the relocation project. Exh. 1, at ¶11. At the meeting, Defendants acknowledged that the Relocation Agreements were valid and that the financial responsibility to relocate the railroad belonged to Defendants as outlined in the Relocation Agreements. *Id.* Defendants explained, however, that they did not wish to shoulder the relocation expense and that they wished to explore alternative funding options. *Id.* Defendants claimed

5

that if they failed to identify a viable third party funding source, they would request that the U. S. Surface Transportation Board ("STB") allow them to abandon the rail line. *Id.*

The PCS representatives at the meeting were surprised by Defendants' response. *Id.* at ¶12. Because a successful abandonment would also preclude the existing third party carrier, CSX, from providing service, PCS understood that Defendants' threat, if acted upon and successful, would terminate rail access to the Aurora Facility. *Id.* Losing rail access would force PCS to halt or substantially decrease operations. *Id.* A plant shutdown would cause PCS to lose many millions of dollars in annual revenues and force PCS to terminate many of its more than 1,000 employees. *Id.*

On September 11, 2003, during a subsequent meeting, Defendants' representatives made a presentation flatly admitting that "the old NS agreed to the track relocation language ('railroad will pay if asked to move')." *See* September 11, 2003 Presentation, attached as Exh. 10, at NS 0000100. A subsequent presentation slide states: "[n]o apparent contractual obligation by either PCS or [third party carrier] CSXT to contribute toward the track relocation." *Id.* at NS 0000103.

Tom Brugman, who attended that meeting and whom Defendants proffered in response to a 30(b)(6) deposition notice, testified that based on "everything that [he has] heard inside the company," the Relocation Agreements mean that "[r]ailroad will pay if asked to move." Dep. of T. Brugman, attached as Exh. 11, at 10. Mr. Brugman also testified as follows:

> Q.   …did anybody in this group of people [Defendants' team dealing with PCS regarding the relocation] ever express any doubt that Norfolk Southern had that obligation dating back to 1966 to pay for the relocation?
>
> A.   No, I never – I don't think so. They –
>
> Q.   So –
>
> A.   -- they would – people would turn to Tom Ambler and to Jim Paschall [Defendants' in-house counsel] and say, **'Jim, is there any way out of this?' And I think Jim was pretty clear, 'No, it's pretty airtight.'**
>
> Q.   So, there was no doubt about the enforceability of that contract when people are having these discussions?

6

A.    Yep.

Q.    So, why are we having to litigate it?

A.    Because people are people and they get stubborn and they don't want to cooperate.

Exh. 11, at 166-67 (emphasis added). *See also id.* at 49 ("I agree that there was consensus on the 1966

agreement and the way it worked and the way it committed NS"). As Mr. Brugman testified, "We'd

like it to go away, but no, we're not disputing it." *Id.* at 74.

Despite conceding that the Relocation Agreements are valid and enforceable, Defendants

explained that they did not wish to allocate their capital expenditures budget to the cost of relocating the

rail line. Exh. 1, at 14. Defendants took the position that they would not live up to their contractual

obligations despite having an annual budget for such capital expenditures exceeding $1.1 billion. *See*

Dep. of M. Kirchner, attached as Exh. 12, at 197.

Defendants have not disputed the fact that PCS' proposal for the relocation is feasible and the

most cost-effective proposal for relocating the rail line. On March 13, 2003, Defendants acknowledged

that "the route proposed by PCS Phosphate is in general terms acceptable to NSR, although NSR will

obviously need to review and approve detailed plans as they become available." *See* Exh. 13. PCS

continued to provide detailed plans from 2003 through the present, and Defendants have never indicated

that the route and specifications are unacceptable. Exh. 1, at ¶16.

In a letter dated November 20, 2003, PCS formally notified Defendants that PCS was invoking

the Relocation Agreements. *See* Exh. 14. The Parties' subsequent discussions of the Relocation

Agreements were not fruitful. On December 16, 2004, Defendants wrote:

> As we discussed at our July and previous meetings, since alternative funding sources
> have been sought but cannot be found, Norfolk Southern now needs to know if PCS will
> fund the relocation project. Norfolk Southern cannot economically justify bearing the
> costs of the relocation project. There is no guarantee, and no apparent likelihood under
> current rates, traffic levels and traffic commitments, that Norfolk Southern could recover
> those costs.

7

*See* Exh. 15. The Relocation Agreements, however, do not permit Defendants to avoid their obligations to relocate the Lee Creek Rail Line at their expense or to shift the expense of relocating the Lee Creek Rail Line to PCS or any third party. Exh. 10, at NS 0000103; Exhs. 4 through 8. Despite the acknowledged obligations, Defendants reiterated their position on February 11, 2005 that Defendants "cannot justify such a capital investment." Exh. 13.

### E. PCS Begins Relocating the Lee Creek Rail Line to Mitigate Its Damages.

When Defendants refused to relocate the Lee Creek Rail Line, PCS immediately began working to mitigate its damages by relocating the Lee Creek Rail Line at its own expense. Exh. 1, at ¶17. These actions were necessary to minimize any interruption to mining operations, which would cause PCS to suffer millions of dollars of additional damages. *Id.* As of September 30, 2006, PCS had spent $11,589,318.26 to relocate the rail line. *Id.* at ¶18. PCS has contracted with third parties who will complete the rail relocation project by approximately April 1, 2007 at a cost of $14,449,000. *Id.*

Defendants previously represented that $15 to $20 million was a reasonable cost to perform the relocation. *See* Message from S. Eisenach, dated Sept. 25, 2003, attached as Exh. 17, at NS 0000193. Defendants also submitted a sworn statement to the STB acknowledging that a preliminary cost estimate by PCS of $12,218,929 for relocating the Lee Creek Rail Line "appeared to be of reasonable magnitude" based upon Defendants' "potential project costs utilizing available information, a reasoned assumption of quantities, and NS's typical unit costs." Statement of D. Becker, attached as Exh. 18, at 251.

### F. Defendants Threaten to Abandon the Lee Creek Rail Line and Make False Statements to PCS to Coerce PCS to Perform Defendants' Obligations.

