IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:05-CV-55-D

PCS PHOSPHATE COMPANY INC.
v.
NORFOLK SOUTHERN CORP. and NORFOLK SOUTHERN
RAILWAY COMPANY, INC.

**INDEX OF EXHIBITS TO
PLAINTIFF PCS PHOSPHATE
COMPANY'S MEMORANDUM OF LAW
IN OPPOSITION TO NORFOLK SOUTHERN RAILWAY CO.'S
MOTION FOR SUMMARY JUDGMENT**

| DOCUMENT | TAB NO. |
|---|---|
| Affidavit of I. K. "Tex" Gilmore | 1 |
| Affidavit of Keith Schniering | 2 |
| ICC Report, Certificate, and Order dated October 26, 1964 | 3 |
| Deed of Easement dated June 29, 1965 | 4 |
| Deed of Easement dated June 29, 1965 | 5 |
| Deed of Easement dated October 12, 1965 | 6 |
| Deed of Easement dated April 15, 1966 | 7 |
| Deed of Easement dated May 3, 1966 | 8 |
| Letter from John Simms dated June 16, 1965 | 9 |
| Presentation given by Norfolk Southern dated September 11, 2003 | 10 |
| Excerpts from Deposition of Thomas J. Brugman dated January 20, 2006 (Complete transcript will be submitted contemporaneously to the court in paper form) | 11 |

| DOCUMENT | TAB NO. |
|---|---|
| Excerpts from Deposition of Marcellus C. Kirchner dated April 13, 2006 (Complete transcript will be submitted contemporaneously to the court in paper form) | 12 |
| Letter from Kathryn McQuade dated February 11, 2005 | 13 |
| Letter from William T. Cooper, Jr. dated November 20, 2003 | 14 |
| Letter from Kathryn McQuade dated December 16, 2004 | 15 |
| Affidavit of Robert M. Chiles | 16 |
| Email Message from Steve D. Eisenach dated September 25, 2003 | 17 |
| Verified Statement of David A. Becker dated October 12, 2005 | 18 |
| Email Message from Joe Osborne dated September 17, 2003 | 19 |
| Email Message from Jim W. McClellan dated October 30, 2003 | 20 |
| Excerpts from Deposition of Benton V. Fisher dated June 22, 2006 (Complete transcript will be submitted contemporaneously to the court in paper form) | 21 |
| Surface Transportation Board Decision dated December 6, 2005 | 22 |
| Affidavit of Jerry Waters | 23 |
| Email Message from Sarah Corey dated April 27, 2005 | 24 |

United States District Court
Eastern District of North Carolina
Eastern Division

Case No.: 4:05-CV-55-D

Plaintiff PCS Phosphate Company, Inc.'s
Memorandum of Law in Opposition
to Norfolk Southern Railway Co.'s
Motion for Summary Judgment

# Exhibit 1

# Affidavit of I. K. "Tex" Gilmore

Demarcation Page for Scanned Document

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Civil Action No. 4:05-CV-55-D

PCS PHOSPHATE COMPANY INC., )
)
Plaintiff, )
)                    **AFFIDAVIT OF**
v. )                    **I. K. "TEX" GILMORE**
)
NORFOLK SOUTHERN CORP. AND )
NORFOLK SOUTHERN RAILWAY )
COMPANY, INC., )
Defendants. )

I. K. "Tex" Gilmore, being first duly sworn, deposes and says as follows:

1. I am over 18 years of age, suffer no legal disabilities and have personal knowledge of the matters set forth herein.

2. I am the Superintendent of the Mine Planning Department of PCS Phosphate Company, Inc. ("PCS") in Aurora, North Carolina.

3. PCS operates a large phosphate mining and processing plant located near Aurora, North Carolina (the "Aurora Facility"). The Aurora Facility sits on 70,000 acres of land, which contains hundreds of millions of tons of phosphate ore. The mining operations at the Aurora Facility have the capacity to produce 6 million tons of phosphate concentrate per year. PCS estimates that it will continue to operate the Aurora Facility for at least several more decades.

4. The Aurora Facility consists of mining and processing operations situated on land owned in the mid-1960s by Texas Gulf Sulphur Company ("TGS") and North Carolina Phosphate Corporation ("NCPC"). In 1985, TGS and NCPC merged into Texasgulf, Inc. Potash

RAL 348216v1

Exhibit 1
Plaintiff's Memorandum of Law in Opposition
to Norfolk Southern Railway Co.'s
Motion for Summary Judgment
4:05-CV-55-D

Case 4:05-cv-00055-D   Document 45-1   Filed 12/08/06   Page 4 of 13

Corporation of Saskatchewan acquired Texasgulf, Inc. in 1995, and subsequently Texasgulf, Inc.'s name was changed to PCS Phosphate Company, Inc.

