IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION NO. 4:05-CV-55-D


PCS PHOSPHATE COMPANY, INC.
v.
NORFOLK SOUTHERN CORPORATION AND NORFOLK SOUTHERN RAILWAY COMPANY

---

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN RESPONSE AND OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


# EXHIBIT A

AFFIDAVITS OF
JAMES R. PASCHALL
AND
THOMAS W. AMBLER


## DEMARCATION PAGE

NOTICE: THIS DIVIDER DOES NOT APPEAR IN THE ORIGINAL DOCUMENTS, BUT HAS BEEN
INCLUDED FOR THE SOLE PURPOSE OF ASSISTING THE READER IN PERCEIVING TABBED OR
OTHER BREAKS IN THE .PDF VERSION OF THIS DOCUMENT. SHOULD ANY QUESTIONS ARISE
AS TO THE USE OR PLACEMENT OF THIS DEMARCATION, PLEASE CONTACT
BODE, CALL & STROUPE, L.L.P., AT 919.881.0338

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Civil Action No. 4:05-CV-55-D

PCS PHOSPHATE COMPANY, INC.,          )
                                      )
              Plaintiff,              )
                                      )
v.                                    )          **AFFIDAVIT OF**
                                      )          **JAMES R. PASCHALL**
NORFOLK SOUTHERN CORPORATION          )
AND NORFOLK SOUTHERN                   )
RAILWAY COMPANY,                      )
                                      )
              Defendants.             )

I, James R. Paschall, having been first duly sworn, state as follows:

1.      I am employed by Norfolk Southern Corporation as Senior General Attorney. I have held an attorney position with Norfolk Southern and its Norfolk Southern Railway Company subsidiary's predecessor, Southern Railway Company, since January 1979. Between September 1973 and August 1976, I held the positions of attorney-advisor and acting branch chief with the Interstate Commerce Commission, now the Surface Transportation Board, in Washington, D.C. I held an attorney position with the Chessie System Railroads between September 1976 and January 1979. I am a member of the bar of the States of Virginia, Illinois and Ohio and the District of Columbia.

2.      I am duly competent to make this Affidavit which I do of my own personal knowledge and information.

3.      In connection with the preparation of this Affidavit, I have reviewed the transcripts of the January 20, 2006 and March 27, 2006 depositions in this case of Mr. Thomas J. Brugman, former Assistant Vice President Shortline Marketing and prior to December 8, 2005 Group Vice President - Agriculture, Fertilizer & Consumer Products of Norfolk Southern, and the exhibits thereto. I also have reviewed e-mails that I have sent or received in connection with this case or its subject matter.

4. Mr. Brugman resigned his position with Norfolk Southern on short notice, effective March 31, 2006. I and the lawyers handling this case first received notice that Mr. Brugman was resigning from Norfolk Southern in a March 22, 2006 e-mail from another of Norfolk Southern's in-house attorneys. Thus, Mr. Brugman's statement shown in the transcript of his March 27, 2006 deposition that: "I have submitted my resignation to Norfolk Southern. My last day is March 31st." and his further answer in which he stated: "I have accepted a position with the Surface Transportation Board in Washington, D.C.," while not unexpected by March 27, had been a recent surprise to us. Brugman, Mar. 27, 2006 depo., p. 7.

5. Mr. Brugman further stated with respect to his resignation from Norfolk Southern: " – that we're here for now. It was primarily, didn't like the way my career path was going, and just before starting here, I think we did our last deposition in December, and they moved me to another position, and I just started looking around for an alternative." Brugman, Mar. 27, 2006 depo., p. 8-9.

6. The following colloquy relating to Mr. Brugman's deposition on January 20, 2006 at page 166-167 has been cited by PCS as evidence that NS's lawyers admitted the enforceability of the relocation agreements:

"Q. In this conference call that Ms. Corey set up, and in these e-mails that she says are going back and forth, did anybody in this group ever express any doubt that Norfolk Southern had that obligation dating back to 1966 to pay for the relocation?

"A. No, I never – I don't think so. They --

"Q. So --

"A. -- they would – people would turn to Tom Ambler and to Jim Paschall and say "Jim, is there any way out of this?' And I think Jim was pretty clear, "No, it is pretty airtight.'."

"Q. So, there was no doubt about the enforceability of that contract when people were having these discussions.

"A. Yep."

7.    At no time and under no circumstances did I ever make the statements attributed to me by Mr. Brugman during the conference call which he was describing or at any other time. My legal opinion on the issues in this case has always been consistent with the views and arguments expressed in NSR's motion for summary judgment, which I developed prior to the September 2003 meeting between Mr. Brugman and other NS personnel and certain representatives of PCS management.

8.    I have consistently advised Norfolk Southern management that the "relocation agreements" in the five deeds at issue are unenforceable for reasons stated in NSR's motion for summary judgment in this case. In a privileged and confidential e-mail dated June 27, 2003, I noted certain case support with respect to a key legal issue. I later wrote the September 8, 2003 privileged and confidential e-mail that contained a memo with arguments in support of NSR's position that is referred to in greater detail in paragraph 7 above. Mr. Brugman received copies of both of these e-mails.

Further, this Affiant sayeth not, this the 17th day of November 2006.

_____ (seal)
James R. Paschall
Senior General Attorney
Norfolk Southern Corporation

SWORN TO and subscribed before me
this the 17th day of November 2006.

_____
Notary Public

My Commission Expires:

_1 - 31 - 07_

Embossed Hereon Is My
Commonwealth of Virginia Notary Public Seal
My Commission Expires January 31, 2007
TERREL M. WIGGINS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Civil Action No. 4:05-CV-55-D

PCS PHOSPHATE COMPANY, INC., )
)
Plaintiff, )
v. )                                          **AFFIDAVIT OF**
)                                          **THOMAS W. AMBLER**
NORFOLK SOUTHERN CORPORATION )
AND NORFOLK SOUTHERN )
RAILWAY COMPANY, )
)
Defendants. )

I, Thomas W. Ambler, having been first duly sworn, state as follows:

1.      I am employed by Norfolk Southern Corporation as a General Attorney. I have held an attorney position with Norfolk Southern Corporation or Southern Railway Company since August 1978. From August of 1978 to January 1981 my position was Attorney, Real Estate Department. At the start of February, 1981 my group was brought into the Law Department. From February 1981 until January 1984 I was Attorney, Law Department, Real Estate Section. From February 1984 until June 1986 I was Solicitor, Law Department. From July 1986 to October 1990, I was Assistant General Solicitor, Law Department, and finally, in November of 1990 I became General Attorney, Law Department, for Norfolk Southern Corporation. I am an active member of the Virginia bar and an inactive member of the Pennsylvania and Georgia bars.

