IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA, EASTERN DIVISION

Civil Action No. 4:05-CV-55-D(1)

| | | |
|---|---|---|
| PCS PHOSPHATE COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | DEFENDANTS' AMENDED |
| | ) | MEMORANDUM OF POINTS |
| v. | ) | AND AUTHORITIES IN |
| | ) | RESPONSE AND OPPOSITION TO |
| NORFOLK SOUTHERN CORP. | ) | PLAINTIFF'S MOTION FOR |
| AND NORFOLK SOUTHERN | ) | SUMMARY JUDGMENT |
| RAILWAY COMPANY | ) | FED. R. CIV. P. 56 |
| | ) | |
| Defendants. | ) | |

Defendants, Norfolk Southern Railway Company ("NSR") and Norfolk Southern Corp. ("NSC"),

by their undersigned attorneys, respond in opposition to Plaintiff's, PCS Phosphate Company, Inc.'s

("PCS") motion for summary judgment in this action, as follows:

**ABBREVIATED SUMMARY OF THE NATURE AND FACTS OF THE CASE**

PCS seeks damages, now claimed to be $15,849,000, from NSC and NSR (together referred to as

"NS") for alleged breach of contract, breach of easement covenant and unjust enrichment. PCS seeks

treble damages for alleged deceptive trade practices under common law and North Carolina Gen. Stat. §

75-1.1, and for recovery of its attorney fees under North Carolina Gen. Stat. § 75-16.1.

PCS claims that NS is required to "relocate" a **6.4**-mile rail line between Aurora, NC and Lee

Creek, NC (the "Rail Line") and, in the process, to turn it into an 8.2-mile right-of-way on PCS's

extensive Beaufort County, NC property, at NS's sole expense[1]. PCS's claims are based on provisions in

five deeds of easement for a right-of-way granted in 1965 and 1966 by previous owners of PCS's land to

a small, 547-mile long predecessor railroad of defendant NSR that had the same name ("old NSR").[2]

---

[1] A 4.6 mile rail line was erroneously indicated in the original filing.

[2] (See Ex. A, B, C, D and E, to NSR's memorandum in support of its motion for summary judgment,

1

Each Deed granting the right of way contained what PCS calls "Relocation Agreements" in very similar, though not identical, language. The easements were not granted to old NSR subject to these "Relocation Agreements," but simply "TO HAVE AND TO HOLD the aforesaid right of way and easement unto Grantee, its successors and assigns, for so long as said right of way and easement shall be used for railroad purposes and shall not be abandoned." Only Deeds A and B add the words "or relocated" after "abandoned." Each Deed then stated: "It is expressly understood and agreed by and between the parties hereto as follows:" The provisions of Deed C are quoted below as an example of the similar language that followed in each Deed:

> (1) If, after ten (10) years from the date of this instrument, Texas Gulf Sulphur Company has exercised its option on the land of Fred R. Alfred and Betty A Alfred, across which this right of way and easement is given, and Texas Gulf Sulphur Company **then** determines that all or any part of said right of way and easement interferes with its **anticipated** mining or processing operations in the Beaufort County, North Carolina area, **then** Texas Gulf Sulphur Company **shall notify** Norfolk Southern Railway Company **in writing** of its desire that the right of way and track be moved, specifying in said notice the date on which it requires the track to be relocated which date shall not be less than 16 months after the date of said notice and designating in the notice a new location for the right of way and relocation of said track.... [**Emphasis supplied**.]

> (3) **That if the Grantee shall abandon the aforesaid land or right of way for railroad purposes** and cease to use the same for such purposes the Grantors and their heirs, successors and assigns shall be seized of their former estates therein and the aforesaid right of way and easement shall cease and determine. Failure to build a track on said right of way and easement within a period of one year from the date of this instrument shall be conclusively presumed to constitute an abandonment. [**Emphasis supplied**.]

> (7) The railroad tracks and appurtenant facilities installed by Grantee shall be and remain the property of Grantee and may be removed by it at any time and from time to time.

Old NSR was the sole railroad carrier operating over the Rail Line when the Deeds of Easement were executed. CSX Transportation, Inc. and its predecessors ("CSXT") began to operate over the Rail

---

which are the same as Complaint Ex. A, B, C, D and E) (the "Deeds"). The Deeds that granted old NSR easements for a **6.4**-mile right-of-way on which to construct the Rail Line over property now owned by PCS were granted by the following grantors on the dates indicated: A. North Carolina Phosphate Corporation ("NCPC") and Weyerhauser Company ("WC"), June 29, 1965; B. NCPC, WC and Union Central Life Insurance Company, June 29, 1965; C. Fred R. Alfred, Betty A. Alfred and Texas Gulf Sulphur Company ("TGS"), October 12, 1965; D. TGS, April 15, 1966; E. TGS, May 3, 1966. TGS had no apparent estate to grant in Deed C, only an option to buy the property. (**Please note a 4.6 mile right-**

2

Line in competition with NSR on or about February 28, 1977 under a settlement agreement in an Interstate Commerce Commission ("ICC") proceeding in which the ICC (the ICC has since been eliminated as a federal agency and the Surface Transportation Board ["STB"] created and has succeeded to many former ICC functions) authorized NSR's acquisition of old NSR. CSXT obtained trackage rights over the Rail Line and the standard "traffic protective conditions" that the ICC regularly imposed as a condition of its approval of mergers and acquisitions. CSXT is not a party to the Deeds of Easement and need not contribute to the cost of relocating the Rail Line. CSXT also is not required to contribute to maintenance costs for the Rail Line. Thus, CSXT enjoys a competitive cost advantage when bidding for PCS rail traffic and NSR can not increase rates on PCS traffic enough to cover its full costs (variable and fixed) of operating and maintaining, much less relocating, the Rail Line. Additional facts are found in the October 16, 2006 Memorandum of Points and Authorities Supporting Defendants' Motion for Summary Judgment (NSR's October 16, 2006 Memorandum).[3]

PCS's breach of contract and breach of covenant claims do not state a claim upon which relief can be granted and are unenforceable as a matter of law. The Deed provisions relied upon by PCS do not contain a unilateral, unconditional and irrevocable right of perpetual duration to require NSR to relocate or rebuild the Rail Line. The unreasonably long time before PCS exercised this alleged right, the unreasonably long time before PCS gave notice of its intent to exercise this alleged right, and the equitable doctrine of laches all bar PCS' claims. Moreover, PCS's action is pre-empted by the Interstate Commerce Commission Termination Act ("ICCTA"). The agreements are not real estate interests, but if they were, they would be unenforceable for the same unreasonable duration and unreasonable time for requesting performance reasons and would be barred by the Rule Against Perpetuities. NSR's October 16, 2006 Memorandum shows that PCS's other claims can not be sustained.

---

**of-way was erroneously indicated in the original filing).**

<u>**ARGUMENT**</u>

Summary Judgment is appropriate only when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Alleged material facts upon which plaintiff relies as a basis for its motion for summary judgment are hotly disputed. Defendants intend to present compelling evidence that the facts which plaintiff claims are undisputed are actually untrue. A synopsis of the alleged "undisputed facts" which Defendants dispute, along with a short discussion of each dispute, are set forth in Section IV herein.