Defendants first threatened PCS with the prospect of abandonment in December, 2002. Exh. 1 at ¶15. In responding to PCS's request that Defendants bear the cost of relocation, Defendants stated that they would abandon the Lee Creek Rail Line before bearing such an expense. *Id.* at ¶11. Defendants explained that a successful abandonment by Defendants would not only mean that Defendants would cease providing rail service, but would also mean that the only other carrier on the

line, CSX, would be forced to cease serving the Aurora Facility. In Defendants' words, "rail service could go from 2 to 0." Exh. 10, at NS 0000108; Exh. 1, at ¶12. Defendants reiterated the abandonment threats during face-to-face meetings and in correspondence between 2002 and 2005. *See, e.g.,* Exh. 1, at ¶15. As revealed in discovery, Defendants internally characterized their efforts to avoid the relocation obligations as an "abandonment threat" or "exit market threat." *See, e.g.,* Exh. 19, at NS 00000841 ("we have the leverage at this point (the exit market threat) to get an acceptable economic result"). Defendants' corporate representative acknowledged he used the term "threat" to describe the manner in which Defendants' Strategic Planning Department was approaching abandonment. Exh. 11, at 37-38. In an e-mail message produced in discovery, Defendants' Director of Strategic Planning wrote:

> the 1966 agreement that the old NS signed commits the rr (now NSR) for the entire cost of the project, including preparatory work, and the 1977 agreement that brought Seaboard into Lee Creek was not tied to the 1966 agreement, so contractually, both PCS and CSX are completely off the hook for any of the cost. **That's why we're threatening abandonment unless all three parties contribute**.

*See* Exh. 17, at NS 00000193 (emphasis added). Tom Brugman's sworn testimony confirms that explanation *See* Exh. 11, at 47, 68-69.

Defendants' internal abandonment expert testified that Defendants' subsequent abandonment filing was unusual and unprecedented for several reasons. Exh. 12, at 77-78. First, the Lee Creek Rail Line abandonment has "considerable traffic" compared to a typical abandonment case. He also admitted that he is not aware of **any** abandonment case with the volume of traffic that travels over the Lee Creek Rail Line. Defendants' expert also testified that he is not aware of another abandonment case in which a carrier seeking to abandon realizes profit on the line as Defendants do here. *Id.* at 45-47. He also conceded that a central premise of the abandonment filing was an effort by Defendants to avoid having to pay to relocate the rail line. *Id.* at 85.

Although the proposed abandonment proceeding for the Lee Creek Rail Line was unusual and unprecedented, Defendants nevertheless decided to utilize that threat to gain an unfair advantage over

9

PCS. For example, in high level discussions involving Defendants' current Chief Executive Officer, Defendants explained the strategy behind the abandonment threat:

> Sounds like the time for talking is over and we need to go ahead and put the abandonment case together. The next meeting should be a courtesy call to PCS stating that this is the way we are heading. Then we simply do not call anymore and when they ask the status it is "the case is being prepared for filing on X date. **See you in court**."

> We had to use this approach on [another abandonment]. Folks did not think that we were serious so we did all the work, then made the rounds with the very impressive filing and said "we are willing to talk for another month, then we file." It was only then that we really got their attention. **While our case was far from airtight, it looked impressive enough to get folks to the table.**

See Message from J. McClellan, attached as Exh. 20, at NS 0000759 (emphasis added).

In addition to utilizing the abandonment threat to pressure PCS into giving up contractual rights, Defendants falsely represented to PCS that Defendants' rail traffic along the Lee Creek Rail Line was unprofitable. In correspondence reiterating Defendants' abandonment threats, Defendants' executives stated that "I hope to hear from you that PCS will fund the relocation, and when I do, I will stop the abandonment process even though Norfolk Southern operates the line at a loss." See Exh. 13.

In fact, Defendants were not operating the Line at a loss. As revealed in Defendants' STB filings and the testimony of its representatives and expert, Defendants operate the Lee Creek Rail Line at a substantial profit. See, e.g., Exh. 11, at 142-43 ("McQuade's statement that 'Norfolk Southern operates the line at a loss'" "might seem a bit out of line with what we were looking at earlier"); Exh. 12, at 204-05 (McQuade's statement that NS operates the line at a loss is inconsistent with the abandonment application that NS subsequently filed); Dep. of B. Fisher, attached as Exh. 21, at 11-12 (showing 26 percent return on ratio of revenue to variable cost for outgoing traffic).

### G.     Defendants File an Abandonment Application, Which the STB Promptly Rejects.

Having failed to deter PCS from enforcing the Relocation Agreements with their abandonment threat, on November 17, 2005, Defendants filed a STB application to abandon a portion of the Lee Creek Rail Line. Twenty days later, the STB rejected the application because the application was

substantially incomplete or otherwise defective. *See* Exh. 22. The STB Order makes it clear that this court must sort out any contractual obligations of the Defendants. *Id.*

## ARGUMENT

### Standard of Review

A moving party is entitled to summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, the Court is "required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. The [nonmoving party] is entitled to have the credibility of all his evidence presumed." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

## I.    THIS IS THE PROPER FORUM TO LITIGATE PCS' STATE LAW CLAIMS.

Defendants claim that the Court lacks subject matter jurisdiction over PCS' breach of contract and other state law claims on the ground that the STB has exclusive jurisdiction over this matter. Defendants are incorrect. Because this matter concerns a private contract and other state law claims, PCS' claims are not preempted. Indeed, Defendants made an identical argument to the STB in connection with their abandonment application. In promptly dismissing Defendants' application, the STB disagreed with Defendants' claim and stated "it is not clear that the court action would interfere with our exclusive jurisdiction over rail transportation, given NSR's alleged consent to the parties' purported contractual arrangement." *See* Exh. 22, at 2.

As the STB indicated, although it has exclusive jurisdiction over abandonment matters, the STB and the courts have uniformly held that the STB has no authority to interpret, reform or abrogate contracts between consenting parties or to relieve a carrier from its financial obligations under a contract. *See, e.g., Houston Belt & Term. Ry. Co. Control*, 275 I.C.C. 289, 313-14 (1950); *Handling Freight Between Ship and Cars at Ports*, 253 I.C.C. 371, 378 (1942); *Southern Pac. Co. Abandonment,*

11

242 I.C.C. 283, 285 (1940) ("Controversies pertaining to rights and obligations under private contracts are matters for determination by the courts"); *Missouri-Kansas-Texas R.R. Co. v. K.C.T. Ry. Co.*, 104 I.C.C. 203, 230-31 (1925) (ICC refrained from ruling on the use of a terminal facility until court interpreted the operating agreement among the parties); *Purcell v. United States*, 41 F.Supp. 309, 315 (D. Md. 1941) (an abandonment order "will have no effect upon the right" of an injured party to obtain compensation pursuant to a contract claim).