5. From the mid-1960s to the present, the Aurora Facility has relied heavily on rail access for the inbound transportation of raw materials and for the outbound shipment of its products to the marketplace. The Defendant Norfolk Southern Railway Company constructed the rail line to the Aurora Facility, which is known as the Lee Creek Rail Line. The Defendant has provided rail service along the Lee Creek Rail Line continuously since the 1960s.

6. PCS' ability to mine phosphate ore at the Aurora Facility requires permits and approvals from various federal and state agencies. The permits that currently authorize PCS' mining operations expressly authorize mining the phosphate reserves located below a portion of the Lee Creek Rail Line and the surrounding areas.

7. By 1999, PCS knew that it would soon be necessary to relocate a portion of the Lee Creek Rail Line. As a result, in 1999, PCS conducted studies regarding additional mining reserves accessible at the Aurora Facility. PCS concluded from those studies that the Lee Creek Rail Line impairs recovery of the phosphate ore and would interfere with the mining operations if the Lee Creek Rail Line was not relocated by mid-2007. PCS also concluded that to avoid interruption of PCS operations, it would be necessary to begin relocating the Lee Creek Rail Line by 2005.

8. On April 28, 1999, H. Michael Breza, PCS' Mine Manager, and Robert M. Chiles, PCS' engineering contractor, met with the Defendants' System Engineer and other representatives of the Defendants. The purpose of that meeting was to inform the Defendants' of PCS' intent to have a portion of the Lee Creek Rail Line relocated. During that meeting,

representatives of the Defendants provided specifications for the new railroad construction that would be used in the relocation project.

9. Between 1999 and 2001, PCS conducted an exhaustive study to allow PCS to prepare a cost-effective and technically sound proposal for relocating the Lee Creek Rail Line. PCS considered various alternatives for relocating the rail line. After considering information from the North Carolina Department of Transportation regarding highway relocation, from Carolina Power & Light regarding power line relocation, and from Defendants regarding rail line relocation, PCS arrived at a final relocation proposal, which PCS memorialized in engineering drawings.

10. On July 25, 2002, I along with other PCS representatives attended a meeting with representatives of the Defendants. That meeting took place at the Defendants' regional office in Raleigh. We explained during the meeting that relocating the rail line was necessary to allow PCS to continue mining operations at the Aurora Facility and that we expected the Defendants to perform their obligations under five agreements that require the Defendants to relocate portions of the Lee Creek Rail Line (the "Relocation Agreements"). During the meeting, PCS provided maps, an aerial photograph, and engineering drawings of the proposed rail line. At the conclusion of the meeting, the Parties agreed to schedule a subsequent meeting after the Defendants had an opportunity to review the specifications and to revisit the language in the Relocation Agreements.

11. On December 19, 2002, I along with other representatives of PCS attended a second meeting with representatives of the Defendants at the PCS Mine Office in Aurora to discuss the relocation project. At the meeting, the Defendants' representatives verbally acknowledged that the Relocation Agreements were valid and that the financial responsibility to

relocate the Lee Creek Rail Line belonged to the Defendants as outlined in the Relocation Agreements. The Defendants' representatives explained, however, that they did not wish to pay the expense of the relocation project, and that they wished to explore alternative funding options. The Defendants' representatives claimed that if they failed to identify a third party funding source, that the Defendants would request that the United States Surface Transportation Board ("STB") allow them to abandon the rail line.

12. I was very surprised by the Defendants' response, and based on subsequent discussions I know that my colleagues at PCS who attended the meeting were also surprised. We believed that a successful abandonment by the Defendants would also mean that the other carrier that was providing rail service along the line, CSX, would not be able to continue providing rail service. We therefore understood that the Defendants' abandonment threat, if the Defendants acted on it and if it was successful, would terminate rail access to the Aurora Facility.

13. We at PCS knew that losing rail access would force PCS to halt or substantially decrease operations at the Aurora Facility. A plant shutdown would cause PCS to lose tens of millions of dollars in annual revenues and could force PCS to terminate many of the 1,000 or more employees who work at the Aurora Facility.

14. Although the Defendants admitted at the December, 2002 meeting that the Relocation Agreements are valid and enforceable, the Defendants explained that they did not wish to spend their capital expenditures budget on the cost of relocating the rail line.

15. The Defendants first threatened PCS with abandonment in the December, 2002 meeting. The Defendants reiterated the abandonment threats throughout face-to-face meetings and in written correspondence between 2002 and 2005.

16. PCS continued to provide detailed plans and specifications for the rail line relocation to the Defendants from 2003 through the present. The Defendants never indicated that the route or specifications were unacceptable.

17. When the Defendants failed to relocate the Lee Creek Rail Line in response to PCS' request, PCS began working to perform the relocation project at its own expense. Those steps were necessary to minimize any interruption to mining operations, which would have caused PCS to face millions of dollars of additional losses.

18. As of September 30, 2006, PCS has spent $11,589,318.26 to relocate the rail line. PCS has contracted with third parties who will complete the rail relocation project by approximately April 1, 2007 at a cost of $14,449,000. In addition, PCS has obtained a cost estimate in the amount of $1,400,000 for the cost of removing the existing rail line and trestles.