2.      I am duly competent to make this Affidavit which I do of my own personal knowledge and information.

3.      In connection with the preparation of this Affidavit, I have reviewed the transcripts of the January 20, 2006 and March 27, 2006 depositions in this case of Mr. Thomas J. Brugman, former Assistant Vice President Shortline Marketing and prior to December 8, 2005

Group Vice President - Agriculture, Fertilizer & Consumer Products of Norfolk Southern, and the exhibits thereto. I also have reviewed e-mails that I have sent or received in connection with this case or its subject matter.

4.     I do wish to comment upon the following testimony by Mr. Brugman in his deposition taken in this proceeding on January 20, 2006 at page166-167, which resulted in the following exchange that is heavily relied upon by PCS:

"Q. In this conference call that Ms. Corey set up, and in these e-mails that she says are going back and forth, did anybody in this group ever express any doubt that Norfolk Southern had that obligation dating back to 1966 to pay for the relocation?

"A.   No, I never – I don't think so.  They --

"Q.  So --

"A.  -- they would – people would turn to Tom Ambler and to Jim Paschall and say "Jim, is there any way out of this?'  And I think Jim was pretty clear, "No, it is pretty airtight.'."

"Q.  So, there was no doubt about the enforceability of that contract when people were having these discussions.

"A.  Yep."

5.     At no time and under no circumstances did I ever hear Jim Paschall make the statements attributed to him by Mr. Brugman during any conference call wherein Jim was describing NS's position or at any other time.  My speculation is that I was quite likely involved in any such call as Mr. Brugman describes.  My legal opinion on the issues in this case and those I have heard expressed by Mr. Paschall are consistent with the views and arguments expressed in NSR's motion for summary judgment filed with this Court herein.

6.     I have advised Norfolk Southern management that the "relocation agreements" in the five deeds at issue are unenforceable for reasons stated in NSR's motion for summary judgment in this case.

Further, this Affiant sayeth not, this the 27th day of November 2006.

Thomas W. Ambler
General Attorney
Norfolk Southern Corporation

COMMONWEALTH OF VIRGINIA
CITY OF NORFOLK, to-wit:

Subscribed and sworn to before me this 27th day of _November_ , 2006, by
Thomas W. Ambler, whose title is General Attorney of Norfolk Southern Corporation.


Donna J. Salani
Notary Public


My Commission Expires: My Commission Expires April 30, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION NO. 4:05-CV-55-D

PCS PHOSPHATE COMPANY, INC.
V.
NORFOLK SOUTHERN CORPORATION AND NORFOLK SOUTHERN RAILWAY COMPANY

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN RESPONSE AND OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT B

EXCERPTS FROM
JANUARY 20, 2006
DEPOSITION TESTIMONY OF
THOMAS J. BRUGMAN

DEMARCATION PAGE

NOTICE: THIS DIVIDER DOES NOT APPEAR IN THE ORIGINAL DOCUMENTS, BUT HAS BEEN
INCLUDED FOR THE SOLE PURPOSE OF ASSISTING THE READER IN PERCEIVING TABBED OR
OTHER BREAKS IN THE .PDF VERSION OF THIS DOCUMENT. SHOULD ANY QUESTIONS ARISE
AS TO THE USE OR PLACEMENT OF THIS DEMARCATION, PLEASE CONTACT
BODE, CALL & STROUPE, L.L.P., AT 919.881.0338

**Deposition of Thomas J. Brugman**
PCS Phosphate Company, Inc. v. Norfolk Southern Corp. and Norfolk Southern Railway Co., Inc.

13

| | | |
|---|---|---|
| 1 | | agreement? |
| 2 | A | If there was any question at all, it was strictly |
| 3 | | the length of the term of the contract and whether |
| 4 | | it was still enforceable, but for the most part, |
| 5 | | no. We agreed that this was enforceable. |
| 6 | Q | If you can turn with me back a few more pages to |
| 7 | | NS-103. At the top it says, "Here is what NS is |
| 8 | | facing." |
| 9 | A | Uh-huh, okay. |
| 10 | Q | The fourth bullet point says, "No apparent |
| 11 | | contractual obligation by either PCS or CSXT to |
| 12 | | contribute toward the track relocation." Do you |
| 13 | | see that? |
| 14 | A | I do. |
| 15 | Q | And do you agree with that from your understanding? |
| 16 | A | Yeah, there -- yeah, I agree with it. |
| 17 | Q | Okay. Why was any obligation on the part of PCS or |
| 18 | | CSX important to your team that was in the Chicago |
| 19 | | meeting? |
| 20 | A | The -- at that time, the preliminary engineering |
| 21 | | estimates were coming up about $10 million to $12 |
| 22 | | million or so, and senior management was very |
| 23 | | concerned that the traffic wouldn't bear that |
| 24 | | cost. They didn't want to get caught in that, and |

17

1   Q   What was your understanding of how, at that time,

2       Norfolk Southern had an abandonment case?

3   A   My understanding was that always be -- you know,

4       blame marketing.  Of course, it was marketing's

5       fault that the traffic was unprofitable, and

6       because of that there was no chance to improve it.

7       Or if we could improve it, it would only be for a

8       short term and then the rates would come right

9       back down again and be unprofitable.  And that --

10      then that -- our return, our analysis, said that

11      we fit the definition and that we were fairly

12      confident that we'd go to the Service

13      Transportation Board and file for abandonment.

14  Q   And you ultimately did, correct?

15  A   Yes.

16  Q   And it's been dismissed, correct?

17  A   I think postponed might be the proper word for it.

18  Q   What's your basis for saying it's postponed rather

19      than dismissed?

20  A   I think the S- -- now again, working from memory,

21      I believe the STB decision said that it was

22      premature.  So that, from our point of view, left

23      it open to go back in there and talk to them after

24      we work out some of the other things we're working

19

1    Q    Okay.  Has the stock price done well in those last

2         three years?

3    A    It's gone up fairly well.  Last few weeks, it's

4         gone back down.  You guys could buy some more for

5         me, you know.

6    Q    Let's talk about your specific piece of the pie.

7         How has your market group performed since 2002,

8         financially?

9    A    When I got into -- well let's see, you're saying

10        since 2002.

11   Q    Yeah, I'd like to compare.  Let's compare today

12        to --

13   A    We --

14   Q    -- what you were presenting --

15   A    We --

16   Q    -- at the time.

17   A    We've grown it.  Of course now I'm no longer the

18        group vice president of Ag, and I guess you know

19        that.  Let me give you my current business card.