**I.      PCS HAS FAILED TO ADDRESS NSR'S ICCTA PREEMPTION DEFENSE.**

At the outset, it should be noted that Plaintiff's claims are preempted by the provisions of the Interstate Commerce Commission Termination Act. This pre-emption is discussed in Section 2 of Defendants' October 16, 2006 Memorandum and will not be repeated herein. If the Court agrees with Defendants' pre-emption argument, then it need not consider Plaintiff's Motion for Summary Judgment at all.

**II**.      **THE RELOCATION PROVISIONS OF THE DEEDS AT ISSUE ARE
          UNENFORCEABLE AS CONTRACTS.**

      A.      <u>PCS HAS FAILED TO SHOW THAT THE RELOCATION PROVISIONS REMAIN
          ENFORCEABLE AFTER ALMOST FORTY YEARS AND THAT ITS REQUEST
          THAT NSR RELOCATE THE LINE WAS TIMELY</u>.

PCS has not shown that the relocation provisions have any language that supports an indefinite and indeed perpetual duration or that they can reasonably be shown to have been interpreted that way when they were drafted.

PCS asserts breach of contract and breach of covenant claims against NSR on the faulty proposition that the deeds and easements in question, entered into in 1965 and 1966, created a perpetual right to demand relocation. Contrary to PCS' position, however, neither the language of the deeds, nor the law of North Carolina supports that interpretation. The basis for PCS' claims has never been articulated,

---

[3]On October 16, 2006, both parties moved for summary judgment.

even in its memorandum in support of its motion for summary judgment, and remains mystifying given the words used by the parties. The deeds plainly state that any such right to demand relocation arises upon the expiration of ten years. The deeds do not use any "words of perpetuity" that might indicate a continual right to demand relocation. Had the parties intended to create a perpetual right, the deeds would have stated "if [at any time] after ten years" or used language of similar effect. Instead, the deeds use the word "then," emphasizing the fact that, at most, PCS had to demand relocation within a reasonable time.

PCS has presented little evidence in total and no probative evidence or persuasive argument at all concerning the parties' intentions with respect to the duration of the contract and the time within which performance of the relocation of the track must be requested. As explained more fully in Section IV (C) below, the June 16, 1965 letter written by counsel for old NSR does not shed any light on this subject, and in fact, contradicts certain of the assertions made by PCS about the development of the Deeds and agreements. Moreover, it is also parol evidence which should not be considered by the Court. See Mecklenburg Furniture Shops, Inc. v. MAI Systems Corp., 800 F. Supp. 1328 (W.D.N.C. 1992). Therefore, the only bases for a decision in this case are the language of the Deeds, which do not support PCS's interpretation of the continued enforceability of the relocation provisions, and the durational terms supplied by North Carolina law in the absence of anything in the Deeds on the subject.

Notwithstanding the limited language of the Deeds, PCS now asks this Court to infer a perpetual right that the parties did not themselves include. PCS takes the absurd position that the right remains valid 40 years after the execution of the Deeds, 30 years after the expiration of the original ten-year period, and 22 years after the determination that the easement interfered with its anticipated mining operation. The terminal weakness of Plaintiff's arguments is further discussed in Section III of Defendants' October 16, 2006 Memorandum. Plaintiff's position is contrary to basic rules of interpretation and violates the settled principle in North Carolina that courts enforce agreements as made by parties, and do not create new agreements for them. *Internet East, Inc.* v. *Duro Commc'ns, Inc.*, 146

N.C. App. 401, 405, 553 S.E.2d 84, 87 (2001) ("Where the terms of a contractual agreement are clear and unambiguous, the courts cannot rewrite the plain meaning of the contract"). Under the plain language of the Deeds and the law of North Carolina, PCS' right, if any, to demand relocation expired within a reasonable time after ten years from the execution of the Deeds. It is clear in this case as a matter of law that PCS's demand for performance by NSR is unreasonably late and therefore unenforceable.

PCS' breach of contract claim also fails because PCS did not provide written notice, as specifically required by the Deeds, of its determination that the location of the tracks interfered with its anticipated mining operations. PCS has admitted that it made this determination in 1981 (Complaint para. 25, Ex. G to NSR's Oct. 16, 2006 Memorandum Regan depo. p. 148). There is no factual dispute that PCS did not provide notice to NS in 1981 when it made its determination, as required by the Deeds. Nor is there any doubt that the failure to provide such notice bars PCS' claims under the law of North Carolina.

The language of the Deeds regarding the required notice is clear and must be enforced as written. As explained by the North Carolina Court of Appeals:

> "[T]he most fundamental principle of contract construction – [is] that the courts must give effect to the plain and unambiguous language of a contract." . . . The plain language of the contract in this case provides that the Subcontractor is bound to the Contractor under the same obligations as the Contractor is bound to the Owner. Those obligations bind the parties to a time certain during which notice of delay for compensation must be given. That time was not observed by ANE here, and thus ANE's complaint is defeated.

American Nat'l Elec. Corp. v. Poythress Commercial Contractors, Inc., 167 N.C. App. 97, 100, 604 S.E.2d 315, 317 (2004) (citations omitted). The Deeds contain the same basic terms[4] for notice:

> If, after ten (10) years from the date of this instrument, either Grantor <u>determines</u> that all or any part of said right of way and easement <u>interferes</u> with its <u>anticipated mining or processing operations</u> in the

_____

[4] There are minor variations in each deed which are immaterial. All of the Deeds require the same basic written notice upon a determination that the location "interferes with its anticipated mining or processing operations."

6

> Beaufort County, North Carolina area, <u>then</u> said Grantor <u>shall notify</u>
> <u>Grantee in writing</u> of its desire that the right of way and track be moved,
> <u>specifying in said notice the date</u> on which it requires said track to be
> relocated which date shall not be less than one year from the date of said
> notice . . . .

(PCS Ex. 4, ¶ 1) (emphasis added). The word "then" in this context connotes immediacy. The use of the word "shall" makes the notice provision mandatory. See <u>Sheppard v. Riverview Nursing Ctr., Inc.</u>, 88 F.3d 1332, 1338 (4th Cir. 1996).

The Deeds unambiguously provide that the written notice shall be given upon a determination that the location of the tracks interferes with PCS' "anticipated" mining operations. The parties could have used other words such as "planned" or "imminent," but they did not. Instead, the Deeds reflect the parties' intent to put NS on notice at the earliest possible time to allow NS to prepare for the relocation. This is absolutely consistent with PCS' admission in its Motion for Summary Judgment that in 1965 and 1966, the amount and location of the possible ore was estimated and unknown because there were no companies engaged in mining until 1966. This point is repeatedly made in the ICC Report attached to PCS' brief as Exhibit 3.

The parties provided for a ten-year window for PCS to make a determination of whether relocation would be necessary. This ten-year period would allow PCS to investigate its estimates further and to determine the extent, if any, and location of the phosphate to be mined. These provisions are consistent with only one view – that the parties intended to provide a limited right to request relocation, not an indefinite, perpetual right. The parties clearly stated that the determination was to be made after the expiration of ten years, not thirty or forty years, and that once the determination was made, "then" NSR "shall" be notified. This bargained for agreement protected NS by limiting its possible exposure to a time period in which NS could reasonably anticipate and make provision for the cost of the relocation. PCS asks the Court to ignore these provisions and rewrite the Deeds to eliminate the protections for which NS bargained.