Thus, while the STB has jurisdiction over abandonment matters, the courts have jurisdiction over the proper interpretation of contracts. *See, e.g., Regents of Univ. System of Georgia v. Carroll*, 338 U.S. 586 (1950); *Central New England Ry. Co. v. Boston & A.R. Co.*, 279 U.S. 415 (1929); *Gulf, Mobile & Ohio R.R. Co. v. Illinois Central R.R. Co.*, 128 F.Supp. 311 (N.D. Ala. 1954). In one abandonment case brought before the ICC (predecessor agency to the STB) the railroad requested the ICC void a trackage rights agreement governing operations that the railroad was seeking to abandon. *Gulf, Mobile & Ohio Railway Co. Abandonment*, 282 I.C.C. 311 (1952). In denying the request, the ICC recognized:

> This Commission over a long period of years has uniformly held that it has no power to reform contracts or to relieve carriers of their financial obligations thereunder in connection with an application to abandon.

*Id.* at 331-32. The ICC dismissed another abandonment application for lack of jurisdiction because of a pending court proceeding, holding that:

> Before any decisive action may be taken it is necessary that the legal effect of the controversial language in the agreement be determined. The interpretation thereof is purely a question of law for the courts and it would be inappropriate in such a proceeding as this for us to express our views for the court's guidance on a purely legal question. We think that we should adhere to our often repeated declaration that we will not undertake to interpret or enforce contracts.

*See Delaware & H.R. Corp. Trackage Agreement Modification*, 290 I.C.C. 103, 111 (1953).

Finally, Defendants' preemption argument fails because Defendants are collaterally estopped from challenging in this Court the STB's decision on this precise issue. Consistent with the cases cited above, the STB decided that it has no jurisdiction over this contractual dispute. Thus, the STB's

decision, which Defendants have not appealed, has resolved this issue. Defendants' argument here is nothing more than an improper collateral attack on the STB's own determination that PCS' claims do not interfere with STB jurisdiction. *See, e.g., Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376 (1940) (holding that party's collateral attack on prior court's ruling regarding jurisdiction was not permissible); *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998) (accord).

## II.     THE AGREEMENTS ARE ENFORCEABLE AGAINST DEFENDANTS.

Defendants do not and cannot dispute that the Relocation Agreements are genuine and valid, that they have breached the Relocation Agreements, or that PCS has been damaged due to Defendants' breach. Instead, Defendants claim only that the time in which PCS could have enforced the Relocation Agreements has expired.

Such contentions contradict the plain language of the Relocation Agreements and the parties' intent at the time they entered into them. Defendants' contentions also contradict sworn testimony and other record evidence. Defendants' unsupported position that the covenants contained in the Relocation Agreements, which run with the land, have expired under the so-called "reasonable time" doctrine ignores that the doctrine does not apply to real covenants.

Thus, the proper interpretation of the Relocation Agreements actually supports entry of summary judgment in favor of PCS. At the very least, there are genuine issues of material fact requiring denial of Defendants' motion for summary judgment.

### A.     The Plain Language and All Other Evidence of the Parties' Intent Requires Enforcement of the Relocation Agreements.

"[T]he most fundamental principle of contract construction [is] that the courts must give effect to the plain and unambiguous language of a contract." *Johnston County v. R.N. Rouse & Co.*, 331 N.C. 88, 414 S.E.2d 30, 34 (1992). The court's job is not to make the contract for the parties, but to construe it. *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962).

13

In addition to being enforceable contracts, the Relocation Agreements are enforceable covenants running with the land. A covenant is an agreement of two or more parties, by written deed, in which one of the parties promises to the other that something is done already or shall be done in the future. *Stephens Co. v. Lisk*, 240 N.C. 289, 292, 82 S.E.2d 99, 102 (1954). Deed covenants are to be interpreted so as to "ascertain and effectuate the intention of the parties." *Id.* at 293, 82 S.E.2d 103. In interpreting a deed covenant, the court must search for a "rational purpose in the language" and "construe it consistently with reason and common sense." *Id.*

The five Relocation Agreements clearly set out the intent of the Parties. The Relocation Agreements grant Defendants easements and rights of way "for railroad purposes." *See* Exhs. 4-8. Although there are minor differences in the language used in each Agreement, the operative relocation language in each Agreement is clear. Each Agreement contains provisions requiring that Defendants relocate the right of way and easement at their sole expense if PCS determines "that all or any part of said right of way and easement interferes with its anticipated mining or processing operations in the Beaufort County, North Carolina area." *Id.*

The Relocation Agreements provide that "after ten (10) years" **and** upon the easement grantors' determination "that all or any part of [the railroad] right of way and easement interferes with its anticipated mining or processing operations," the easement grantor may invoke the relocation provision. Exhs. 4-8, Paragraph (1). The clear intent of that provision was to prevent the grantor from requesting that Defendants construct a new rail line immediately after they invested in the first construction. That clear intent is also consistent with other provisions of the Relocation Agreements, which allow Defendants to review engineering design and limit elevation changes, excessive curvature, grade, and distances of the track, all of which allowed NSRC to limit the cost of constructing the relocated line. Exhs. 4-8. Thus, the lack of time limitation on the relocation covenant evidences NSRC's view that so long as the relocation occurred more than ten years after construction, NSRC would have the opportunity to receive an adequate return on its investment.

14

Nothing in the Relocation Agreements terminates PCS's right to invoke the relocation provisions upon the passage of ten years. Rather, PCS's right to invoke the relocation provision is not limited by time, but instead by PCS's need to have the rail line relocated to allow mining operations to continue. The language is clear that while the parties did not know precisely when the relocation would take place, they did know it would be in excess of 10 years.

Defendants' counsel expressly acknowledged the intent of the parties that the relocation would not be necessary for many years in correspondence that was contemporaneous with the Relocation Agreements. Exh. 9, at 3. Defendants' counsel wrote that: "[w]ith reference to the changing of the last part of the relocation paragraphs, we pointed out that **in all likelihood the relocation...will be at some distant time in the future**...." *Id.* (emphasis added). Thus, the circumstances surrounding the Relocation Agreements, including the admissions of Defendants' counsel, demonstrate that the parties intended the relocation agreements to be enforced many years in the future. *See, e.g., Root v. Allstate Ins. Co.*, 272 N.C. 580, 158 S.E.2d 829 (1968) (holding extrinsic evidence admissible to "show what was in the minds of the parties at the time of making the contract..."); *Thomco Realty, Inc. v. Helms*, 107 N.C. App. 224, 418 S.E.2d 834 (N.C. App. 1992) ("extrinsic evidence [is] admissible to explain and clarify the contract's terms").