Further the affiant sayeth not.

This 16th day of October, 2006.

*I. K. Gilmore*
I. K. "Tex" Gilmore

STATE OF NORTH CAROLINA

COUNTY OF BEAUFORT

I certify that I. K. "Tex" Gilmore personally appeared before me this day, acknowledging to me that he voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated: I. K. "Tex" Gilmore, Superintendent of Mine Planning Department of PSC Phosphate Company, Inc. [CHECK ONE] [✓] (i) I have personal knowledge of the identity of the principal(s); or [__] (ii) I have seen satisfactory evidence of the principal's identity by a current state or federal identification with the principal's photograph in the form of a _____.

Date: 10-16-06

_____Jayne Jones_____
Official Signature of Notary

Jayne Jones, Notary Public
Notary's printed or typed name

My Commission Expires: 3-21-09

[AFFIX NOTARIAL STAMP SEAL]

United States District Court
Eastern District of North Carolina
Eastern Division

Case No.: 4:05-CV-55-D

Plaintiff PCS Phosphate Company, Inc.'s
Memorandum of Law in Opposition
to Norfolk Southern Railway Co.'s
Motion for Summary Judgment

# Exhibit 2

# Affidavit of Keith Schniering

**Demarcation Page for Scanned Document**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Civil Action No. 4:05-CV-55-D

| | |
|---|---|
| PCS PHOSPHATE COMPANY INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | **AFFIDAVIT OF** |
| v. ) | **KEITH SCHNIERING** |
| ) | |
| NORFOLK SOUTHERN CORP. AND ) | |
| NORFOLK SOUTHERN RAILWAY ) | |
| COMPANY, INC., ) | |
| Defendants. ) | |

Keith Schniering, being first duly sworn, deposes and says as follows:

1. I am over 18 years of age, suffer no legal disabilities and have personal knowledge of the matters set forth herein.

2. I am employed as Director of Rail Rates and Terminals for PCS Sales (USA), Inc. My office is in Northbrook, Illinois.

3. The Plaintiff in this lawsuit, PCS Phosphate Company, Inc. ("PCS"), is a company affiliated with PCS Sales (USA), Inc., and my job responsibilities include working on transportation matters for PCS.

4. PCS operates a large phosphate mining and processing operation located near Aurora, North Carolina (the "Aurora Facility").

5. In connection with my responsibilities at PCS Sales (USA), Inc., I have been involved in matters concerning the Aurora Facility's shipping and receiving requirements, including the volumes of the Aurora Facility's shipments and the cost to PCS for such shipments.

**Exhibit 2**
Plaintiff's Memorandum of Law in Opposition
to Norfolk Southern Railway Co.'s
RAL 348227v1                                                        Motion for Summary Judgment
4:05-CV-55-D

Case 4:05-cv-00055-D    Document 45-1    Filed 12/08/06    Page 11 of 13

I am knowledgeable about the Aurora Facility's rail transportation requirements, including certain historic rail traffic volumes and expenditures.

6. The Aurora Facility currently ships and receives by rail more than 2 million tons of raw materials and products annually.

7. The Defendant Norfolk Southern Railway Company and its predecessors have provided rail service over a railroad line known as the Lee Creek Rail Line to and from the Aurora Facility since the 1960s. Over that period of time, PCS and its predecessors have paid the Defendant Norfolk Southern Railway Company many millions of dollars for such rail service. For example, in the last five years alone, Defendants have received more than $65 million in payments from PCS for traffic over the Lee Creek Rail Line. I am informed and believe that the Defendant Norfolk Southern Railway Company has received additional payments from third party shippers and a third party rail carrier that also operates over the Lee Creek Rail Line.

8. I am informed and believe that PCS will continue to rely upon the Defendant Norfolk Southern Railway Company to provide rail traffic along the Lee Creek Rail Line for at least several more decades.

9. Further the affiant sayeth not.

This 13th day of October, 2006.

_____
Keith Schniering

STATE OF ILLINOIS

COUNTY OF _Cook_

I certify that Keith Schniering personally appeared before me this day, acknowledging to me that he voluntarily signed the foregoing document for the purpose stated therein and in the capacity indicated: Keith Schniering, Director of Rail Rates and Terminals for PCS Sales (USA), Inc. [CHECK ONE] [✓] (i) I have personal knowledge of the identity of the principal(s); or [_] (ii) I have seen satisfactory evidence of the principal's identity by a current state or federal identification with the principal's photograph in the form of a _____.

Date: _October 13, 2006_

_Ann M. Baltys_
Official Signature of Notary

"OFFICIAL SEAL"
Ann M. Baltys
Notary Public, State of Illinois
My Commission Exp. 02/01/2007

_ANN M. BALTYS_, Notary Public
Notary's printed or typed name

My Commission Expires: _02/01/2007_

[AFFIX NOTARIAL STAMP SEAL]

3