20        I've been -- I've been rotated over to short line

21        marketing, which is a different function, and I've

22        been there since December 9th.  Anyway, we've

23        grown it to about -- at this time, if we flip to

24        the next page or the second page thereafter --

Deposition of Thomas J. Brugman
FCS Phosphate Company, Inc. v. Norfolk Southern Corp. and Norfolk Southern Railway Co., Inc.

86

```
 1    Q    Okay.  Is this a lateral move for you, or how
 2         would you describe it?
 3    A    It's a lateral move.
 4    Q    Okay.  Is it a move that you're happy with?
 5    A    I wasn't overjoyed.
 6    Q    Uh-huh.  Did it -- did you have to physically
 7         locate to another office or are you --
 8    A    Well --
 9    Q    -- just essentially --
10    A    -- another office in the same building.
11    Q    Okay.  And are your -- is the role that you play
12         in the short line business essentially the same
13         that you played for the agriculture business?
14    A    Oh, very -- well, it's very different.
15    Q    Okay.
16    A    Where I was a commodities specialist and a
17         customer specialist in the agricultural group,
18         with short lines, now I work with a short line
19         railroad partners and try to develop business on
20         their individual short lines.  There are 234 of
21         them.
22    Q    Okay.  Have you had any discussions since December
23         9th with any short line partners about potential
24         fixes for the Lee Creek line situation?
```

# BODE, CALL & STROUPE, L.L.P.
ATTORNEYS AT LAW

## EXHIBIT DIVIDER

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION NO. 4:05-CV-55-D

PCS PHOSPHATE COMPANY, INC.
V.
NORFOLK SOUTHERN CORPORATION AND NORFOLK SOUTHERN RAILWAY COMPANY

---

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN RESPONSE AND OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT C

EXCERPTS FROM
MARCH 27, 2006
DEPOSITION TESTIMONY OF
THOMAS J. BRUGMAN

# DEMARCATION PAGE

NOTICE: THIS DIVIDER DOES NOT APPEAR IN THE ORIGINAL DOCUMENTS, BUT HAS BEEN
INCLUDED FOR THE SOLE PURPOSE OF ASSISTING THE READER IN PERCEIVING TABBED OR
OTHER BREAKS IN THE .PDF VERSION OF THIS DOCUMENT. SHOULD ANY QUESTIONS ARISE
AS TO THE USE OR PLACEMENT OF THIS DEMARCATION, PLEASE CONTACT
BODE, CALL & STROUPE, L.L.P., AT 919.881.0338

7

1   A   I have submitted a resignation to Norfolk Southern.

2       My last day is March 31st.

3   Q   Okay.  Have you determined what you are going to do

4       after that period?

5   A   I have accepted a position with the Surface

6       Transportation Board, in Washington, D.C.

7   Q   Okay.  Now, is that going to entail a physical move

8       for you or?

9   A   Yeah.

10  Q   Okay.  And when do you start with the Surface

11      Transportation Board?

12  A   April 17th is the tentative start-date right now.

13      It gives me a couple of weeks to find an apartment,

14      get my affairs in order, and get started up there.

15  Q   What type of work are you going to be doing for the

16      STB?

17  A   I don't know exactly how they are going to use me,

18      but I'm going to be in the compliance and

19      enforcement division, under Mel Clemmons, and I'm

20      going to be following up, I believe, on customer

21      complaints about railroads and trying to resolve

22      them through negotiation and other stuff.

23  Q   Okay.  Do you know if that's going to entail a lot

24      of travel, or is your work mostly going to be out

17

1        there?

2   A    Not making enough money on the business that we're

3        handling out of that area, not covering our cost of

4        maintenance.

5   Q    Now, when you say "not making enough money" does

6        that mean not making any profit, or is there a

7        certain profit level that Norfolk Southern would

8        consider to be enough?

9   A    When we started this project, and about these

10       dates -- in other words, when I first became

11       involved in this, and you have the e-mails, we were

12       below 1.0 VPD as I recall, VPD cost.  And then

13       working with PCS, we managed to raise that up a

14       little bit.  I think, in the last year or so, I

15       think we were showing better than 1.0 VPD.  And

16       still that doesn't cover the cost of capital.

17  Q    Okay.  Look in that notebook at Exhibit Number 33,

18       and if you'll turn to page 12 of that.  And I'll

19       tell you that Exhibit 33 is the abandonment

20       application that Norfolk Southern filed with the

21       Surface Transportation Board.

22  A    What page was that?

23  Q    Page 12.  The numbers are down at the bottom.

24  A    Got it.  All right, page 12.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION NO. 4:05-CV-55-D

PCS PHOSPHATE COMPANY, INC.
V.
NORFOLK SOUTHERN CORPORATION AND NORFOLK SOUTHERN RAILWAY COMPANY

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN RESPONSE AND OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT D

EXCERPTS FROM
APRIL 13, 2006
DEPOSITION TESTIMONY OF
MARCELLUS C. KIRCHNER

## DEMARCATION PAGE

**NOTICE:** THIS DIVIDER DOES NOT APPEAR IN THE ORIGINAL DOCUMENTS, BUT HAS BEEN INCLUDED FOR THE SOLE PURPOSE OF ASSISTING THE READER IN PERCEIVING TABBED OR OTHER BREAKS IN THE .PDF VERSION OF THIS DOCUMENT. SHOULD ANY QUESTIONS ARISE AS TO THE USE OR PLACEMENT OF THIS DEMARCATION, PLEASE CONTACT BODE, CALL & STROUPE, L.L.P., AT 919.881.0338

1    abandonment more complicated?

2  A   Well, it makes it more unusual in that the -- in

3    our depiction of the case, we are treating the cost

4    to relocating the line as a rehabilitation expense

5    in the forecast year, and we believe -- our counsel

6    believes that this was a position that had strong

7    merit to it, but it is not something that is

8    routinely encountered.

9  Q   Okay.  Are you aware of any precedent at all at

10    Norfolk Southern, or anywhere else, for including a

11    relocation cost such as this in an abandonment --

12    in the financial calculations in connection with an

13    abandonment?

14  A   I am not personally familiar, but I have not

15    researched it.

16  Q   Okay.  Is there anyone else at Norfolk Southern

17    that you think would know the answer to that?

18  A   Well, I guess Mr. Paschall would know the answer.

19  Q   Okay.  And you don't know one way or the other?

20  A   No.

21  Q   Okay.  So you have identified the proposed

22    relocation.  Well, let me back up.  Why was it

23    deemed appropriate by you and Norfolk Southern

24    generally to include the proposed relocation cost

1        all in the initial year for the abandonment?