PCS has admitted, and indeed pled in its initial Complaint, that it made the necessary determination that the location of the tracks would interfere with PCS' anticipated mining operations by no later than 1981. Specifically, in paragraph 25 of the Complaint, PCS admitted that "[s]ince at least 1981, PCS maps and projections of future mining operations have contemplated that phosphate reserves located immediately below the current Lee Creek Rail Line would be mined." (Compl. Para. 25). Tom Regan, PCS' CEO, admitted the same during the course of his deposition (Ex. G to NSR's Oct. 16, 2006 Memorandum Regan depo. p. 148).

Even assuming that PCS had the right to request relocation in 1981, which is denied, the Deeds expressly required PCS to provide NS with written notice at that time in order to allow NS to prepare administratively and financially for the relocation. Under the law of North Carolina, PCS' failure to provide the required notice bars its breach of contract claim. See, e.g., D.W.H. Painting Co. v. D.W. Ward Constr. Co., 174 N.C. App. 327, 331, 620 S.E.2d 887, 890-91 (2005) (holding that the failure to provide notice as required under a contract barred recovery); American Nat'l Elec., 167 N.C. App. at 100, 604 S.E.2d at 317 (barring a contract claim for failure to provide notice); Biemann & Rowell Co. v. Donohoe Cos., 147 N.C. App. 239, 246-47, 556 S.E.2d 1, 6 (2001) (barring a contract claim based upon a failure to provide required notice).

B.     NSR HAS NOT ADMITTED THAT THE CONTRACTS ARE ENFORCEABLE.

PCS presents only a Power Point slide and the suspect deposition testimony of Thomas J. Brugman regarding alleged comments made by NS lawyers to support its contention that Defendants have admitted the enforceability of the relocation provisions. NSR disputes Plaintiff's contention. The factual basis for this dispute is discussed in Section IV supra. However, the Court does not have to reach those factual issues, because the statements Plaintiff relies upon are inadmissible.

It should first be noted that only admissible evidence may be used in support of a Motion for Summary Judgment. Fed.R.Civ.P. 56. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548

(1986). The statements which Plaintiff relies upon in both the Power Point slide and in Mr. Brugman's testimony constitute conclusions of law. Indeed, the issue which this Court will be deciding is whether or not the relocation language in the Deeds is binding at this late date. That is quintessentially a legal question. However, while factual admissions are generally admissible as evidence, legal conclusions do not constitute such admissions, and should not be introduced into evidence, even though they may prove to be inconsistent with the ultimate position of the pleading party. Lacoste v. Alligator Company, 374 F.Supp. 52, 68 (Del., vacated on other grounds,) 506 F.2d 339 (3rd Cir. 1974, cert. denied, 421 U.S. 937, 95 S.Ct. 1666, 44 L.Ed. 2d 94 (1975).[5] Currie v. United States, 111 F.R.D. 56 (M.D. N.C. 1986).

Additionally, the opinions expressed by Mr. Brugman are inadmissible because (1) to the extent legal conclusions are admissible at all, which is denied as set forth above, Mr. Brugman, a layman, was not qualified to express a legal opinion; (2) the alleged statements are hearsay, See F.R.E. 801 and 802; (3) the alleged statements are covered by attorney-client privilege, See Boca Investerings Partnership v. U.S., 31 F.Supp.2d 9 (D.D.C. 1998); and (4) the alleged statements are covered by attorney work product doctrine. See Hickman v. Taylor, 329 U.S. 495, 511 (1947). With respect to Mr. Brugman's deposition testimony, the parties stipulated that objections to questions and motions to strike answers could "be made for the first time during the progress of the trial of this case, or at any pretrial hearing held before any judge of competent jurisdiction for the purpose of ruling thereon, or at any other hearing of said case at which said deposition might be used…"Brugman, Jan. 20, 2006 depo., pp. 6-7; Brugman March. 27, 2006 depo., pp. 4-5.

C.     PCS's DAMAGES CLAIM IS INFLATED.

---

[5] An admission should not be able independently to create a claim for relief that the law would not otherwise recognize. Admitting to the fact that one is a common carrier, for example, might give rise to a duty of utmost care, but that is because the law recognizes such a legal duty. A party who merely admits to "a legal duty of utmost care" may not be bound by that admission-the party will still be subject to a duty of ordinary care unless the law imposes a higher duty on him. Currie, 111 F.R.D. at 59 n.5; Cf. Fed.R.Civ.P. 36 (Advisory Committee Notes to 1970 Amendment); Williams v. Krieger, 61 F.R.D. 142 (S.D.N.Y.1973); Wright & Miller § 2255 (Supp.1986); Moore's ¶ 36.10[8], at 36-25.

PCS's damages claim is inflated for at least two reasons. First, PCS has added approximately $1.4 million to its damages claim for removal of the existing track and trestles. The track and material comprising the Rail Line are the property of NSR. NSR will remove the track, ties and usable material from the existing right-of-way when PCS moves its operation to the area on the new PCS built track.[6] This is not in any way an admission that NSR has any responsibility to relocate the Rail Line but a recognition that if NSR wants to salvage its material that can no longer be used in service to PCS over the current route, it needs to remove that material from its easement on PCS's fee property.

Second, PCS has **lengthened** the mileage of the line in question[7]. While denying that NS is legally obligated to pay PCS anything, Defendants certainly should not have to pay for almost **two** additional miles of track[8].

III. **PCS CANNOT SUCCEED ON ITS BREACH OF REAL COVENANT CLAIM BECAUSE PCS CANNOT ESTABLISH THE ELEMENTS OF THAT CLAIM AND BECAUSE PCS IS INAPPROPRIATELY ATTEMPTING TO CONVERT A PERSONAL COVENANT INTO A COVENANT RUNNING WITH THE LAND.**

PCS finds itself in the unenviable position of asserting alleged rights contained in deeds drafted over 40 years ago. PCS is not the original grantor in the Deeds, and NSR is not the original grantee. The determination that relocation would be necessary was made 25 years ago in 1981, but PCS did not provide formal written notice of that determination, as required by the Deeds, until 2003, 22 years later. The original grantors are long since gone, replaced by a multinational corporation that bears little resemblance to the original parties.

---

[6]In view of PCS's strip mining operation, it does not matter whether or not some or all of the ballast is left on the right-of-way because PCS will strip away the surface of the land and redeposit the soil and other matter nearby regardless whether some additional stone might be on the surface of the land being mined. The removal of a small amount of additional surface stone in the course of PCS's ordinary striping operations is unlikely to cause PCS to incur any significant or measurable additional costs.

[7] The word "lengthened" has replaced the words "almost doubled" which was indicated in original filing.

[8] The word "two" has replaced the word "four" which was indicated in original filing.

Grasping to find a basis under which it can assert its alleged rights, PCS now claims that it is the beneficiary of a "covenant running with the land," commonly referred to as a "real covenant." This is inappropriate under the facts of the case and the law of North Carolina.