That admission is explained by the fact that Defendants' predecessors knew before constructing the line that "extensive phosphate producing activity" was planned for the Aurora Facility and that mining would initially produce 3 million net tons of phosphate rock annually. Exh. 3, at 2. NSRC also knew that between 2 and 3 billion tons of recoverable phosphate ore resided in the immediate vicinity. *Id.* at 6. Thus, as of 1964, at a recovery rate of 3 million tons annually, NSRC knew that phosphate recovery would continue for many decades and quite possibly for more than 100 years.

Thus, the parties' intent based on the plain language of the Relocation Agreements and surrounding circumstances supports summary judgment in favor of PCS, and therefore also raises a genuine issue of material fact as to the enforceability of the Relocation Agreements.

15

**B.** **Artificial Time Limitations do not Apply Because the Relocation Agreements are Valid and Enforceable Covenants Running with the Land.**

The Relocation Agreements contain valid and enforceable real covenants, which, unlike simple contracts, run with the land and are enforceable generations and decades later. Unlike an ordinary contract, a real covenant without a specific limitation as to duration will continue to be enforced unless there has been a change of circumstances to such an extent that the objectives of the covenant have been frustrated or made impossible or impracticable. *Muilenburg v. Blevins*, 242 N.C. 271, 87 S.E.2d 493 (1955). The burden of showing such a change in condition is on the party contending that the covenant should not be enforced. *Sheets v. Dillon*, 221 N.C. 426, 20 S.E.2d 344 (1942). Equity will not relieve a party from a covenant merely because it has become burdensome, but instead will give a covenant full effect unless changed conditions are so radical as to destroy the essential objects of the covenant. *Tull v. Doctors Bldg., Inc.* 255 N.C. 23, 120 S.E.2d 817 (1961).

In *Stephens Co. v. Lisk*, the North Carolina Supreme Court enforced a covenant, **of indefinite duration**, which provided that **if** grantor or its successors **should decide** to improve streets or sidewalks the grantees should bear part of the cost of such improvements. 240 N.C. 289, 295, 82 S.E.2d 99, 102 (1954) (emphasis added). In *Lisk*, the property owners were not consulted prior to the improvements being made, and did not consent to the improvements. Nevertheless, the Court enforced the nineteen-year-old covenant following a review of the covenant language and the intent of the parties at the time the covenant entered. *Id. See also Louisville & Nashville R. Co. v. Pierce*, 230 S.W.2d 430 (Ky. 1950) (acknowledging absence of precedent supporting that "reasonable time" doctrine applies to covenants running with the land).

Thus, Defendants' argument that North Carolina law presumes that parties to certain contracts intended a "reasonable time" is irrelevant to covenants that run with the land. Indeed, Defendants offer no authority supporting their contention that real covenants that run with the land are limited by a

16

"reasonable time" rule. Defendants cite only **contract** cases involving leases, employment contracts, insurance and a joint use agreement. Those cases are not relevant here.

## C.    PCS Enforced its Rights Within a Reasonable Time.

Almost all of the cases that Defendants rely upon to establish their "reasonable time" theory involve situations where a party's failure to take an affirmative action encumbered the use or transfer of land. The courts have not utilized a bright line test to determine what is reasonable because the reasonableness of the time of enforcement depends on the subject matter of the contract, the situation of the parties, their intention and what they contemplated at the time the contract was made. *See, e.g., Lambeth v. City of Thomasville*, 179 N.C. 452, 102 S.E. 775 (1920).

Even if the reasonable time doctrine applies here, it is clear that PCS exercised its rights within such a reasonable time period. At the time of the agreements, the parties understood that the mining methods and pace of the operation dictated that the rail line would be relocated many years down the road. In 1964, the parties knew that there were at least two billion tons of recoverable phosphate ore at the Aurora Facility. *See* Exh. 3, at 6. The parties also knew that PCS was capable of producing 3 million net tons of phosphate rock annually. *Id.* Thus, a simple calculation reveals that as of 1964, the parties knew PCS would operate the mine for hundreds of years. Further, based on the methods of mining employed from the 1960s through the present, a reasonable person in 1964 would have known that there would be no need to relocate the rail line for at least forty years.

The North Carolina Supreme Court has found that forty years is a reasonable time for performance of a railroad franchise agreement silent as to duration. *Boyce v. City of Gastonia*, 227 N.C. 139, 144, 41 S.E.2d 355, 360 (1947) (holding taxpayer dollars could properly be used to purchase a new right of way for the purpose of relocating railroad tracks that after forty years conflicted with widening of city streets). Other states have also recognized the enforceability of affirmative covenants in railroad agreements after nearly sixty years. *See, e.g., Louisville & Nashville R. Co. v. Pierce*, 230 S.W.2d 430 (1950). In *Pierce*, a 1892 deed contained a covenant that the railroad must provide two railroad

17

crossings. *Id.* at 433. In 1950, the landowners filed suit on the ground that there was only one crossing, and the defendant railroad had refused to construct a second crossing. *Id.* at 433. While the court reversed an earlier judgment on other grounds, the case was remanded for further proceedings not inconsistent with the court's holding that, after fifty-eight years, was not subject to the "reasonable time" rule of contract law. *Id.* at 435.

Here, the parties intended the relocation clause to be enforced no less than ten years in the future and more likely "at some distant time in the future." The very fact that the parties entered into Deeds of Easement that contain real covenants, and recorded the Deeds of Easement with the Beaufort County Register of Deeds, rather than simply entering into a ten-year contract that would not run with the land, indicates that the parties chose for the covenants to be enforceable for decades. The parties also knew that mining was likely to continue for many decades. Defendants, who provide rail service to mining operations around the country, undoubtedly know from experience that mining operations continue for decades, and not for weeks, months, or only a few years. Thus, at the very least, a genuine issue of material fact exists as to the reasonableness of PCS' decision to invoke the Relocation Agreements, and this issue must be referred to a jury. *See East Coast Development Corp. v. Alderman-250 Corp.*, 30 N.C.App. 598, 605, 228 S.E.2d 72, 79 (1976) (what constitutes a "reasonable time" for performance where a contract is silent as to the time of performance is an issue of fact for the jury).