2  A    In the forecast year.

3  Q    In the forecast year.

4  A    Yes.

5  Q    Excuse me.

6  A    Because that is a cost that's based on the

7        allegations of PCS Phosphate that we would have to

8        undertake in order to continue enjoying the traffic

9        in the future.

10  Q    Okay.  But --

11  A    In other words, we had been instructed by PCS

12       Phosphate that we were supposed to pay to relocate

13       this line, and they intended to remove the existing

14       line to mine under it, and therefore to continue

15       enjoying the traffic, we would have to replace the

16       track, in their view of the world.

17  Q    Okay.  And I want to get some terminology down

18       because I'm not an abandonment lawyer or an STB

19       lawyer.  Tell me what the forecast year you're

20       referring to is.

21  A    Under the regulations of the Surface Transportation

22       Board, they define several years of data that need

23       to be depicted in the abandonment presentation.

24       First being the base year, which is a year of past

1          experience, and they have regulations that

2          determine what the timing of that should be, vis-a-

3          vis the time filing, and then the forecast year is

4          the 12-month period beginning with the month in

5          which the application or petition is filed.

6   Q   Okay.

7   A   In this case, we filed in November of 2005, so it

8          was November 2005 through October 2006.

9   Q   Being the forecast year?

10   A   Being the forecast year.

11   Q   And the base year would have been the year

12          immediately preceding that?

13   A   The base year in this instance was the 12-month

14          period ending in June 2005.

15   Q   And why ending in June 2005 as opposed to November

16          2005?

17   A   Because we like to do these things on an even

18          quarter basis, and we were able to readily retrieve

19          traffic information and other data for the June

20          period, and that fit within the regulations.

21   Q   So ordinarily, you like to go from even quarters

22          for purposes of determining the base year.  Is that

23          what I understood you to say?

24   A   That's our preference, yes.

```
1              reason why those relocation agreements don't mean
2              what they say they mean?
3     A        Yes.  Well, our position is, as a matter of law,
4              that our obligation, whatever it may have been, has
5              since expired.
6     Q        Okay.  Do you have an understanding of when that
7              obligation -- that you can -- when you contend that
8              obligation expired?
9     A        I could not specify precisely the date that that
10             occurred, but I understand that is our position.
11    Q        Okay.  Help me understand that.  Is that -- is it
12             your understanding that it simply -- too much time
13             has passed since the agreements were entered into?
14    A        Yes.
15    Q        Okay.  But you don't have an understanding of when
16             the too-much-time threshold occurred?
17    A        I -- I don't recall specifically what the precise
18             interval is.
19    Q        Okay.  Now, you're aware that in response to PCS
20             invoking the relocation agreements or deeds of
21             easement, as you've described them, that Norfolk
22             Southern has -- has indicated back a couple of
23             years ago that rather than relocate, they would
24             abandon the Lee Creek rail line, correct?
```

1        considerable amount of traffic on the Lee Creek

2        rail line, correct?

3  A     Correct.

4  Q     So in light of all the unusual, and in fact, in

5        your experience, unprecedented characteristics of

6        this particular application, it wasn't surprising

7        to you that the STB denied the application, was it?

8  A     I guess I view your question as a non sequitur in

9        that I didn't -- the unusual characteristics, in my

10       mind, did not dictate the outcome, and I fully

11       expected the Board to agree with us and approve the

12       abandonment application.

13  Q    Okay.  Are you saying that you were not

14       surprised - or no, were you saying that were you

15       surprised at the result issued by the Board?

16  A    I was surprised at the result, yes, that they

17       dismissed it in 20 days rather than having the

18       proceeding continue on the merits.

19  Q    Okay.  And specifically, why were you surprised?

20  A    Because in my experience, we had not had an

21       abandonment case follow that pattern before, so I

22       was not anticipating that they would immediately

23       dismiss it, that I expected them to rule on the

24       merits.

1  A  Yes.

2  Q  -- of the page, the first sentence says, "Through

3     rate increases and the diversion of some of NSR's

4     low margin or unprofitable PCS traffic to CSXT in

5     the past two years, NSR has handled its remaining

6     PCS traffic at a profit in those years, although it

7     has served PCS and its predecessors at near

8     breakeven or even unprofitable revenues or revenue

9     levels for such traffic in many past years since

10    1977."  Do you see that?

11  A  Yes.

12  Q  Do you agree with that statement?

13  A  I agree with the -- I guess, the overall intent of

14    it.  I probably would have phrased it differently

15    if I were describing the situation.

16  Q  How would you have phrased it?

17  A  Well, it's not even the situation that it is

18    describing, and Mr. Paskill, our counsel who wrote

19    these words, was not even near breakeven, and in

20    reality what he is referring to as breakeven is a

21    situation where the revenue just barely covered the

22    variable costs of the operation.  But at breakeven

23    means it's making no contribution towards the fixed

24    cost of the -- operating a railroad.

1  Q  Okay.  So you disagree with his characterization

2     that it was at near breakeven prior to the past two

3     years?

4  A  I am explaining that it's even worse than he

5     described it.

6  Q  Okay.

7  A  It is as bad as he described it but even worse.

8  Q  And this goes back to the year 1977.  Do you see

9     that?

10 A  Yes.

11 Q  Do you have an understanding of what the

12    profitability levels were back to 1977?

13 A  I do not.

14 Q  Do you have an understanding of what they were

15    before 1977?

16 A  I do not.

17 Q  Do you have an understanding of how they may have

18    changed since before 1977 versus after 1977?

19 A  I do not.

20 Q  So would it be fair to say that you don't have any

21    personal knowledge regarding whether this is true

22    that it was at near breakeven or unprofitable in

23    years back to 1977?

24 A  Which years are you speaking of?

1          the word "profit," I would have not have used in

2          this context.

3   Q    And why not?

4   A    Because what he means by "profit" is that they

5          created a contribution, i.e., the revenue was

6          slightly above the variable cost of the operation.

7   Q    Okay.  Now -- but you don't disagree that there was

8          a contribution made with respect to this particular

9          rail service on the Lee Creek rail line over the

10         last two years before this abandonment application

11         was filed?

12  A    I would -- I could not say of my own recollection

13         exactly at what point or at what quarter the tide

14         turned from being a negative to a positive

15         contribution, but there was some period of time

16         prior to the filing that the -- it had gone to a

17         positive contribution.

18  Q    Okay, okay.  And you would agree also that in fact

19         the profitability levels were trending upward in

20         the two years prior to this abandonment application

21         being filed?