As explained in more detail below, a real covenant requires two parcels of property, one which is burdened by the covenant and the other benefited. There is only one parcel of property at issue here. It requires a covenant that touches and concerns the land, not a covenant that merely benefits a specific owner of land. Here, however, the right to relocate is triggered only upon a determination that the location of the NS tracks will interfere with "anticipated mining or processing operations." That limitation necessarily links the alleged covenant to a mining company. A real covenant, by its nature, must be enforceable by future landowners. When a covenant can not, by its own terms, be enforced by future landowners (e.g., any other entity or individual not involved in mining), it does not touch and concern the land, and the parties could not have intended for the covenant to run with the land.

At most, the relocation provision is a personal covenant, not a real covenant. Personal covenants do not run with the land, and they are not enforceable by or against successors in interest to the original covenanting parties. Accordingly, PCS' breach of real covenant claim must fail.

A. <u>NORTH CAROLINA LAW DISTINGUISHES BETWEEN REAL COVENANTS THAT RUN WITH THE LAND AND PERSONAL COVENANTS THAT DO NOT</u>

"[I]n analyzing whether a covenant is real or personal, '[t]he instrument must be construed most favorably to the grantee, and all doubts and ambiguities are resolved in favor of the unrestricted use of the property.'" <u>Wal-Mart Stores, Inc. v. Ingles Markets, Inc.</u>, 158 N.C. App. 414, 421, 581 S.E.2d 111, 116 (2003). Favoring the unrestricted use of property includes questions of duration, with any doubt being construed in favor of a limited duration. <u>See</u> <u>Brown v. Woodrun Ass'n, Inc.</u>, 157 N.C. App. 121,124-25, 577 S.E.2d 708, 711 (2003) ("Therefore, the Declaration [containing restrictive covenants] is unenforceable and cannot be extended by the Restatement because its ambiguity must be construed in favor of limited duration and against restricting property"). A party alleging an affirmative covenant must

11

clearly prove each element as "the requirements for a covenant to run are to be more strictly applied to affirmative covenants than negative covenants." Raintree Corp. v. Rowe, 38 N.C. App. 664, 670, 248 S.E.2d 904, 908 (1978).

The distinction between real and personal covenants is critical because a personal covenant can not be enforced by or against successors in interest. As the Supreme Court of North Carolina explained in Raintree:

> Personal covenants are not assignable. "A restriction which is merely a personal covenant with the grantor does not run with the land and can be enforced by him only." . . . "It is elemental that a personal covenant does not run with the land." . . . "One cannot at common law maintain any action upon a personal covenant merely by force of the fact that he is the successor in title of the owner with whom such covenant was made."

Id. at 671, 248 S.E.2d at 909 (citations omitted). A personal covenant "does not bind the assignee of the covenantor." Maples v. Horton, 239 N.C. 394, 399, 80 S.E.2d 38, 43 (1954).

B.    A COVENANT RUNNING WITH THE LAND REQUIRES TWO, DISTINCT PARCELS OF PROPERTY

Although PCS claims the Deeds create a covenant running with the land, PCS conveniently omits that a covenant running with the land can not exist in the absence of two separate parcels of land, known as the dominant and servient estates. In Runyon v. Paley, 331 N.C. 293, 416 S.E.2d 177 (1992), relied upon heavily by PCS, the Supreme Court of North Carolina explained this key distinction between real covenants and personal covenants:

> The significant distinction between these types of covenants is that a personal covenant creates a personal obligation or right enforceable at law only between the original covenanting parties, whereas a real covenant creates a servitude upon the land subject to the covenant ("the servient estate") for the benefit of another parcel of land ("the dominant estate"). As such, a real covenant may be enforced at law or in equity by the owner of the dominant estate against the owner of the servient estate, whether the owners are the original covenanting parties or successors in interest.

Id. at 299, 416 S.E.2d at 182. This same principle has been repeatedly acknowledged by other appellate courts in North Carolina. See, e.g., Wal-Mart Stores, Inc. v. Ingles Markets, Inc., 158 N.C. App. 414, 421, 581 S.E.2d 111, 116 (2003); Bermuda Run Country Club, Inc. v. Atwell, 121 N.C. App. 137, 141, 465 S.E.2d 9, 13 (1995).

PCS ignores this basic premise in its attempt to turn what is, at most, a personal covenant into a covenant running with the land. PCS asserts that to "prevail on a breach of a real covenant claim, the owner of the dominant estate must establish that an enforceable real covenant exists and that the covenant has been breached to the detriment of the dominant estate." (PCS Br. at 24). PCS assumes that it is the owner of the dominant estate, which is not true. The easements created by the Deeds burden PCS' land, not NS' land, making PCS' land the servient estate. Indeed, there is no other parcel of real property involved, and therefore no "dominant estate." Without two separate parcels of property constituting the dominant and servient estates, however, there can be no real covenant.[9] This fatal defect in PCS' argument is sufficient, by itself, to enter summary judgment in favor of NS on the breach of real covenant claim.

C.    PCS CANNOT SATISFY THE OTHER ELEMENTS NECESSARY TO ESTABLISH A COVENANT RUNNING WITH THE LAND

PCS correctly states that a party claiming a covenant running with the land must prove that (1) the covenant touches and concerns the land, (2) there is privity of estate between the parties, and (3) the original parties intended that the benefits and burdens of the covenant would run with the land. "For a covenant to run, all three requirements must concur, intent, touch and concern, and privity of estate." Raintree Corp. v. Rowe, 38 N.C. App. 664, 670, 248 S.E.2d 904, 909 (1978). As with the requirement of two parcels of land, however, PCS cannot establish any of these elements.

---

[9] The easement itself, of course, cannot constitute the second parcel of land, i.e., the missing dominant estate. Otherwise, there could be no easements in gross that are "personal" to an individual or entity. In every case there would be a servient estate burdened by the easement and a dominant estate consisting of the easement itself. The law does not contemplate such a situation. See Shingleton v. State, 260 N.C.

13

1.       *The Alleged Covenant Does Not Touch and Concern the Land and the Original Parties Did Not Intend that the Obligation to Relocate Would Run with the Land*

As noted by the Supreme Court of North Carolina, "the touch and concern requirement is not capable of being reduced to an absolute test or precise definition." Runyon v. Paley, 331 N.C. 293, 300, 416 S.E.2d 177, 183 (1992). Purporting to paraphrase Runyon, PCS claims that, "[w]here a party establishes that a covenant impacts the legal rights or economic interests in land, the covenant touches and concerns the land and is enforceable." The quoted language does not appear in Runyon. In that case, the court actually stated that the "touch and concern" element is satisfied only when the parties "ownership rights" and rights as "landowners" are affected:

> It is sufficient that the covenant have some economic impact on the parties' ownership rights, by for example, enhancing the value of the dominant estate and decreasing the value of the servient estate. It is essential, however, that the covenant in some way affect the legal rights of the covenanting parties as landowners. Where the burdens and benefits created by the covenant are of such a nature that they may exist independently from the parties' ownership interests in land, the covenant does not touch and concern the land and will not run with the land.

Id. at 300, 416 S.E.2d at 183; see also Bermuda Run Country Club, Inc. v. Atwell, 121 N.C. App. 137, 142, 465 S.E.2d 9, 13 (1995) ("It is sufficient that an economic impact on the parties' ownership rights occurs such that the value of the dominant estate is enhanced and the value of the servient estate is decreased; and that the covenant affects the legal rights of the covenanting parties as landowners").