### D. Defendants' Sworn Testimony and Other Record Evidence Demonstrates Overwhelmingly That the Relocation Agreements Are Enforceable.

Defendants' own interpretation of the Relocation Agreements raises a triable issue as to the enforceability of the Relocation Agreements. This confirms not only that PCS' interpretation of the plain language of the Relocation Agreements is reasonable and correct, but also that prior to this litigation Defendants have agreed with PCS's interpretation.

Defendants have continually acknowledged that the Relocation Agreements are valid and that the financial responsibility to relocate the railroad belongs to Defendants. Exh. 1, at ¶11. On September

18

11, 2003, Defendants' representatives flatly admitted that "the old NS agreed to the track relocation language ('railroad will pay if asked to move')." *See* September 11, 2003 Presentation, attached as Exh. 10, at NS 0000100. A subsequent presentation slide states: "[n]o apparent contractual obligation by either PCS or [third party carrier] CSXT to contribute toward the track relocation." *Id.* at NS 0000103.

Tom Brugman, who attended that meeting, testified that Norfolk Southern's in-house lawyers stated that the Relocation Agreements were "airtight." Exh. 11, at 166-67. *See also id.* at 49 ("I agree that there was consensus on the 1966 agreement and the way it worked and the way it committed NS"). As Mr. Brugman testified, "We'd like it to go away, but no, we're not disputing it." *Id.* at 74. Thus, even if the Court does not conclude that these admissions establish as a matter of law that Defendants are liable to PCS, they at the very least raise a genuine issue of material fact as to the enforceability of the Relocation Agreements.

## III. THE RULE AGAINST PERPETUITIES DOES NOT APPLY TO THE RELOCATION AGREEMENTS.

Defendants contend that the enforcement of the Relocation Agreements is barred by the Rule Against Perpetuities. The Rule Against Perpetuities provides that no **devise or grant of future interest** in property is valid unless title thereto must vest, if at all, not less than 21 years after some life or lives in being at the time of the creation of the interest. *McQueen v. Branch Banking & Trust Co.*, 234 N.C. 737, 68 S.E.2d 831 (1952) (emphasis added). The Relocation Agreements, however, **do not devise or grant any future interest** in property that is waiting to vest. Indeed, the relocation provisions do not purport to convey any property at all to Defendants. The relocation provisions instead require that Defendants perform an affirmative act – relocate the Lee Creek Rail Line. Defendants offer no legal support for an unprecedented extension of the Rule Against Perpetuities to these facts.

The Rule Against Perpetuities also does not apply to future interests retained by a grantor, which include a reversion, possibility-of-reverter, and right of entry. *See Id.; Hornets Nest Girl Scout Council, Inc. v. The Cannon Foundation, Inc.*, 79 N.C.App. 187, 191 339 S.E.2d 26, 29 (1986) (reversionary

19

interests are not subject to Rule); *see also Charlotte Park and Recreation Commission v. Barringer*, 242 N.C. 311, 321 88 S.E.2d 114, 123 (1955) (possibility of reverter does not violate Rule). Therefore, any reversionary interest held by PCS in the easements that PCS' predecessors granted in 1965 and 1966 is not restricted by the rule.[2]

Thus, Defendants' assertion that the Rule Against Perpetuities precludes enforcement of the relocation covenants is simply wrong. At best, Defendants appear to be arguing that the Rule Against Perpetuities should be expanded to place a twenty-one year limitation on every contract and every real covenant, even when such application would defeat the clear intent of the parties. However, the Rule Against Perpetuities was designed as a rule of construction to avoid the intent of parties to a conveyance of real property from being defeated and to prevent unreasonable restrictions on the alienability of land. *See, e.g., Rich, Rich & Nance v. Carolina Construction Corp.*, 355 N.C. 190, 193, 558 S.E.2d 77, 79 (2002) (holding that the rule against perpetuities' 'primary purpose is to...prevent undue restraint upon or suspension of the right of alienation'"). That policy would not be served here.

In support of applying the so-called "twenty-one year in gross" rule of construction to the Relocation Agreements, Defendants cite cases involving grants of property actually covered by the Rule Against Perpetuities, where parties failed to identify lives in being. The courts in those cases then apply the "twenty-one year in gross" rule of construction to save the transactions and enforce the parties' intent. For example, in *Rodin v. Merritt*, the North Carolina Court of Appeals upheld a contract for purchase of property, covered by the Rule Against Perpetuities, but lacking reference to a life in being. 48 N.C. App. 64, 268 S.E.2d 539 (1980). The court concluded that "we find it difficult to believe that either lives in being or 21 years have much relevance to business and their affairs, or that this judge made rule should be applied to commercial transactions." *Id.* at 68, 268 S.E.2d 542; *see also Rich v. Carolina Construction Corp.*, at 194, 558 S.E.2d at 80 (holding that "the rule under the common law

---

[2] Moreover, Defendants cite no authority supporting that the Rule Against Perpetuities applies to covenants running with the land, such as those contained in the Relocation Agreements. Indeed, they do not. *See, e.g., Wong v. DiGrazia*, 60 Cal.2d 525, 536 n. 19, 35 Cal.Rptr. 241, 249 n. 19, 386 P.2d 817, 825 n. 19 (1963).

does not apply in all cases involving commercial transactions. Commercial transactions that do not violate the underlying policies behind the rule against perpetuities, as well as those involving mere contract provisions...do not fit under the umbrella of the common law rule").

In *Love v. United States*, 889 F. Supp. 1548 (E.D.N.C. 1994), this court considered a contract granting a railroad right of way. In order to enforce the intent of the parties' agreement, the court, relying on *Rodin*, construed the contract as containing an implied term of performance within 21 years. *Village of Pinehurst v. Regional Investments of Moore, Inc.*, 330 N.C. 725, 412 S.E.2d 645 (1990), involved a right of first refusal contract for the purchase of a business, specifically covered by the Rule against Perpetuities. *See Coxe v. Wyatt*, 83 N.C.App. 131, 134, 349 S.E.2d 75 (1986). Rights of first refusal "are dependent on the actions of third parties in making an offer to purchase." *Love v. United States*, 889 F. Supp. 1548, 1569 (E.D.N.C. 1994). The Relocation Agreements are not rights of first refusal, and none of Defendants' cases forms a basis for disrupting the parties' intent by applying the Rule Against Perpetuities to the covenants at issue here.