22  A    Well, the contribution levels had improved in

23         recent periods.

24  Q    Okay.  And as it indicated here, part of that was

1         profitability but with respect to financial

2         reporting calculations of profitability?

3  A    Yes, in the context of gathering data for the

4         abandonment.

5  Q    Okay.  And is Norfolk Southern profitable for the

6         years 2005 and 2006 on the Lee Creek rail line,

7         from a financial reporting calculation of

8         profitability?

9  A    I would answer that no.

10  Q    And tell me why.

11  A    Because the -- the factor we look at is our -- is

12        our contribution, and this line is showing a

13        contribution that is slightly above 1.0, where you

14        take the ratio of revenue to cost, a variable cost,

15        and this is merely a contribution towards the fixed

16        cost of operating railroads.  And so if all of our

17        traffic had a -- a kind of a breakeven

18        profitability where the revenue was equal to the

19        variable cost, then we would eventually go

20        bankrupt.  And so although this line, this traffic

21        at PCS is now just barely covering its variable

22        cost, it's still not making a substantial

23        contribution to our system fixed cost.

24  Q    Okay.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

CIVIL ACTION NO. 4:05-CV-55-D

PCS PHOSPHATE COMPANY, INC.
V.
NORFOLK SOUTHERN CORPORATION AND NORFOLK SOUTHERN RAILWAY COMPANY

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN RESPONSE AND OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT E

EXPERT REPORT OF
BENTON V. FISHER
DATED MARCH 17, 2006

DEMARCATION PAGE

NOTICE: THIS DIVIDER DOES NOT APPEAR IN THE ORIGINAL DOCUMENTS, BUT HAS BEEN
INCLUDED FOR THE SOLE PURPOSE OF ASSISTING THE READER IN PERCEIVING TABBED OR
OTHER BREAKS IN THE .PDF VERSION OF THIS DOCUMENT. SHOULD ANY QUESTIONS ARISE
AS TO THE USE OR PLACEMENT OF THIS DEMARCATION, PLEASE CONTACT
BODE, CALL & STROUPE, L.L.P., AT 919.881.0338

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

PSC PHOSPHATE COMPANY, INC., )
)
               Plaintiff, )
)
   v. )
)
NORFOLK SOUTHERN CORPORATION )
AND NORFOLK SOUTHERN )
RAILWAY COMPANY, INC. )
)
           Defendants. )

EXHIBIT

PENGAD 800-631-6989

63

Fisher

## REPORT

by

**BENTON V. FISHER**
**Senior Managing Director**

**FTI Consulting, Inc.**

**Prepared for**

**Bode, Call & Stroupe, LLP**

**March 17, 2006**

**CONTAINS CONFIDENTIAL INFORMATION**

## I. INTRODUCTION

This report is submitted on behalf of Norfolk Southern Corporation and Norfolk Southern Railway ("NS") in the United States District Court for the Eastern District of North Carolina, Eastern Division, Civil Action No. 4:05-CV-55-D.

I am a Senior Managing Director in the Network Industries Strategies group of FTI Consulting. Much of the group's work focuses on the economic and financial analysis of the transportation, telecommunications, pipeline, and postal industries. I have spent 15 years involved in various aspects of transportation consulting including economic studies of costs and revenues, traffic and operating analyses, and work with performance measurement and financial reporting systems.

Exhibit No. 1 to this report summarizes my consulting experience. Exhibit No. 2 provides the basis for the compensation to be paid to FTI Consulting for our analysis and my testimony in this proceeding. Exhibit No. 3 identifies the proceedings in which I have provided testimony. Exhibit No. 4 provides a list of materials I have reviewed in forming the opinions expressed in this report.

I have been requested by Counsel for NS in this proceeding to offer an opinion as to the Report submitted by Philip H. Burris on behalf of PCS Phosphate Company ("PCS") on January 16, 2006, hereafter "the January 16 Report." In that report, Mr. Burris claimed to evaluate NS's financial ability to pay for the relocation of the rail line from Aurora to Lee Creek, North Carolina ("the line"). In this report, I will respond to Mr. Burris's specific claims and refute his incorrect conclusions regarding the revenue and cost assessment associated with NS's relocation of the line.

1

To form my opinions, I have reviewed Mr. Burris's January 16 Report, NS's responses to PCS's interrogatories and requests for production of documents from this proceeding, NS's November 17, 2005 abandonment application and supporting work papers in Surface Transportation Board ("STB") Docket No. AB-290 (Sub.-No. 262), *Norfolk Southern Railway Company – Abandonment – In Beaufort County, North Carolina – Abandonment Application* ("Abandonment Application"), decisions by the STB, and various financial reports submitted to the Securities Exchange Commission ("SEC").

## II.    SUMMARY OF FINDINGS

Based on my review of Mr. Burris's report, I find that:

1.    Mr. Burris's conclusion that NS may have the financial ability to expend $12 million is misleading and does not support the relocation of a line whose current operations are non-compensatory.

2.    Mr. Burris's conclusion that NS is unlikely to lose traffic to CSXT is flawed and not supported by the materials provided in discovery in this proceeding.

3.    Mr. Burris's conclusion that NS is enjoying a "profit" on the line is incorrect and belies considerable uncertainty of its future financial viability.

## III.    ANALYSIS

## A. NS'S PRESUMED FINANCIAL ABILITY TO PAY FOR THE RELOCATION IS MISLEADING AND DOES NOT SUPPORT THE RELOCATION

Mr. Burris attempts to demonstrate NS's financial ability to pay for the relocation of the line by referring to Norfolk Southern Corporation's press releases, SEC filings, and STB decisions that identify (1) NS's plans to spend more than $1 billion in capital

2

improvements; (2) NS's reported cash and cash flow from operations of $1 billion; and (3) the STB's determination that NS was the only "revenue adequate" railroad in 2004.

As background, the construction, operation, and maintenance of freight railroads is a very capital-intensive business. Investments in track and equipment are tremendous, and critical. NS's extensive network and associated expenditures to ensure its upkeep are no exception. Mr. Burris has identified NS's capital requirements, that it must expend more than $1 billion to maintain its existing operations and retain its business on its entire system. Without these, NS would no longer be able, among other actions, to service its debt or to provide an adequate return to its investors, which would have devastating repercussions. As such, and as reflected by the press release to which Mr. Burris cites, NS pursues a capital-planning process that seeks to identify and pursue the best use for NS's spending. In light of (1) the non-existent return for the traffic currently moving over the line, (2) the decreasing traffic levels, (3) the competitive nature of many of the commodities NS moves over the line, and (4) the reliance on a single customer's business, it would not be surprising for NS to evaluate the relocation of the line and conclude that it does not meet the criteria of the subset of projects that were selected for capital spending, regardless of Mr. Burris's calculation of its proportion of the total.