In its summary judgment brief, PCS ignores North Carolina law explaining the touch and concern and intent elements of a real covenant and offers nothing more than conclusory statements that they are satisfied. There are, however, several flaws in PCS' argument. First, Runyon makes clear that the "touch and concern" must be satisfied with respect to both the dominant and servient estates. In distinguishing real covenants from equitable servitudes, the court stated, "unlike with real covenants, however, [with equitable servitudes] it is not always necessary to show *that both the burden and the benefit touch and*

---

451, 133 S.E. 2d 183 (1963).

*concern the land*." Id. at 310, 416 S.E.2d at 189 (emphasis added). As noted above, NSR does not own

any land affected by the Deeds. There is no dominant tract of land to "touch and concern," and, therefore,

no real covenant can exist.

The second flaw with PCS' position applies equally to the intent element, on which PCS also

bears the burden of proof. See Runyon, 331 N.C. at 304, 416 S.E.2d at 185; Raintree Corp. v. Rowe, 38

N.C. App. 664, 669, 248 S.E.2d 904, 908 (1978). The intent of the parties is determined at the time of

creation. See Runyon, at 305, 416 S.E.2d at 186 ("Whether restrictions imposed upon land … create a

personal obligation or impose a servitude upon the land enforceable by subsequent purchasers [of the

covenantee's property] is determined by the intention of the parties at the time the deed containing the

restriction was delivered")

In order to "touch and concern" the land, and for the parties to have intended that the covenant

run with the land, the covenant must have value that benefits the land itself, not simply the covenanting

party. The Fourth Circuit, applying North Carolina law, explained this crucial determination in Chappell

v. Winslow, 144 F.2d 160 (4th Cir. 1944) in finding that a restrictive covenant was personal to the

covenantee and did not run with the land:

> The right of a person not a party to a restrictive covenant to enforce it
> depends upon the limitation of the parties in imposing it. In order to
> confer such right upon one other than a party to the agreement, it must
> appear that it was the intention of the covenantee to create a servitude or
> right which should inure to the benefit of the land acquired by the
> plaintiff and should be annexed as to it as an appurtenance, or, as
> sometimes expressed, that it was intended to operate as between
> subsequent grantees. . .
>
> When a restrictive covenant agreement will be regarded as a personal
> covenant and when as one creating a right which passes with the land to
> a purchaser thereof is a question which cannot be answered categorically.
> *The determinative factor is, as above stated, whether it was intended for
> the benefit of the land retained or intended to subserve some purpose
> personal to the covenantee*.

Id. at 161 (emphasis added).

The classic example of a covenant running with the land is a restrictive covenant that restricts residential property from being put to certain uses (e.g., commercial enterprises). The benefit runs with the land, regardless of who owns the property as a residence. Each succeeding landowner buys the property in reliance upon the restrictive covenant and the ability to limit the uses of the burdened property.

The relocation obligation at issue here is different because it benefits a specific owner, not the land. PCS' right to force relocation, if it exists at all, arises only upon a determination that the current location of the NS tracks will interfere with "anticipated mining or processing operations." This was a benefit to the original owner, who was engaged in phosphate mining, but it does not provide a benefit to other future landowners. For example, if the property were sold to a real estate development company, that company could not force NS to relocate its tracks simply because the new owner anticipates interference with its development plans. The right would only be triggered by interference with mining operations of the original covenanting parties, i.e., PCS' predecessors. The right does not pass as an appurtenance to the <u>land</u> itself, which is required for the covenant to run with the <u>land</u>. This is true even if the new owner happens to be in the same business as the original owner.

A covenant can not run with the land when, by its own terms, a future landowner can not enforce it. At most, the Deeds create a personal covenant that benefited the original mining companies, i.e., "it was intended to subserve some purpose personal to the covenantee." <u>Id.</u> at 161. Any rights that PCS has to enforce the relocation provision arise, if at all, under contract law as a successor in interest. PCS cannot, however, transform this personal covenant into a real covenant in order to avoid basic contract principles.

2.    *PCS Cannot Establish Privity of Estate*

PCS' breach of real covenant claim also fails because PCS cannot establish vertical privity of <u>estate</u> as opposed to privity of contract. Vertical privity "requires a showing of succession in interest

16

between the original covenanting parties and the current owners of the dominant and servient estates.  As one scholar has noted:  The most obvious implication [of vertical privity] is that the burden of a real covenant may be enforced against remote parties only when they have succeeded to the covenantor's *estate* in land."  Runyon, 331 N.C. at 302-03, 416 S.E.2d at 184 (emphasis in original).  Again, however, NS does not own any land affected by the Deeds.  There is no dominant estate in land, and NS has no estate of any kind to transfer vertically.  This, of course, is because covenants running with the land (real covenants) require two parcels of land owned by two different parties.  In the absence of privity, PCS's breach of real covenant claim can not succeed.

D.    PCS RIGHTS, IF THEY EXIST, ARE PURELY CONTRACTUAL

The fact that PCS allegedly is a successor in interest and is engaged in mining operations can not transform a contractual right into a covenant that runs with the land for the benefit of all future owners.  To the extent PCS has any right to enforce the relocation provisions, that right is based upon its status as a successor to the contract, not the land.  However, as a purported successor the contractual right, PCS can only succeed if it can prove its breach of contract claim.  PCS' breach of real covenant claim is essentially duplicative of its breach of contract claim.  Indeed, PCS concedes that "North Carolina law recognizes that establishing breach of a real covenant follows the same analysis as a breach of contract claim."  (PCS Br. at 25).  In this case, essential to the analysis is the fact that PCS waited decades before notifying NSR that the easement should be moved.  While that fact is fatal to both its contract claim and its covenant claim, PCS perceives some benefit in bringing both.  This should not be permitted.  The law of North Carolina clearly sets forth the elements necessary to establish a real covenant.  These include two distinct parcels of property, a covenant that "touches and concerns" the land, privity of estate, and proof that the original parties intended the covenant to run with the land, regardless of who might own it.  PCS cannot satisfy any of these elements.  Accordingly, PCS can not prevail on its breach of real covenant claim and

is limited to its breach of contract cause of action. For the reasons stated above and in NSR's own summary judgment motion, however, that claim is barred.

## IV. ERRORS AND OMISSIONS IN PCS' STATEMENT OF FACTS.

### A. DEFENDANTS HAVE NOT ADMITTED THAT THE "RELOCATION AGREEMENTS ARE VALID AND ENFORCEABLE."

Since it is unable to prove its case or rebut NS's defenses from the documents at issue or from law or precedent, PCS bases its case heavily on a bald and unproven assertion that the Defendants have admitted that the "Relocation Agreements" are valid and enforceable but have simply decided not to perform their stated obligation. PCS produces no credible evidence to support this assertion, which is quite simply wrong. After several depositions of NS employees, three sets of interrogatories, an expert report and thousands of pages of produced documents PCS relies on only two pieces of actual evidence, neither of which supports their assertion. Otherwise, their argument consists of nothing but implications.