## IV. THE COMPLAINT IS NOT BARRED BY THE DOCTRINE OF LACHES.

A laches defense fails because PCS promptly filed its claims upon Defendants' breach of the Relocation Agreements. Laches does not apply unless a party delays filing suit for an unreasonable amount of time after the cause of action arises and that the defendant would be unreasonably prejudiced by such delay. *See, e.g., Rape v. Lyerly*, 287 N.C. 601, 215 S.E.2d 737 (1975); *Knotville Volunteer Fire Dpt. v. Wilkes County*, 85 N.C. App. 598, 355 S.E.2d 169 (1987). Here, PCS' cause of action arose when Defendants breached the Relocation Agreements. PCS filed this lawsuit within four months of Defendants' final representation that they would not perform the relocation. *See* Exh. 18. Thus, PCS did not unreasonably delay filing this lawsuit. In any event, where, as here, the action is not barred by the applicable statutes of limitation, laches will not bar a party's claims. *See, e.g., Clark v. Henrietta Mills,* 219 N.C. 1, 12 S.E.2d 682 (1941).

21

In support of its laches argument, Defendants imply that because PCS alleged in the Complaint that PCS has anticipated since 1981 that it would eventually mine the area under Defendants' rail line, that PCS' claim must have accrued then, and that PCS then waited more than twenty years to invoke the Relocation Agreements. *See* Def's Br. at 21. This argument misinterprets the law because PCS' claims did not arise until 2005, and also misconstrues the Relocation Agreements. Each Relocation Agreement requires that any relocation be completed either within one year or eighteen months after PCS invokes the Relocation Agreements. *See* Exhs. 4-8. PCS, however, could not have invoked the Relocation Agreements until its mining progressed beyond the existing rail line. Otherwise, the relocated rail line would have interfered with PCS' existing mining operations. *See* Aff. of J. Waters, attached as Exh. 23, at ¶4. Thus, it was impossible for PCS to invoke the Relocation Agreements until the time that they did.

Finally, laches requires a fact-intensive inquiry typically reserved for the jury. *See, e.g., Williams v. Blue Cross Blue Shield of North Carolina*, 357 N.C. 170, 581 S.E.2d 415 (2003) (holding that whether a "delay will constitute laches depends upon the facts and circumstances of each case"). A party seeking to establish laches must demonstrate that the plaintiff has unreasonably delayed filing suit and that the delay was prejudicial to the defendant and resulted in a change of condition that makes it unjust to allow the plaintiff to prosecute the claim. *Cieszko v. Clark*, 92 N.C.App. 290, 295-6, 374 S.E.2d 456, 459-60 (1988). Defendants have failed to establish any such delay or prejudice here.

## V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS TO THE UNFAIR AND DECEPTIVE TRADE PRACTICES CLAIM.

The Chapter 75 claim arises not only from Defendants' egregious actions in breaching the contract, but also from Defendants' repeated and sustained threats that Defendants would eliminate rail access to and from the Aurora Facility, from Defendants' false statements, and from Defendants' frivolous abandonment action, all of which Defendants calculated would coerce PCS into surrendering its contractual rights. Defendants' unfair and deceptive conduct also proximately caused PCS to relocate the Lee Creek Rail Line at a cost of more than $15 million and also forced PCS to pay to defend

22

what amounted to frivolous litigation before the STB. Defendants' abandonment attempt also constitutes an unfair and deceptive trade practice because it was not reasonably calculated to elicit a favorable opinion from the STB, but instead was filed only to intimidate PCS, and was immediately rejected by the STB as "premature and incomplete."

A. **Defendants' Sustained Coercive Tactics Constitute Unfair and Deceptive Acts.**

Conduct that a court of equity would consider unfair may constitute an unfair and deceptive trade practice under N.C.G.S. § 75-1.1. *See Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987). A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious. *Jacobs v. Central Transport Inc.*, 891 F.Supp 1088, 1116 (E.D.N.C. 1995). A party commits an unfair act and deceptive practice when it engages in an inequitable assertion of power or position. *See Johnson v. Insurance Co.*, 300 N.C. 247, 264, 266 S.E.2d 610, 622 (1980); *Dull v. Mut. of Omaha Ins. Co.*, 85 N.C.App. 310, 354 S.E.2d 752, *disc. rev. denied*, 320 N.C. 512, 358 S.E.2d 518 (1987). "[C]oercive tactics are within the definition of unfair practices." *Wilder v. Squires*, 68 N.C.App. 310, 315, 315 S.E.2d 63, 66, *disc. rev. denied*, 311 N.C. 769, 321 S.E.2d 158 (1984) (finding threat to withhold money due unless plaintiff accepted seller's financing offer was a violation of §75-1.1).

Defendants' conduct here raises a triable issue under Chapter 75. Defendants repeatedly threatened and attempted to coerce PCS to fund the relocation of the Lee Creek Rail Line or else risk the consequence of losing all rail access to the Aurora Facility. *See* Exh. 1, at ¶¶11-15. Defendants' own documents reveal that Defendants intended to employ such threats to coerce PCS into abandoning its position. *See, e.g.*, Exh. 19, at NS 00000841 ("we have the leverage at this point (the exit market threat) to get an acceptable economic result").

Defendants' corporate representative acknowledged under oath that he used the term **"threat"** to describe the manner in which his colleagues in the Strategic Planning Department approached

23

abandonment. Exh. 11, at 37-38. In another internal communication, Defendants' Director of Strategic Planning wrote:

> the 1966 agreement that the old NS signed commits the rr (now NSR) for the entire cost of the project, including preparatory work, and the 1977 agreement that brought Seaboard into Lee Creek was not tied to the 1966 agreement, so contractually, both PCS and CSX are completely off the hook for any of the cost. That's why we're threatening abandonment unless all three parties contribute.

*See* Exh. 17, at NS 00000193.

> Another communication from Defendants' Strategic Planning Department reveals that:

> we need to file something soon to let PCS know we are serious about not spending $12 million to relocate the line. Given the amount that PCS has already spent re: mining permits it is expected that they will ultimately come up with the money for relocation. **They cannot afford to lose rail access**."

Exh. 24, at NS 000019 (emphasis added). Mr. Brugman confirmed that was the reason Defendants threatened to abandon the rail line:

> Q.    So the threatened abandonment, was it because Norfolk Southern was responsible for the entire cost and the other two parties were not obligated to join in that cost, correct?

> A.    Yes, and we felt that we needed help.

Exh. 11, at 47.

> Mr. Brugman also testified as follows:

> Q.    In terms of tools, probably the strongest tool that you would have is the threat of abandoning a line, correct?