Further, in addition to the critical need for sizable capital investment in its track and equipment that it shares with other freight railroads, NS is more debt-laden than its peers. Specifically, NS reported $6.6 billion in long-term debt at year-end 2005, 30 percent more than the comparably-sized CSX Transportation ("CSXT"). NS's reported debt level was within $150 million (2 percent) of that of each of Burlington Northern Santa Fe ("BNSF") and Union Pacific ("UP"), two considerably larger railroads reporting

3

25-to-50 percent greater investments ($5 to $10 billion more) in property, plant, and equipment. NS's considerable capital needs and significantly greater debt-to-capital situation underscore the scrutiny with which capital-planning decisions are made.

Finally, Mr. Burris cites to the STB's determination that NS achieved a rate of return on net investment that exceeded the industry-wide cost of capital in 2004, and that it was the only of the seven Class I railroads that the STB evaluated to do so. It is important to note that 2004 was the first year since 1997 that any railroad was found to be "revenue adequate." The fact that NS failed to earn the industry cost of capital for each of the last six years indicates that the 2004 calculation that Mr. Burris selected is in fact an exception when compared to recent performance.

## B. NS HAS ALREADY LOST BUSINESS MOVING OVER THE LINE

Mr. Burris asserts that NS is the only carrier that can move much of the PCS "captive" rail traffic and concludes that it is unlikely to lose the traffic. This claim is simply not supported by the facts or the commodities moved over the line. Documents that NS produced in discovery indicate that the number of carloads that NS has handled decreased in 6 of the 8 years between 1995 and 2003, and over the eight years had fallen nearly 40 percent lower from 1995 levels. NS's Abandonment Application indicates that volumes continue to decrease beyond 2003, falling from 2003 to 2004, and again through 2005, when the annualized number of shipments through August is nearly one-quarter (25 percent) lower than the traffic levels of just two years before. The Abandonment Application also indicates that the traffic handled by CSXT via trackage rights, by contrast, was not following a similar pattern, remaining constant through 2004 and 2005.

4

Mr. Burris bases his faulty conclusion that NS is unlikely to lose the traffic on an assessment of the origins and destination of the shipments moving to and from the PCS facility in Aurora. While he may have identified that certain shipments currently move between Aurora and stations where NS is the only rail carrier, this is simply not enough, and fails to consider the competitive pressures produced by the presence of two carriers at the other end of the move. Further, the breadth of origins and destinations of the traffic moving over the line suggests that many of these commodities could be sourced from (or delivered to) different facilities. The presence of alternative geographic sources (and destinations) for this traffic indicates that even without the necessary increase to the rates that would be required by NS to recover the cost of the relocation, NS is threatened to lose traffic to CSXT, as well as other modes of transportation. The significant overall shift in traffic volumes over the last decade as well as that between the two rail carriers is in part reflective of the dynamics of competition in the marketplace for the different commodities, which extend beyond Mr. Burris's comparison of the relative distance between two locations. NS's concerns that it has no assurance of future traffic and revenue levels from the lone customer on the line are legitimate and cannot be disregarded.

## C. NS'S OPERATIONS OF THE LINE ARE CURRENTLY NON-COMPENSATORY

Using materials in the Abandonment Application, Mr. Burris attempts to refute NS's claim that it cannot operate and maintain the line profitably. Based on the difference between the attributable revenues and avoidable costs as determined for the

5

abandonment, Mr. Burris improperly concludes that this "operating profit" is grounds for the long-term financial viability of the line. It is not.

First, Mr. Burris cites to the fact that the cost included in the abandonment application are based in part on the STB's general purpose costing system ("URCS" – Uniform Rail Costing System). The STB's costing system is used to calculate variable costs, that is, the portion of costs that are determined to vary with changes in levels of output. Thus, use of such URCS costs would reflect only a subset of NS's total costs, and would by design provide for no recovery of the significant fixed costs associated with NS's network system.

Second, Mr. Burris suggests that materials provided by NS indicate that URCS costs are higher than NS's internal costs. Both the Abandonment Application and materials that NS produced in discovery show that the revenues from the PCS traffic on the line have for years been close to and often less than NS's internal costs associated with handling the traffic, that is, the ratio between revenues and costs ranges from 0.9 to 1.1. In these materials as well as NS's responses to PCS's interrogatories, NS indicates that these internal costs also account only for "variable costs," and do not cover the fully allocated costs of constructing, operating, and maintaining the line. Thus, much of the PCS traffic that NS handles does not cover even its variable cost of service. This is not the predicate for an operation this is financially viable for one year, let alone for the next 50.

Mr. Burris's faulty conclusions regarding NS's financial performance on the line and the relevance of benefits from an earlier merger also render his challenges to NS's Frustration of Purpose defense invalid. He misuses the "profit" figure to estimate that the

6

cost of the relocation will be "returned" within 8 to 10 years. In actuality, the fact that NS is already falling short of recovering its fully allocated costs of operating and maintaining the line, before any additional payment for the relocation of the line, instead indicates that any further investment would be uneconomic and unrecoverable. And, notwithstanding the significantly harmful impact that the relocation cost would have on both NS's performance and competitive position, Mr. Burris attempts to compare the $12-to-$15 million estimate to capital expenditures from more than 30 years ago. This effort is misplaced, as it is irrelevant to inflate to current price levels additional investments associated with NS's merger with Southern Railway ("SR"), and certainly does not change the precarious financial position with which NS now operates the line.

## IV. CONCLUSIONS

In conclusion, NS has lost traffic on the line, has lost traffic to CSXT, has no assurance that such losses will not continue in the future. Further, NS is not recovering its fully allocated costs on the line and, for much of the traffic, unable to recover even its internal estimate of variable costs. These factors far outweigh any perceived ability to pay, an ability that belies the capital-intensive and debt-laden nature of NS's network business that render its specific planning decisions and expenditures even more critical. It is clear that making additional investments in the line is not justified, as they would be uneconomic and unrecoverable for NS.

Mr. Burris's January 16 Report does not successfully refute NS's Defenses. I reserve the right to submit supporting details and respond to any subsequent claims or analyses that PCS or Mr. Burris submits.

7

This report is signed on the 17th day of March, 2006.