### 1. *PCS ERRONEOUSLY ASSIGNS SIGNIFICANCE TO TWO PHRASES IN POWER POINT SLIDES USED TO DESCRIBE THE BACKGROUND FOR DISCUSSIONS AT TWO MEETINGS.*

Plaintiff's exhibit 11 to its October 16, 2006 memorandum is a series of Power Point slides presented by Mr. Steven D. Eisenach, former Norfolk Southern Director of Strategic Planning, now deceased, at a meeting between Norfolk Southern and PCS representatives on September 11, 2003. PCS portrays one bullet point from these slides as representing NS' acknowledgement of the enforceability of the agreement.

PCS presents no other evidence or argument that the Power Point "presentation" was anything other than one page out of the set of Power Point slides that were taken to the meeting to discuss the parties' positions. It was nothing more than a summary of points for discussion. The phrase simply says that old NSR executed the Deeds, which was set forth as the first fact that set the stage for the discussion at the meetings. The phrase "railroad will pay if asked to move" was an abbreviated layman's statement identifying the term on which PCS relied. It did not carry the implication that NSR agreed to this

18

interpretation or that NSR thought the provisions were enforceable.  Indeed, later in the same Power Point presentation, Mr. Eisenach had a bullet point stating: "STB abandonment approval pre-empts any private contract or deed that requires a railroad to keep a line in operation."  It is clear that those making the presentation to PCS thought that NSR could defend against an action for enforcement of the relocation provisions.

2.    *PCS's RELIANCE ON HEARSAY AND SUSPECT DEPOSITION TESTIMONY OF A FORMER NS MANAGER IS MISPLACED AND IS REFUTED BY NS EVIDENCE.*

PCS misplaces its reliance on the deposition testimony of Mr. Thomas J. Brugman, former Assistant Vice President Shortline Marketing and prior to December 8, 2005 Group Vice President - Agriculture, Fertilizer & Consumer Products of Norfolk Southern, for the proposition that NSR agreed that the relocation provisions of the Deeds were enforceable.  Deposition testimony from other NS witnesses and NS answers to interrogatories do not support their argument.  Neither do Mr. Brugman's statements.

PCS relies on Mr. Brugman's hearsay statement that NS in-house attorneys declared that PCS's case was airtight.  However, as the attached affidavits of James R. Paschall and Thomas W. Ambler show, NS attorneys never made such a statement and have never expressed such an opinion (affidavits attached as Ex. A).

NSR will show that shortly before the deposition, dissatisfied with what amounted to a demotion, Mr. Brugman resigned from NSR.  In his deposition he stated:  "Of course, now I'm no longer the group vice president of Ag, and I guess you know that."  Ex. B, Brugman Jan. 20, 2006 depo., p. 19.  He also stated in response to a question about whether he was happy with his move from Agricultural Marketing to Shortline Marketing: "I wasn't overjoyed."  Ex. B, Brugman, Jan. 20, 2006 depo., p. 86.  In his March 27, 2006 deposition Mr. Brugman stated that: "I have submitted my resignation to Norfolk Southern.  My last day is March 31st." and he further stated: "I have accepted a position with the Surface Transportation Board, in Washington, D.C."  Ex. C, Brugman Mar. 27, 2006 depo., p. 7.

In fact, despite PCS's portrayal of the strength of Mr. Brugman's testimony, Mr. Brugman himself admitted that there was a question as to the enforceability of the contract given the length of the term of the contract. Ex. B, Brugman, Jan. 20, 2006 depo., p. 13.

Defendants made available several witnesses for deposition in response to PCS's 30(b)(6) deposition notice, not just Mr. Brugman. Another NS witness, Mr. Marcellus C. Kirchner, said in answer to a question concerning the meaning of the relocation provisions: "Yes. Well our position is, as a matter of law, that our obligation, whatever it may have been, has since expired." Ex. D Kirchner depo., p. 68. PCS can not cite any statements by any of the other witnesses that the agreements were considered enforceable by NSR. Moreover, it is clear that Mr. Brugman's feelings concerning his change in positions at NS and his resignation from the company after many years of service just days after his second deposition colored his recollection and tainted his testimony. Credibility aside and more importantly, a lay witness's legal opinions are simply irrelevant in the interpretation of a contract or in the determination whether legal defenses to the enforcement of the contract exist or are valid.

Nonetheless, PCS relies on this testimony as establishing NS's position with respect to the validity of the agreement on the basis of a quotation from *United States* v. *Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1966)("testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the corporation...The designated witness is speaking for the corporation"). This reliance is misplaced. Not only is the testimony inadmissible, but *United States* v. *Taylor* does not have such sweeping application. In *Interstate Narrow Fabrics, Inc.* v. *Century USA, Inc.*, 218 F.R.D. 455, 462 (M. D. N. C. 2003), Judge Tilley stated:

> Interstate relies on *United States* v. *Taylor*, 166 F.R.D. 356 (M.D.N.C. 1996) to support its contention. *Taylor* involved a pre-deposition order discussing the responsibility of a corporate party to have a 30(b)(6) witness properly prepare for the deposition. It was not a sanctions case and the discussion of limitations of use of 30(b)(6) testimony at trial was necessarily dicta. Even so, the opinion observed that statements in a 30(b)(6) deposition are not the same as judicial admissions, that under certain circumstances the corporation may contradict the testimony at trial. Id. at 362 n.6. Evidence and arguments offered at a Rule 30(b)(6) are not as binding as Interstate

20

contends. Therefore, Century is not precluded from providing evidence different or beyond that which was provided at its 30(b)(6) deposition, and summary judgment will be decided with reference to all appropriate evidence.

A Rule 30(b)(6) deposition witness does not make a judicial admission on a matter of law that formally and finally decides an issue. Deposition testimony is simply evidence, which may be explained or contradicted.

The deposition testimony of Mr. Kirchner, cited above, shows that NSR personnel's opinion on the enforceability of the contract was contrary to that portrayed by the apparently disgruntled Mr. Brugman. Moreover, NSR has consistently advised PCS that it did not interpret the relocation provisions of the 1965-1966 Deeds to impose a current binding duty on NSR to assume these costs (See Ex. K, L and M to NSR's Oct. 16, 2006 Memorandum).

B.    NSR's PREDECESSOR REQUESTED THE RELOCATION PROVISIONS BECAUSE OF ACTIONS OF PCS's IMMEDIATE PREDECESSOR, TGS.

PCS states "that as an express condition to Defendants obtaining rail line easements and constructing the Lee Creek rail line, Defendants agree to relocate the rail line - at Defendants' expense - upon a determination by PCS that the easement interferes with anticipated mining or processing operations." PCS points to nothing but the Deeds themselves for this characterization of events. In fact, the June 16, 1965 letter from old NSR's counsel, John M. Simms, to TGS's counsel, James B. McMullan, presented by Plaintiff itself as Exhibit 9 to its memorandum, provides quite a different perspective concerning the inclusion of these provisions in the Deeds. Mr. Simms stated that:

the present alignment of the track was not that proposed by Norfolk Southern and desired by other interested parties in connection with the development of this area. However, the present location was insisted upon by Texas Gulf and finally worked out in its present location over the objection of N. C. Phosphate Corporation. In order to get this worked out, it was necessary for us to agree to give N. C. Phosphate Corporation a relocation provision and in subsequent discussions it was agreed that a relocation provision would also be included in certain of the Texas Gulf instruments....As I pointed out to you, once the track is constructed and in operation, and bear in mind that this is at the place insisted upon by Texas Gulf, Norfolk Southern will have no rights in the future to exercise the rights to acquire a new right of way.