> A.    It wouldn't be a tool from my perspective. It did give us an advantage in that we could say to PCS, 'Hey, look guys, we've got to turn this around a little bit here to try and, you know, have an opportunity to try and work out some sort of a compromise.'

> *****************************
> Q.    Even though you don't like to use it, it serves as one of those tools, doesn't it? I mean, essentially you're painting them into a corner because you have the ultimate threat of, 'You're not going to have any line.'

> A.    Uh-huh.

> Q.    Correct?

A.      Well, the – I guess the railroad is entitled to make a profit.

Q.      …But in terms of the message going to PCS the message was clear in that Power Point presentation back in Exhibit Number 1…Is that the threat is to go from two carriers to zero.

A.      The possibility to go from two carriers to zero, yeah. Well, I think that was mentioned. Yeah.

Exh. 11, at 68-69.

Thus, by threatening PCS with the prospect that it might lose rail access entirely, Defendants were claiming that it could shut down PCS' operations if PCS did not capitulate and relocate the rail line at its own expense. Another internal communication makes clear that this was not the first time Defendants have wielded such tactics against captive rail customers. Jim McClellan, Defendants' Vice-President for Strategic Planning, characterized Defendants' rationale for filing an abandonment application with the STB as follows:

> Sounds like the time for talking is over and we need to go ahead and put the abandonment case together. The next meeting should be a courtesy call to PCS stating that this is the way we are heading. Then we simply do not call anymore and when they ask the status it is "the case is being prepared for filing on X date. **See you in court**."

> We had to use this approach on [another abandonment]. Folks did not think that we were serious so we did all the work, then made the rounds with the very impressive filing and said "we are willing to talk for another month, then we file." It was only then that we really got their attention. **While our case was far from airtight, it looked impressive enough to get folks to the table.**

Exh. 20, at NS 0000759 (emphasis added). In addition to utilizing the abandonment threat as a tool to pressure PCS into giving up contractual rights, Defendants also made false statements to PCS that Defendants' rail traffic along the Lee Creek Rail Line was unprofitable. *See supra*, at 10. Such false statements support an unfair and deceptive trade practices claim. *See Johnson v. Phoenix Mut. Life Ins. Co.*, 300 NC. 247, 266, 266 S.E.2d 610, 629 (1980), *overruled on other grounds* (recognizing that deception under Chapter 75 includes not only fraud, but also misrepresentation and that an act is deceptive if it has the capacity or tendency to deceive).

25

**B.    Defendants' Coercive Tactics Proximately Caused PCS to Suffer Millions of Dollars in Damages.**

To prevail on a Chapter 75 claim, "it is only necessary that plaintiff demonstrate that defendant's illegal conduct was a substantial cause of injury to plaintiff's business. Plaintiff is not required to prove that the defendant's conduct was the only cause of his injury." *American Rockwool, Inc., v. Owens-Corning Fiberglas Corp.,* 640 F.Supp. 1411, 1444 (E.D.N.C. 1986).

The cost of the rail relocation incurred by PCS satisfies the damages requirement of a §75-1.1 claim. PCS has offered evidence that the cost of rail relocation will be $15,589,318.26. *See* Exh. 1, at ¶¶17-18; Exh. 16, at ¶4. The expense of track relocation is a direct result of Defendants' refusal to relocate the rail line and their concurrent threats that they would abandon the line if PCS attempted to enforce the contract. Also, by filing a frivolous (and promptly dismissed) abandonment application, Defendants forced PCS to incur legal fees and expert witness fees to present its case to the STB.

**C.    The Sham Abandonment Application Constitutes An Unfair and Deceptive Trade Practice.**

The institution of litigation can be the basis for an unfair trade practice claim if it is a sham. *See United States v. Ward,* 618 F.Supp. 884, 907 (E.D.N.C. 1985). The Supreme Court has recognized that there are many forms of reprehensible conduct which may corrupt the judicial process and result in violations of unfair trade statutes. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 513 (1972). Objectively unreasonable litigation may constitute an unfair and deceptive trade practice. *See Reichold Chem., Inc., v. Goel,* 146 N.C.App. 137, 157, 555 S.E.2d 281, 293 (2001). *Reichold* defined an objectively reasonable lawsuit to be a claim where "an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome." *Id.* at 157, 555 S.E.2d at 293 *citing Professional Real Estate Investors v. Columbia Pictures Indus.,* 508 U.S. 49 (1993).

Defendants routinely litigate abandonment matters before the STB and should have reasonably expected that the STB would not consider an abandonment while the underlying contract was being litigated in North Carolina. Defendants' internal abandonment specialist testified under oath that

26

Defendants' Lee Creek Rail Line abandonment filing was unprecedented. Exh. 12, at 47. He testified that he was unaware of any other abandonment case with the volume of traffic that travels over the Lee Creek Rail Line or in which the carrier seeking to abandon realized profit on the rail line as Defendants do here. *Id.* at 45-47. He also conceded that a central premise of the abandonment filing was an effort by Defendants to avoid having to pay to relocate the rail line, as opposed to some other potentially legitimate purpose of abandoning the rail line. *Id.* He further testified that the STB's rejection of Defendants' abandonment was the fastest rejection by the STB that he could remember. *Id.* at 79. Thus, Defendants' own admissions belie their contention that the STB application was reasonably calculated to elicit a favorable opinion.

Evidence that Defendants' abandonment application was not objectively reasonable can be found in the STB decision itself. After only twenty days, the STB concluded that Defendant's application was defective because Defendants attempted to abandon the Lee Creek Rail Line without the permission of CSXT, a rail company that also provides transportation services to PCS. The STB decision points out that Defendants could not abandon the rail line without the permission of CSXT and that Defendants could not unilaterally eject CSXT without the approval of the STB, a remedy not sought by Defendants in their application. Exh. 22, at 2. Second, the STB concluded that Defendants' abandonment application was "substantially incomplete," for, among other reasons, that Defendants' Environmental Report lacked statutorily required analysis. *Id.* at 3. Third, the STB cited STB precedent that showed that Defendants' application was premature. *Id.* at 2. The STB decision went on to state that rejection was proper because Defendants' application was "substantially incomplete and defective." *Id.* at 3. The STB's prompt rejection of Defendants' abandonment application and the reasons for its conclusion confirm that the abandonment attempt was nothing more than a threat intended to coerce PCS to give up its rights or designed to delay Defendants' own payment for the relocation.