Benton V. Fisher
_____
Benton V. Fisher

8

 F T I

**Benton V. Fisher** is a Senior Managing Director of FTI Consulting's Network Industries Strategies group, located in Washington, D.C. Mr. Fisher has 15 years of experience in providing financial, economic and analytical consulting services to corporate clients dealing with transportation, telecommunications, and postal subjects.

Mr. Fisher has worked extensively to develop railroad clients' applications for mergers and acquisitions and expert testimony justifying the reasonableness of their rates before the Surface Transportation Board. In addition to analyzing extensive financial and operating data, Mr. Fisher has worked closely with people within many departments at the railroad as well as outside counsel to ensure that the railroads' presentations are accurate and defensible. Additionally, Mr. Fisher reviews the expert testimony of the railroads' opponents in these proceedings, and advises counsel on the necessary course of action to respond.

Mr. Fisher has been responsible for reviewing cost studies in the telecommunications arena. Mr. Fisher analyzes the sensitivity of multiple economic components and incorporates this information into various models being relied upon by the parties and regulators to determine the pricing of services. Mr. Fisher has also been responsible for preparing testimony that critiques alternative presentations.

Mr. Fisher assisted in reviewing the U.S. Postal Service's evidence and preparing expert testimony on behalf of intervenors in Postal Rate and Fee Changes cases. He has also been retained by a large international consulting firm to provide statistical and econometric support in their preparation of a long-range implementation plan for improving telecommunications infrastructure in a European country.

Mr. Fisher has sponsored expert testimony in rate reasonableness proceedings before the Surface Transportation Board.

Mr. Fisher graduated from Princeton University with a Bachelor of Science degree in Engineering and Management Systems.

## COMPENSATION

The table below summarizes FTI Consulting's hourly billing rates by category of personnel. Direct expenses for travel, report production, postage, and other expenses are billed at cost, in addition to fees. Mr. Fisher's billing rate is $400 per hour.

| Personnel | Hourly Rate |
|---|---|
| 1. Senior Managing Directors | $400 - $575 |
| 2. Directors / Managing Directors | $285 - $395 |
| 3. Senior Consultants / Consultants | $150 - $280 |
| 4. Administrative / Paraprofessionals | $ 95 - $145 |

Neither the amount of FTI Consulting's or Mr. Fisher's compensation nor the timing or terms of its payment are in any way contingent on the outcome of the proceeding.

# CURRICULUM VITAE

## OF

## BENTON V. FISHER

## EDUCATION

Princeton University, Princeton, New Jersey, 1990
Bachelor of Science in Engineering - Civil Engineering and Operations Research,
Concentration in Engineering and Management Systems

## EMPLOYMENT HISTORY

Bill Bradley for U.S. Senate; Woodbridge, New Jersey; 1990-1991
Deputy Campaign Controller

FTI Consulting/Klick, Kent & Allen; Washington, DC & Alexandria, Virginia; 1991-Present
Senior Managing Director, 2006-Present

## TESTIMONY

### Surface Transportation Board

| | |
|---|---|
| January 15, 1999 | Docket No. 42022 FMC Corporation and FMC Wyoming Corporation v. Union Pacific Railroad Company, Opening Verified Statement of Christopher D. Kent and Benton V. Fisher |
| March 31, 1999 | Docket No. 42022 FMC Corporation and FMC Wyoming Corporation v. Union Pacific Railroad Company, Reply Verified Statement of Christopher D. Kent and Benton V. Fisher |
| April 30, 1999 | Docket No. 42022 FMC Corporation and FMC Wyoming Corporation v. Union Pacific Railroad Company, Rebuttal Verified Statement of Christopher D. Kent and Benton V. Fisher |
| July 15, 1999 | Docket No. 42038 Minnesota Power, Inc. v. Duluth, Missabe and Iron Range Railway Company, Opening Verified Statement of Christopher D. Kent and Benton V. Fisher |
| August 30, 1999 | Docket No. 42038 Minnesota Power, Inc. v. Duluth, Missabe and Iron Range Railway Company, Reply Verified Statement of Christopher D. Kent and Benton V. Fisher |
| September 28, 1999 | Docket No. 42038 Minnesota Power, Inc. v. Duluth, Missabe and Iron Range Railway Company, Rebuttal Verified Statement of Christopher D. Kent and Benton V. Fisher |
| June 15, 2000 | Docket No. 42051 Wisconsin Power and Light Company v. Union Pacific Railroad Company, Opening Verified Statement of Christopher D. Kent and Benton V. Fisher |
| August 14, 2000 | Docket No. 42051 Wisconsin Power and Light Company v. Union Pacific Railroad Company, Reply Verified Statement of Christopher D. Kent and Benton V. Fisher |

1

| | |
|---|---|
| September 28, 2000 | Docket No. 42051 Wisconsin Power and Light Company v. Union Pacific Railroad Company, Rebuttal Verified Statement of Christopher D. Kent and Benton V. Fisher |
| December 14, 2000 | Docket No. 42054 PPL Montana, LLC v. The Burlington Northern Santa Fe Railway Company, Opening Verified Statement of Christopher D. Kent and Benton V. Fisher |
| March 13, 2001 | Docket No. 42054 PPL Montana, LLC v. The Burlington Northern Santa Fe Railway Company, Reply Verified Statement of Christopher D. Kent and Benton V. Fisher |
| May 7, 2001 | Docket No. 42054 PPL Montana, LLC v. The Burlington Northern Santa Fe Railway Company, Rebuttal Verified Statement of Christopher D. Kent and Benton V. Fisher |
| October 15, 2001 | Docket No. 42056 Texas Municipal Power Agency v. The Burlington Northern Santa Fe Railway Company, Opening Verified Statement of Benton V. Fisher |
| January 15, 2002 | Docket No. 42056 Texas Municipal Power Agency v. The Burlington Northern Santa Fe Railway Company, Reply Verified Statement of Benton V. Fisher |
| February 25, 2002 | Docket No. 42056 Texas Municipal Power Agency v. The Burlington Northern Santa Fe Railway Company, Rebuttal Verified Statement of Benton V. Fisher |
| May 24, 2002 | Docket No. 42069 Duke Energy Corporation v. Norfolk Southern Railway Company, Opening Evidence and Argument of Norfolk Southern Railway Company |
| June 10, 2002 | Docket No. 42072 Carolina Power & Light Company v. Norfolk Southern Railway Company, Opening Evidence and Argument of Norfolk Southern Railway Company |
| July 19, 2002 | Northern States Power Company Minnesota v. Union Pacific Railroad Company, Union Pacific's Opening Evidence |
| September 30, 2002 | Docket No. 42069 Duke Energy Corporation v. Norfolk Southern Railway Company, Reply Evidence and Argument of Norfolk Southern Railway Company |
| October 4, 2002 | Northern States Power Company Minnesota v. Union Pacific Railroad Company, Union Pacific's Reply Evidence |
| October 11, 2002 | Docket No. 42072 Carolina Power & Light Company v. Norfolk Southern Railway Company, Reply Evidence and Argument of Norfolk Southern Railway Company |
| November 1, 2002 | Northern States Power Company Minnesota v. Union Pacific Railroad Company, Union Pacific's Rebuttal Evidence |
| November 19, 2002 | Docket No. 42069 Duke Energy Corporation v. Norfolk Southern Railway Company, Rebuttal Evidence and Argument of Norfolk Southern Railway Company |
| November 27, 2002 | Docket No. 42072 Carolina Power & Light Company v. Norfolk Southern Railway Company, Rebuttal Evidence and Argument of Norfolk Southern Railway Company |
| January 10, 2003 | Docket No. 42057 Public Service Company of Colorado D/B/A Xcel Energy v. The Burlington Northern and Santa Fe Railway Company, Opening Evidence and Argument of The Burlington Northern and Santa Fe Railway Company |
| February 7, 2003 | Docket No. 42058 Arizona Electric Power Cooperative, Inc. v. The Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad, Opening Evidence of The Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad |

2

| April 4, 2003 | Docket No. 42057 Public Service Company of Colorado D/B/A Xcel Energy v. The Burlington Northern and Santa Fe Railway Company, Reply Evidence and Argument of The Burlington Northern and Santa Fe Railway Company |
|---|---|
| May 19, 2003 | Docket No. 42057 Public Service Company of Colorado D/B/A Xcel Energy v. The Burlington Northern and Santa Fe Railway Company, Rebuttal Evidence and Argument of The Burlington Northern and Santa Fe Railway Company |
| May 27, 2003 | Docket No. 42058 Arizona Electric Power Cooperative, Inc. v. The Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad, Joint Variable Cost Reply Evidence of The Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad |
| May 27, 2003 | STB Docket No. 42058 Arizona Electric Power Cooperative, Inc. v. The Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad, Reply Evidence of The Burlington Northern and Santa Fe Railway Company |
| June 13, 2003 | STB Docket No. 42071 Otter Tail Power Company v. The Burlington Northern and Santa Fe Railway Company, Opening Evidence of The Burlington Northern and Santa Fe Railway Company |
| July 3, 2003 | STB Docket No. 42058 Arizona Electric Power Cooperative, Inc. v. The Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad, Joint Variable Cost Rebuttal Evidence of The Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad |
| October 8, 2003 | STB Docket No. 42071 Otter Tail Power Company v. The Burlington Northern and Santa Fe Railway Company, Reply Evidence of The Burlington Northern and Santa Fe Railway Company |
| October 24, 2003 | STB Docket No. 42069 Duke Energy Corporation v. Norfolk Southern Railway Company Supplemental Evidence of Norfolk Southern Railway Company |
| October 31, 2003 | STB Docket No. 42069 Duke Energy Corporation v. Norfolk Southern Railway Company, Reply of Norfolk Southern Railway Company to Duke Energy Company's Supplemental Evidence |
| November 24, 2003 | STB Docket No. 42072 Carolina Power & Light Company v. Norfolk Southern Railway Company, Supplemental Evidence of Norfolk Southern Railway Company |
| December 2, 2003 | STB Docket No. 42072 Carolina Power & Light Company v. Norfolk Southern Railway Company, Reply of Norfolk Southern Railway Company to Carolina Power & Light Company's Supplemental Evidence |
| January 26, 2004 | STB Docket No. 42058 Arizona Electric Power Cooperative, Inc. v. The Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad Company, Joint Supplemental Reply Evidence and Argument of The Burlington Northern and Santa Fe Railway Company and Union Pacific Railroad Company |
| March 1, 2004 | STB Docket No. 41191 (Sub-No. 1) AEP Texas North Company v. The Burlington Northern and Santa Fe Railway Company, Opening Evidence and Argument of The Burlington Northern and Santa Fe Railway Company |
| March 22, 2004 | STB Docket No. 42071 Otter Tail Power Company v. The Burlington Northern and Santa Fe Railway Company, Supplemental Reply Evidence of The Burlington Northern and Santa Fe Railway Company |

| | |
|---|---|
| May 24, 2004 | STB Docket No. 41191 (Sub-No. 1) AEP Texas North Company v. The Burlington Northern and Santa Fe Railway Company, Reply Evidence of The Burlington Northern and Santa Fe Railway Company |
| March 1, 2005 | Docket No. 42071 Otter Tail Power Company v. BNSF Railway Company, Supplemental Evidence of BNSF Railway Company |
| April 4, 2005 | Docket No. 42071 Otter Tail Power Company v BNSF Railway Company, Reply of BNSF Railway Company to Supplemental Evidence |
| April 19, 2005 | Docket No. 42088 Western Fuels Association, Inc. and Basin Electric Power Cooperative, Inc. v. BNSF Railway Company, Opening Evidence of BNSF Railway Company |
| July 20, 2005 | Docket No. 42088 Western Fuels Association, Inc. and Basin Electric Power Cooperative, Inc. v. BNSF Railway Company, Reply Evidence of BNSF Railway Company |
| September 30, 2005 | Docket No. 42088 Western Fuels Association, Inc. and Basin Electric Power Cooperative, Inc. v. BNSF Railway Company, Rebuttal Evidence of BNSF Railway Company |
| October 20, 2005 | Docket No. 42088 Western Fuels Association, Inc. and Basin Electric Power Cooperative, Inc. v. BNSF Railway Company, Surrebuttal Evidence of BNSF Railway Company |

## LIST OF MATERIALS REVIEWED

Complaint of PCS Phosphate Company ("PCS") against Norfolk Southern Corporation and Norfolk Southern Railway Company ("NS")

NS's Answers and Affirmative Defenses to Complaint

January 16, 2006 Report of Phillip H. Burris

NS's Responses to PCS's Interrogatories and Requests for Production of Documents

NS's November 17, 2005 Abandonment Application in Surface Transportation Board ("STB") Docket No. AB-290 (Sub.-No. 262), *Norfolk Southern Railway Company – Abandonment – In Beaufort County, North Carolina – Abandonment Application*

Decisions in STB Ex Parte No. 552 Railroad Revenue Adequacy Determinations (each year 1997 through 2004)

10-K Reports for Norfolk Southern Corporation, Burlington Northern Santa Fe Corporation, CSX Corporation, and Union Pacific Corporation (2005)