21

Simms June 16, 1965 letter, Pl. Ex. 9, pages 2-3.  TGS, PCS's principal predecessor, did not insist upon

the inclusion of the relocation provisions in the Deeds of Easement from that company to old NSR.  Old

NSR had to provide this option only to N. C. Phosphate because of TGS's requirement that the Rail Line

be placed along a route not agreeable to N. C. Phosphate.  Old NSR requested TGS to accept a similar

provision in order to be able to move the Rail Line if N. C. Phosphate requested it in a timely manner.

C.    PCS RELIES ON A SINGLE AMBIGUOUS PHRASE FROM A 1965 LETTER FROM
      NSR'S PREDECESSOR'S COUNSEL AS CONTEMPORANEOUS SUPPORT FOR
      ITS POSITION.

Neither the language of the Deeds themselves nor contemporaneous evidence of the parties'

intent or interpretation of the Deeds supports PCS's interpretation of the relocation provisions as ones of

perpetual duration.  The only evidence that PCS has produced from the time when the Deeds were drafted

to support its interpretation of the Deeds' duration or the time during which performance of the relocation

could be requested is a single sentence from the June 16, 1965 letter from Mr. Simms to Mr. McMullan

that PCS does not quote in its entirety.  Simms June 16, 1965 letter, Pl. Ex. 9, page 3.  The full sentence

that PCS quoted in abridged form from Mr. Simms's letter and the following sentence read:

> With reference to the changing of the last part of the relocation paragraphs, we pointed
> out that in all likelihood the relocation, **if it ever takes place**, will be at some distant time in the
> future, and will come at a time when all of the present parties are out of the picture.  The present
> location of the track as insisted upon by Texas Gulf has required the track to be approximately
> five miles longer than it would have been otherwise and we feel it is not proper to agree to any
> relocation provision that does not protect the Railway Company against any relocation in a
> circuitous route. (Emphasis supplied to phrase omitted from PCS quotation on page 4 of its
> memorandum.)

Admission of this statement to supply or vary a term in the contract is barred by the parol

evidence rule, See Mecklenburg Furniture Shops, Inc. v. MAI Systems Corp., 800 F. Supp. 1328

(W.D.N.C. 1992).  Even if this evidence were admissible, it does not support PCS's argument.

It is easy to understand why PCS left the emphasized phrase out of its quotation of this sentence.

Mr. Simms clearly recognized that the relocation might never take place, just as Defendants have argued.

22

PCS's unconditional interpretation of the phrase "distant time in the future" is undermined when the full sentence is considered.  Moreover, Mr. Simms is not interpreting the language of the Deeds and certainly is not even implying that the relocation provisions were of perpetual duration.  His statement that the relocation could take place at a "distant time in the future," does not show what he might have meant by a "distant time" and is not inconsistent with Defendant's interpretation and argument that a request to relocate the line after a period longer than the initial ten-year waiting period before the relocation notice could be given plus 21 years would be unreasonable, unenforceable and, if the relocation provisions were considered real estate covenants, in violation of the Rule Against Perpetuities.  He also made this statement at a time when old NSR was set to be the only railroad serving the area, would not have contemplated CSXT's predecessor gaining access to the line and therefore would expect to be able to make a profit from continuing rail service to the area on a relocated line.

PCS presents no other contemporary letter dealing with the intent of the parties concerning the relocation provisions.  The single partial sentence from a letter written by Mr. Simms is inadmissible and provides no basis for PCS's interpretation of the duration of the contract or the time limit on PCS's request for performance of the relocation.  The Court is left with the terms as written.

     D.    <u>PCS DOES NOT ADDRESS KEY LANGUAGE IN THE DEEDS THAT COVER THE DURATION OF THE AGREEMENTS AND THE TIMING OF ITS REQUEST TO RELOCATE THE TRACK</u>.

PCS does not explain how the language that requires PCS to notify NSR of its desire to move the track, quoted from Exhibit C again below, can be interpreted to extend for a term of perpetual duration, when it clearly states that the notices must come after ten years.

> (1) If, after ten (10) years from the date of this instrument, Texas Gulf Sulphur Company has exercised its option on the land of Fred R. Alfred and Betty A Alfred, across which this right of way and easement is given, and Texas Gulf Sulphur Company **then** determines that all or any part of said right of way and easement interferes with its **anticipated** mining or processing operations in the Beaufort County, North Carolina area, **then** Texas Gulf Sulphur Company **shall notify** Norfolk Southern Railway Company in writing of its desire that the right of way and track be moved,...

Under North Carolina law, PCS can not request performance of an open-ended term after an unreasonable time, conclusively deemed to be more than 21 years. That period had elapsed long before PCS gave NSR notice of its relocation demand. Moreover, PCS states that as early as 1981 it anticipated that it would ask to have the Rail Line relocated, but waited until 2003 to make that request in writing as required by the Deeds. In Defendants' October 16, 2006 Memorandum, NSR cited admissions from PCS officers to that effect.

PCS does not explain how, (1) without words of perpetual or indefinite duration in the Deeds, (2) without clear contemporaneous evidence of the parties' interpretation of or agreement concerning the Deed's duration, (3) in the face of language that states the performance must be requested, after 10 years upon its determination that relocations will be required and (4) contrary to North Carolina law on (a) reasonable duration of agreements without express terms and (b) reasonable time in which to request performance under a contract, the Court has any basis to accept its argument that the relocation provisions of the Deeds are enforceable.

E.     PCS MISCHARACTERIZES NSR's STATEMENTS CONCERNING POSSIBLE ABANDONMENT OF THE RAIL LINE SERVING PCS.

Defendants did not "threaten" PCS with abandonment of the Rail Line but simply discussed with PCS a legal option that Defendants believe they have under the provisions of the ICCTA and an option recognized in the Deeds themselves. Mr. Kirchner testified that he would have been surprised had the STB ruled against NSR on the merits of the abandonment application had the Board ruled on the merits. Ex. D Kirchner depo., p. 78. Thus, filing for STB approval of the abandonment of the Rail Line was not an empty "threat," but an option that was, and, as recognized in the Deeds, always had been, available to NSR.

PCS makes much of the fact that NSR's witness Kirchner stated that the application to abandon the Rail Line was unusual. They ignore that Mr. Kirchner explained the abandonment case was unusual

only in the sense that the relocation cost was submitted in place of the usual future rehabilitation cost in the determination of costs and revenues for the forecast year. In either case, these costs are the costs necessary to keep a rail line in service and are costs that need to be recovered for the railroad to be able to make a profit on the future operation and maintenance of a line. Ex. D Kirchner depo., p. 41-43. As Mr. Kirchner pointed out, "… the unusual characteristics, in my mind, did not dictate the outcome, and I fully expected the Board to agree with us and approve the abandonment application." Ex. D Kirchner, depo. p. 78.