The record establishes a genuine issue of material fact as to whether the STB action initiated by Defendants was a sham. Thus, summary judgment should be denied.

27

**D.** **Defendants' Conduct is Also Actionable Under Chapter 75 Because Defendants' Willful Breach of the Relocation Were Accompanied by Aggravating and Egregious Conduct.**

Defendants' conduct went well beyond mere breach of contract. A breach of contract rises to the level of an unfair or deceptive trade practice if "substantial aggravating circumstances are present in relation to that breach." *United Roasters, Inc. v. Colgate Palmolive Co.*, 649 F.2d 985, 992 (4th Cir. 1981); *see also Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998).

The record clearly reveals that Defendants used threats and coercive tactics in an effort to avoid their obligation under Relocation Agreements. Defendants orchestrated a well-planned campaign to convince PCS that if PCS demanded that Defendants honor their obligations, Defendants would retaliate by eliminating PCS' rail access, which, if successful, would cripple PCS' operations at the Aurora Facility. These actions raise a genuine issue of material fact that Defendants' actions were sufficiently egregious and aggravating to support a §75-1.1 claim.

## V. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED AS TO THE UNJUST ENRICHMENT CLAIM.

Unjust enrichment is based on the principle that "a person should not be permitted to enrich himself unjustly at the expense of another." *Stauffer v. Owens*, 25 N.C.App. 650, 652, 214 S.E.2d 240, 241 (1975). "Liability arises, on theory of quantum meruit, irrespective of intention of parties to be charged, where one is enriched and receive benefit at another's expense which equitably he ought to pay." *U.S. for Use of F. E. Robinson Co. of N.C. Inc. v. Alpha –Continental,* 273 F.Supp. 758 (E.D.N.C. 1967). To prevail on a theory of unjust enrichment a party must show: "[1] benefit conferred on the defendant by the plaintiff, [2] acceptance of the benefit by defendant, and [3] circumstances which make it inequitable for the defendant to retain the benefit." *Federal Deposit Ins. Corp. v. British-American Corp.*, 755 F.Supp. 1314 (E.D.N.C. 1991). *See also Southeastern Shelter Corp. v. BTU Inc.*, 154 N.C.App. 321, 331 572 S.E.2d 200, 206 (2002).

PCS has raised a genuine issue of fact as to each of these elements. First, PCS has conferred a substantial benefit on Defendants. By April, 2007, PCS will have spent more than $14 million to relocate a portion of the Lee Creek Rail Line when it is Defendants' obligation to perform the relocation. Exh. 1, at ¶18. By forcing PCS to relocate the Lee Creek Rail Line, Defendants have benefited by not having to pay the cost of relocation, and have delayed having to spend millions of dollars at the time PCS invoked the Relocation Agreements. Defendants have admitted that if they paid for the relocation project, that would cost Defendants between $15 and $20 million. Exh. 17, at NS 0000193.

Second, by refusing to relocate the Lee Creek Rail Line and forcing PCS to relocate the Line at PCS' expense, Defendants have accepted the benefit of PCS paying to relocate the Lee Creek Rail Line. Defendants have not (to date) had to pay the cost of relocating the Lee Creek Rail Line, which has benefited Defendants by more than $15 million. Thus, PCS has raised a genuine issue of fact as to Defendants' acceptance of the more than $15 million benefit PCS has conferred.

Third, the circumstances here render inequitable Defendants' acceptance of the benefits of owning and operating over the relocated rail line. *Lankford v. Wright*, 347 N.C. 115, 489 S.E.2d 604 (1997) (recognizing that equity allows the court to do what in fairness and good conscience should have been done). Here, it would be inequitable for PCS to bear the cost of relocating a rail line. PCS was forced to relocate the Lee Creek Rail Line to allow mining operations to continue. PCS entered into the Relocation Agreements with the reasonable expectation that Defendants would perform their obligations. Thus, Defendants' acceptance of the benefits of PCS' relocation of the Lee Creek Rail Line is inequitable.

Defendants argue that they are entitled to summary judgment on PCS' unjust enrichment claim because PCS' claim is based on an express contract. Although North Carolina law precludes recovery both on an express contract and on an unjust enrichment claim, North Carolina's "liberal pleading rules permit pleading in the alternative, and that theories may be pursued in the complaint even if plaintiff

29

may not ultimately be able to prevail on both." *Catoe v. Helms Const. & Concrete Co.*, 91 N.C.App. 492, 498, 372 S.E.2d 331, 335 (1998); *Potter v. Homestead Preservation Ass'n* 330 N.C. 569, 412 S.E.2d 1 (1992) (if plaintiff fails to prove existence of express contract, he is not foreclosed from recovery in quantum meruit if contract can be implied and reasonable value of plaintiff's services can be drawn from evidence). Thus, the fact that PCS filed suit against Defendants for both breach of contract and unjust enrichment does not preclude PCS from also raising a genuine issue of material fact as to both breach of contract and unjust enrichment claims. Moreover, in the unlikely event that the court finds that no contract exists between Defendant and PCS, unjust enrichment would be proper because "the claim is not based on a promise but is imposed by law to prevent an unjust enrichment." *Booe v. Shadrick*, 322 N.C. 567, 369 S.E.2d 554 (1988). Therefore, Defendants' Motion for Summary Judgment should be denied as to this claim.

## CONCLUSION

For the reasons set forth above, Defendants' summary judgment motions should be denied. This 8th day of December, 2006.

/s/ Charles E. Raynal, IV
R. Bruce Thompson II
N.C. State Bar No. 21468
Charles E. Raynal, IV
N.C. State Bar No. 32310
PARKER, POE, ADAMS & BERNSTEIN, L.L.P.
150 Fayetteville Street Mall, Suite 1400
Post Office Box 389
Raleigh, North Carolina 27602-0389
Telephone: (919) 828-0564
Facsimile: (919) 834-4564
**Attorneys for PCS Phosphate Company, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **PLAINTIFF PCS PHOSPHATE COMPANY, INC.'S MOTION TO COMPEL** on all parties to this action by depositing a copy in the United States certified mail, postage prepaid, addressed as follows:

> Odes L. Stroupe, Jr.
> John S. Byrd, II
> Bode, Call & Stroupe, L.L.P.
> Post Office Box 6338
> Raleigh, North Carolina  27628-6338

This the 8th day of December, 2006.

/s/ Charles E. Raynal, IV
Charles E. Raynal, IV

31