  F. <u>NSR DOES NOT OPERATE THE LINE AT A PROFIT WHEN FULL COSTS ARE CONSIDERED</u>.

  PCS states that NSR falsely stated that it does not make a profit in operating the Rail Line. PCS either does not understand or is deliberately disregarding Defendant's evidence and explanation on this point.

  Over the last ten years, NSR revenues from PCS traffic have not covered or, in the best years, barely covered, NSR's variable costs of maintaining and operating the Rail Line. (See Marc Kirchner affidavit attached as Ex. F to NSR's memorandum in support of its motion for summary judgment.) The revenue to variable cost ratios for the last ten years have ranged from a low of 0.94 to a high of 1.16 which occurred in 1996. See Kirchner Affidavit. A revenue to variable cost ratio of 1.00 would indicate revenue was equal to variable cost. NSR traffic with a ratio of 1.00 would not make a contribution to the fixed costs of operating the railroad and if all NSR traffic had a ratio of 1.00, there would be no contribution to the railroad's fixed cost and the railroad would go bankrupt. See Kirchner Affidavit. Revenues from PCS traffic would need to be sufficient to produce a revenue to long term variable cost ratio of about 1.40 in order to recover NSR's fully allocated costs of providing service to the Rail Line. See Kirchner Affidavit. For each of the last ten years the revenue to variable cost ratio has been below the 1.40 threshold and the Line has been unprofitable over that period. See Kirchner Affidavit.

As Mr. Kirchner explained in his deposition, "…what he is referring to as breakeven is just a situation where the revenue just barely covered the variable costs of the operation. But at breakeven means it's making no contribution towards the fixed cost of the – operating a railroad." Ex. D Kirchner depo., p. 94. "I am explaining that it's even worse than he described it." Ex D Kirchner depo., p. 95. He further stated: "….the word "profit," I would not have used in this context." [Q. And why not?] "Because what he means by a "profit" is that they created a contribution, i.e., the revenue was slightly above the variable cost of the operation." Ex. D Kirchner depo., p. 98. Mr. Kirchner further explained the additional 30 percent or more factor that would be required for revenue at a 1.0 ratio to variable costs to cover full or fixed costs and to approach profitability. Ex. D Kirchner depo., p. 212.

Even Mr. Brugman, upon whose testimony PCS otherwise places great reliance, stated in his second deposition: "When we started this project, and about these dates -- in other words, when I first became involved in this, and you have the e-mails, we were below 1.0 VPD as I recall, VPD cost. And the working with PCS, we manage to raise that up a little bit. I think, in the last year or so, I think we were showing better than 1.0 VPD. And still that doesn't cover the cost of capital." Ex. C Brugman, Mar. 27, 2006 depo., p. 17. Cost of capital would be one of the overhead or additional costs required to cover full or fixed costs before a true profit can be made from revenue for a service or product.

Finally, the expert report of Mr. Benton V. Fisher, dated March 17, 2006, and produced in discovery in this matter stated:

> "Both the abandonment application and materials that NS produced in discovery show that the revenues from the PCS traffic on the line have for years been close to and often less than NS' internal costs associated with handling the traffic, that is, the ratio between revenues and costs ranges from 0.9 to 1.1. In these materials as well as NS' responses to PCS' interrogatories, NS indicates that these internal costs also account only for "variable costs," and do not cover the fully allocated costs of constructing, operating, and maintaining the line. Thus, much of the PCS traffic that NS handles does not cover even its variable costs of service. This is not the predicate for an operation that is financially viable for one year, let alone the next 50….In actuality, the fact that NS

26

is already falling short of recovering its fully allocated costs of operating and maintaining the line, before any additional payment for the relocation of the line, instead indicates that any further investment would be uneconomic and unrecoverable."

See p. 6-7 of Benton Fisher report attached as Ex. E.

        G.     <u>THE STB DID NOT DENY NSR'S ABANDONMENT APPLICATION, BUT ONLY DISMISSED IT AS PREMATURE</u>.

In a decision served December 7, 2005, the STB rejected NSR's application for authority to abandon the Rail Line that was filed on November 17, 2005. The STB did not decide the application on the merits but deemed the application premature and incomplete. While the STB raised questions that needed to be addressed, the Board neither stated that NSR had no right to file the application nor that NSR would be precluded from filing a further and more complete application at an appropriate time. Thus, PCS mischaracterizes the STB decision as "denying" NSR's abandonment application when the Board in fact reached no decision on the merits.

**V.     PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON ALL ISSUES**.

After taking into account PCS's mischaracterization of certain facts, and PCS's reliance on non-material facts, there are no disputed issues of material fact that would preclude the Court from granting summary judgment to the Defendants and from denying summary judgment to the Plaintiffs. The mere existence of some disputed facts does not require that a case go to trial. The disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict. Thus, if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment. PCS's evidence is not significantly probative on any material issue and is not reasonably supported by the language of the Deeds. Defendants' legal defenses on ICCTA pre-emption, the interpretation of the relocation provisions, the duration of the agreement and a reasonable time for

notice and performance determine the case in defendants' favor.

CONCLUSION

WHEREFORE, for the foregoing reasons, Defendants NSR and NSC respectfully request that the Court deny Plaintiff PCS's motion for summary judgment in its entirety; and grant judgment in favor of NSR and NSC and against the Plaintiff on all issues before this Court; and dismiss the Complaint; and tax the costs actions, including reasonable attorneys fees, against the Plaintiff.

This the 25th day of April, 2007.

BODE, CALL & STROUPE, L.L.P.

BY:    _s/ John S. Byrd II_____
ODES L. STROUPE, JR. (State Bar No. 4983)
JOHN S. BYRD II (State Bar No. 28185)
Attorneys for Defendants
P.O. Box 6338
Raleigh, North Carolina 27628
Telephone:    919-881-0338
Facsimile:    919-881-9548
EMAIL: stroupe@bcs-law.com
            jbyrd@bcs-law.com

<u>**CERTIFICATE OF SERVICE**</u>

It is hereby certified that on this date that the foregoing Defendants' Amended Memorandum of Points and Authorities in Response and Opposition to Plaintiff's Motion for Summary Judgment (Fed.R.Civ.P. 56) was duly served upon all parties of record to this cause by email transmission and by mailing a copy to the party's attorney of record in accordance with the provisions of Rule 5, Federal Rules of Civil Procedure.

This the 25th day of April, 2007.

BODE, CALL & STROUPE, L.L.P.

BY: _s/ John S. Byrd II_____
      ODES L. STROUPE, JR. (State Bar No. 4983)
      JOHN S. BYRD II (State Bar No. 28185)
      Attorneys for Defendants
      P.O. Box 6338
      Raleigh, North Carolina 27628
      Telephone: 919-881-0338
      Facsimile: 919-881-9548
      EMAIL: stroupe@bcs-law.com
               jbyrd@bcs-law.com

SERVED:

R. Bruce Thompson II, Esquire
Charles E. Raynal IV, Esquire
PARKER, POE, ADAMS & BERNSTEIN, LLP
Wachovia Capitol Center
150 Fayetteville Street Mall, Suite 1400
Raleigh, North Carolina 27602
EMAIL: charlesraynal@parkerpoe.com
*Attorneys for Plaintiff*