IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:05-CV-55-D

| | | |
|---|---|---|
| PCS PHOSPHATE COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| NORFOLK SOUTHERN CORPORATION | ) | |
| and NORFOLK SOUTHERN RAILWAY | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

PCS Phosphate Company, Inc. ("PCS" or "plaintiff") filed suit against Norfolk Southern Corporation ("NSC") and Norfolk Southern Railway Company ("NSRC") (collectively "defendants") for breach of contract, breach of easement covenants, unjust enrichment, and unfair and deceptive trade practices. Plaintiff alleges that defendants are obligated under deeds of easement negotiated in 1965 and 1966 to relocate at their expense a portion of their rail lines on plaintiff's property. NSC filed an amended motion to dismiss for lack of personal jurisdiction, and plaintiff and NSRC filed cross motions for summary judgment. As explained below, the court denies NSC's amended motion to dismiss, grants plaintiff's motion for summary judgment on its breach of contract and breach of easement covenants claims, and grants NSRC's motion for summary judgment on the unjust enrichment and unfair and deceptive trade practices claims.

I.

Plaintiff owns and operates a phosphate mining and processing plant on 70,000 acres near Aurora, North Carolina ("Aurora facility"). Compl. ¶ 9. The Aurora facility was constructed in the 1960s by two companies – Texas Gulf Sulphur Company ("TGSC") and North Carolina

Phosphate Corporation ("NCPC"). These two companies merged in 1985 and became what is now PCS. Id. ¶ 10. PCS is a successor in interest to TGSC and NCPC. See Answer ¶ 10.

Since its creation, the Aurora facility has relied on rail access for the receipt of raw materials and the shipment of its products. Compl. ¶ 13. On October 30, 1963, NSRC's predecessor by the same name – Norfolk Southern Railway Company – applied to the United States Interstate Commerce Commission ("ICC") to construct and operate a rail line in Beaufort County, North Carolina to serve the Aurora facility. See Answer ¶ 4; Pl.'s Mot. for Summ. J., Ex. 3 at 2 (ICC Report, Certificate, and Order). On October 30, 1964, the ICC approved the application. Pl.'s Mot. for Summ. J., Ex. 3 at 30.

After obtaining approval from the ICC, Norfolk Southern Railway Company negotiated five deeds of easement to construct a rail line between Phosphate Junction and Lee Creek ("Lee Creek rail line"), the location of the Aurora facility. Compl. ¶¶ 8, 15-16. On June 29, 1965, NCPC and the Weyerhaeuser Company ("Weyerhaeuser") granted to Norfolk Southern Railway Company two deeds of easement across property owned by NCPC and Weyerhaeuser. Pl.'s Mot. for Summ. J., Exs. 4, 5 (deeds of easement). NCPC and Weyerhaeuser granted the easement "for so long as said right of way and easement shall be used for railroad purposes and shall not be abandoned or relocated." Id. at 2. The parties also agreed to certain conditions:

> (1) If, after ten (10) years from the date of this instrument, <u>either Grantor determines that all or any part of said right of way and easement interferes with its anticipated mining or processing operations</u> in the Beaufort County, North Carolina area, then said <u>Grantor shall notify Grantee in writing of its desire that the right of way and track be moved</u>, specifying in said notice the date on which it requires said track to be relocated which date shall not be less than one year from the date of said notice and designating in the notice a new location for the right of way and relocation of the said track, and Grantors shall provide Grantee with a right of way and easement over said new location and <u>Grantee at its expense shall relocate the said track on the said new right of way</u>; provided, however, that the new location for the right of way and relocation of said track shall be determined by engineering representatives of Grantors

2

and Grantee and shall be over such land as will provide a track subgrade elevation between elevation nine feet and thirteen feet above mean sea level, and be such land as will avoid excessive curvature, grade and distances for the relocated track . . . .

(3) That if this easement or right of way be relocated or if the Grantee shall abandon the aforesaid land or right of way for railroad purposes and cease to use the same for such purposes, the Grantors and their respective successors and assigns shall be seized of their former estates therein and the aforesaid right of way and easement shall cease and determine. If a railroad track is placed on the right of way and easement and later removed and not replaced within one year, this shall be conclusively presumed to constitute an abandonment.

Id. at 2-3 (emphasis added). On October 12, 1965, Fred R. Alfred, Betty A. Alfred, and TGSC granted a similar deed of easement to Norfolk Southern Railway Company. Id., Ex. 6. Likewise, TGSC granted two nearly identical deeds of easement to Norfolk Southern Railway Company on April 15, 1966, and May 3, 1966. Id., Exs. 7, 8.

The Norfolk Southern Railway Company constructed the Lee Creek rail line pursuant to the deeds of easement, and its successors in interest, including the modern NSRC, provided continuous rail service to the Aurora facility from 1966 to the present. See Compl. ¶ 15; Answer ¶ 4. NSRC is a wholly owned subsidiary of NSC. Answer ¶ 3. Since 1977, a competitor railroad, CSX Transportation, Inc. and its predecessors ("CSX Transportation"), also has provided rail service over the Lee Creek rail line to the Aurora facility. Id. ¶ 13; NSRC's Am. Mem. in Resp. to Pl.'s Mot. for Summ. J. 4. CSX is not a party to the 1965-66 deeds of easement. Id.

According to plaintiff, it has contemplated mining phosphate reserves located below the Lee Creek rail line since at least 1981. Compl. ¶ 25. By 1999, plaintiff conducted preliminary studies that concluded that the Lee Creek rail line would interfere with mining operations at the Aurora facility if the line was not relocated by mid-2007. Id. ¶ 27. In 2001, plaintiff developed a final relocation proposal based on its own engineering study. Id. ¶ 28. Plaintiff claims it conferred with defendants in developing its proposal, but defendants contend they did not discuss relocation with

3

plaintiff until 2002. See id.; Answer ¶ 28. On November 30, 2003, plaintiff formally notified "Norfolk Southern pursuant to the Relocation Agreements of its desire that the railroad track and right of way be moved" to the locations it identified in its engineering study. Compl., Attach. F at 2. Plaintiff stated that the "relocation must be initialized by mid-year 2005 and completed no later than mid-year 2007." Id. Defendants refused to relocate the track. See, e.g., NSRC's Mem. in Supp. of Mot. for Summ. J., Exs. K, L, & M. Plaintiff claims it was, therefore, "forced to mitigate damages by relocating a portion of the Lee Creek Rail Line at its own expense and to seek damages from the Defendants resulting from the Defendants' breach." Compl. ¶ 43.

On May 6, 2005, plaintiff filed this action, seeking in excess of $12.1 million on its breach of contract, breach of easement covenants, and unjust enrichment claims. Plaintiff also seeks treble damages pursuant to North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. §§ 75-1.1 et seq.

On November 17, 2005, NSRC filed an application with the Surface Transportation Board ("STB") for permission to abandon the Lee Creek rail line. Pl.'s Mem. in Opp. to NSRC's Mot. for Summ. J., Ex. 22 at 1 (STB Decision). On December 7, 2005, the STB rejected NSRC's application as premature in light of this action and "substantially incomplete and defective" for its failure to detail the proposed abandonment's impact on CSX's operations and the environment. Id. at 2-3.

NSC filed an amended motion to dismiss for lack of personal jurisdiction, or alternatively for summary judgment. Plaintiff and NSCR filed cross motions for summary judgment.

II.

Initially, the court considers NSC's amended motion to dismiss for lack of personal jurisdiction. The court does not have personal jurisdiction over a nonresident defendant unless jurisdiction is consistent with the forum state's long-arm statute and with due process. See, e.g.,

4

Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004). North Carolina's long-arm statute is construed to reach the limits of constitutional due process. Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). Thus, the statutory inquiry merges into the constitutional inquiry, i.e., whether haling NSC before this court violates due process. See id.

Due process requires a defendant to have "certain minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). The extent of the contacts needed for jurisdiction turns on whether the claims asserted against a defendant relate to or arise out of the defendant's contacts with the forum state. See ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002). If the defendant's contacts with the state are the basis for the suit, specific jurisdiction may exist. Id. In determining specific jurisdiction, the court considers "(1) the extent to which the defendant purposefully avail[ed] itself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Id. (internal quotations omitted). Thus, the "constitutional touchstone" of specific personal jurisdiction "remains whether the defendant purposefully established 'minimum contacts' in the forum state." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985).

If the defendant's contacts with the forum state are not the basis of suit, general jurisdiction may "arise from the defendant's general, more persistent, but unrelated contacts with the State." ALS Scan, Inc., 293 F.3d at 712. To establish general jurisdiction, the defendant's contacts with the forum state must be "continuous and systematic." This standard for general jurisdiction is more

demanding than the one used to establish specific jurisdiction. Id. (citing Helicopteros, 466 U.S. at 414-16).

When the court decides a pretrial personal jurisdiction motion without conducting an evidentiary hearing, the plaintiff need only make a prima facie showing of personal jurisdiction. Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993). The court construes all relevant jurisdictional allegations in the light most favorable to the plaintiff and draws the most favorable inferences for the existence of jurisdiction. Id.

NSC, a Virginia holding company, asserts that it is not subject to specific or general personal jurisdiction in North Carolina. NSC was not incorporated until 1980, fifteen years after the execution of the first deed of easement. NSC's Am. Mot. to Dismiss 3. Additionally, "[t]he separate corporate identities of NSC and NSRC are maintained carefully and all customary corporate formalities are observed strictly[,]" including separate articles of incorporation, bylaws, boards of directors, property, accounting records, and dividend distribution. Id. at 3-4. Consequently, NSC argues, it lacks "sufficient contacts, if any contacts at all, for the Eastern District of North Carolina to assert constitutional jurisdiction." Id. at 6.

The court disagrees with this conclusion. Generally, "the contacts of a corporate subsidiary cannot impute jurisdiction to its parent entity." Saudi v. Northrop Grumman Corp., 427 F.3d 271, 276-77 (4th Cir. 2005); Mylan Labs., 2 F.3d at 60. However, when the parent entity exerts a significant degree of control over the activities of the subsidiary, personal jurisdiction may extend to the parent corporation, regardless of corporate formalities. See Mylan Labs., 2 F.3d at 60. NSC's 2005 Annual Report states that NSC "controls a major freight railroad, Norfolk Southern Railway Company." Pl.'s Mem. in Opp. to Mot. to Dismiss, Ex. 6 at 2. Additionally, NSC employees make strategic infrastructure plans for the NRSC rail line. See id., Ex. 10 at 7

6

(deposition of Sarah Corey). Moreover, regardless of NSC's degree of control over NSRC, NSC itself has purposefully availed itself of the privilege of conducting activities within North Carolina. For example, NSC representatives met with PCS representatives in North Carolina several times before and after plaintiff formally invoked the relocation provisions in the deeds of easement. See id., Ex. 13 ¶¶ 10-15; Ex. 21 ¶ 3. At one meeting, NSC and PCS representatives met with the North Carolina Secretary of Commerce to seek funding from the State for relocating the rail line. See id., Ex. 21 ¶ 3. Further, NSC directly informed plaintiff that it would not relocate the rail line and threatened abandonment. See, e.g., id., Exs. 20, 22. NSC employees also prepared NSRC's application to the STB to abandon the Lee Creek rail line. See id., Ex. 11 at 8. There are numerous other examples in the record. Accordingly, the court finds that NSC has sufficient minimum contacts with North Carolina related to plaintiff's claims to support the exercise of specific jurisdiction. See Burger King, 471 U.S. at 472; ALS Scan, 293 F.3d at 712; Mylan Labs., 2 F.3d at 60.

Alternatively, the court finds that NSC is subject to general jurisdiction in North Carolina. NSC maintains offices in Raleigh and Charlotte, North Carolina. See PCS Mem. in Opp. to Mot. to Dismiss, Ex. 7. A resident vice president for NCS works in Raleigh and has been registered with the North Carolina Secretary of State as NSC's lobbyist since 1993. See id., Ex. 9. NSC holds itself out as engaged in substantial gainful activity within North Carolina by holding meetings in the state, denoting Raleigh and Charlotte as points of correspondence on its letterhead, and planning and coordinating NSRC infrastructure and capital projects in North Carolina. See, e.g., id., Ex. 7; Ex. 10; Ex. 13 ¶¶ 10-15. In short, NSC has continuous and systematic contacts with North Carolina and should have reasonably anticipated being haled into court in the state. See, e.g., ALS Scan, Inc., 293 F.3d at 712; Jaeger v. Applied Analytical Indus. Deutschland GMBH, 159 N.C. App. 167, 172-73, 582 S.E.2d 640, 644-45 (2003). NSC's amended motion to dismiss for lack of personal jurisdiction is denied.

III.

Plaintiff and NSRC filed cross motions for summary judgment. Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Fed. R. Civ. P. 56. The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn from the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).

A.

NSRC argues that plaintiff's claims are preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. §§ 10101 et seq. Thus, NSRC seeks summary judgment on all claims. Section 10501(b) grants the STB exclusive jurisdiction over

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b). Section 10501(b) further states that "[e]xcept as otherwise provided in this

8

part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." Id. Consequently, according to NSRC, "PCS cannot receive 'remedies,' through a suit brought for breach of contract or at common law, for alleged damages directly related to rail line abandonment, construction, or operation." NSRC's Am. Mem. in Supp. of Defs.' Mot. for Summ. J. 7.

The Fourth Circuit has not addressed preemption under section 10501(b).[1] Other courts have. See New England Cent. R.R. v. Springfield Terminal Ry. Co., 415 F. Supp. 2d 20, 23-27 (D. Mass. 2006) (collecting cases). Congress, of course, may preempt state laws under the Supremacy Clause in Article VI of the Constitution. Emerson v. Kansas City S. Ry. Co., 2007 WL 2758556, at *2 (10th Cir. Sept. 24, 2007). Federal preemption may either be express or implied. Id.; see English v. Gen. Elec. Co., 496 U.S. 72, 78-80 (1990) (describing forms of federal preemption). Because the ICCTA "contains an express pre-emption clause [49 U.S.C. § 10501(b)], our task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." Emerson, 2007 WL 2758556, at *2 (quotation omitted).

In Emerson, the Tenth Circuit noted that the STB (the agency that Congress created in the ICCTA to administer the ICCTA) recently described the preemptive effect of section 10501(b) as follows:

> [T]he courts have found two broad categories of state and local actions to be preempted regardless of the context or rationale for the action. The first is any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the Board has authorized. Second, there can be no state or local regulation of matters directly regulated by the Board – such as the construction,

---

[1] The Fourth Circuit has mentioned the ICCTA in two opinions. See Ward v. Allied Van Lines, Inc., 231 F.3d 135, 141 n.2 (4th Cir. 2000); In re Apex Express Corp., 190 F.3d 624, 627 n.1 (4th Cir. 1999). Neither case involved preemption under section 10501(b).

9

> operation, and abandonment of rail lines (see 49 U.S.C. §§ 10901-10907); railroad mergers, line acquisitions, and other forms of consolidation (see 49 U.S.C. §§ 11321-11328); and railroad rates and service (see 49 U.S.C. §§ 10501(b), 10701-10747, 11101-11124)[.]

Id. at *4 (citing CSX Transp., Inc. – Pet. for Declaratory Order, 2005 WL 1024490, at *2-*4 (Surface Transp. Bd. May 3, 2005)).

Examples of the first category of cases described in Emerson (i.e., those holding that certain state or local permitting or preclearance laws are preempted) include: Green Mtn. R.R. Corp. v. Vermont, 404 F.3d 638, 641-45 (2d Cir. 2005) (preconstruction permitting of transload facility preempted by section 10501(b)); City of Auburn v. United States, 154 F.3d 1025, 1030-31 (9th Cir. 1998) (environmental and land use permitting preempted by section 10501(b)); Soo Line R.R. Co. v. City of Minneapolis, 38 F. Supp. 2d 1096, 1101 (D. Minn. 1998) (demolition permitting process preempted by section 10501(b)); Burlington N. Santa Fe Corp. v. Anderson, 959 F. Supp. 1288, 1292-96 (D. Mont. 1997) (requirement that railroad companies obtain state approval before discontinuing station agents, abandoning rail lines, or removing side tracks or spurs preempted by section 10501(b)); CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n, 944 F. Supp. 1573, 1580-86 (N.D. Ga. 1996) (preclearance requirement on modifying railroad services in state preempted by section 10501(b)).

Examples of the second category of cases described in Emerson (i.e., those holding that certain state or local regulation of matters directly regulated by the STB are preempted) include: R.R. Ventures, Inc. v. Surface Transp. Bd., 299 F.3d 523, 561-63 (6th Cir. 2002) (state statute regulating railroad operations preempted by section 10501(b)); Friberg v. Kansas City S. Ry. Co., 267 F.3d 439, 442-44 (5th Cir. 2001) (state statute imposing operational requirements on railroad preempted by section 10501(b)); San Luis Cent. R.R. Co. v. Springfield Terminal Ry. Co., 369 F.

Supp. 2d 172, 176-77 (D. Mass. 2005) (contract between rail carriers concerning use of railroad cars and payment rates preempted in light of other ICCTA provisions regulating those issues); Wis. Cent. Ltd. v. City of Marshfield, 160 F. Supp. 2d 1009, 1013-15 (W.D. Wis. 2000) (attempt to use state's condemnation statute to condemn an actively used railroad track preempted by section 10501(b)).

Beyond the two categories of cases described above, "section 10501(b) preemption analysis requires a factual assessment of whether the action would have the effect of preventing or unreasonably interfering with railroad transportation." CSX Transp., 2005 WL 1024490, at *3; see Emerson, 2007 WL 2758556, at *4. Applying this standard, courts have held that certain state laws or state common law claims would have the effect of preventing or unreasonably interfering with railroad transportation and are therefore preempted. See, e.g., City of Lincoln v. Surface Transp. Bd., 414 F.3d 858, 860-63 (8th Cir. 2005) (attempt to use eminent domain to acquire portion of property abutting a rail line for municipal bicycle trail preempted by section 10501(b)); Friberg, 267 F.3d at 444 (state claims of negligence and negligence per se concerning a railroad's alleged road blockages of road leading to plaintiff's business preempted by section 10501(b)); Guckenberg v. Wis. Cent. Ltd., 178 F. Supp. 2d 954, 958-60 (E.D. Wis. 2001) (state law nuisance claim pertaining to railway traffic preempted by section 10501(b)); CSX Transp., Inc. v. City of Plymouth, 92 F. Supp. 2d 643, 658-59 (E.D. Mich 2000) (state law that limited the amount of time that a train could block a grade crossing preempted by section 10501(b)); Rushing v. Kan. City S. Ry. Co., 194 F. Supp. 2d 493, 500-01 (S.D. Miss. 2001) (state law nuisance and negligence claims that would interfere with operation of railroad switchyard preempted by section 10501(b)).

Likewise, in a variety of cases, courts have found that the action would not have the effect of preventing or unreasonably interfering with railroad transportation and held that preemption does not apply. See, e.g., Hi Tech Trans, LLC v. New Jersey, 382 F.3d 295, 305-12 (3d Cir. 2004) (state

11

regulation of solid waste disposal facility serving railroad not preempted); Iowa, Chicago & E. R.R. Corp. v. Wash. County, 384 F.3d 557, 558-62 (8th Cir. 2004) (state statute requiring replacement of bridges to comply with state safety requirements not preempted); Fla. E. Coast Ry. Co. v. City of West Palm Beach, 266 F.3d 1324, 1329-38 (11th Cir. 2001) (applying zoning and occupational license ordinances of general applicability to railway's lessee not preempted); Pejepscot Indus. Park, Inc. v. Me. Cent. R.R. Co., 297 F. Supp. 2d 326, 332-33 (D. Me. 2003) (state law breach of contract claim concerning use of a spur not preempted).

Courts applying section 10501(b) have distinguished state tort claims from state contract claims involving railroads, where the breach of contract claim does not unreasonably interfere with railroad transportation. See, e.g., Pejepscot, 297 F. Supp. 2d at 332-33; Cedarapids, Inc. v. Chicago, Cent. & Pac. R.R. Co., 265 F. Supp. 2d 1005 (N.D. Iowa 2003). In Pejepscot, the district court relied on the STB's opinion "that a rail carrier that voluntarily enters into an otherwise valid and enforceable agreement cannot use the preemptive effect of section 10501(b) to shield it from its own commitments, provided that the agreement does not unreasonably interfere with interstate commerce." Id. at 333 (citing Twp. of Woodbridge v. Consol. Rail Corp., 2001 WL 283507 (S.T.B. Mar. 22, 2001)). Nonetheless, the district court in Pejepscot held that the plaintiff could not recover exemplary damages in the action because such an award would amount to a regulation of the railroad. Id. Further, the district court held that section 10501(b) preempted the plaintiff's tortious interference claim because "the alleged interference centers around rail transportation itself, and awards of damages in these circumstances may serve to impermissibly regulate rail transportation." Id. Similarly, in Cedarapids, the district court dismissed as preempted claims that a rail line was abandoned under state law, but allowed the plaintiff to pursue claims for rescission of the lease for the land on which the rail line was located and restitution of amounts paid under the lease.

12

Cedarapids, 265 F. Supp. 2d at 1015-16.

In this case, plaintiff asserts claims for breach of contract, breach of easement covenants, unjust enrichment, and unfair and deceptive trade practices. Applying the foregoing principles, the court holds that section 10501(b) does not preempt plaintiff's breach of contract and breach of easement covenants claims. These claims concern the performance of obligations under contracts voluntarily negotiated by the parties' predecessors in interest and do not have the effect of preventing or unreasonably interfering with railroad operations. Defendants dispute the terms and enforceability of the easement covenants, but "they cannot hide behind the shield of section 10501(b) to avoid their [alleged] commitments." Pejepscot, 297 F. Supp. 2d at 333. NSRC cites the STB decision in Township of Woodbridge and contends that easement covenants, even though voluntarily negotiated, unreasonably interfere with railroad operations by "effectively . . . forc[ing] NSR[C] to abandon the Rail Line and not . . . receive the normal savings of future costs that result from such an abandonment." NRSC's Am. Mem. in Supp. of Mot. for Summ. J. 9-10. However, the disputed provisions of the easement covenants concern only the contractual liability for paying to relocate the Lee Creek rail line. This contractual liability does not interfere with railroad operations any more than did the contractual liability for the use of the spur in Pejepscot or the lease in Cedarapids. See Pejepscot, 297 F. Supp. 2d at 333; Cedarapids, 265 F. Supp. 2d at 1015.

As for plaintiff's unjust enrichment claim, it does not lie in contract or tort, but in quasi contract or a contract implied in law. See Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988); but see Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998) (describing unjust enrichment as a North Carolina tort claim). Plaintiff contends that "[b]y forcing PCS to relocate the Lee Creek Rail Line in spite of Defendants' contractual obligations to do so, the Defendants are accepting the benefits of services that PCS is providing." Compl. ¶ 67.

13

Thus, this claim depends on whether the easement covenants are enforceable between plaintiff and defendants and not on a matter subsumed by the ICCTA. Cf. Booe, 322 N.C. at 570, 369 S.E.2d at 556 ("If there is a contract between the parties the contract governs the claim and the law will not imply a contract."). Further, plaintiff's unjust enrichment claim does not have the effect of preventing or unreasonably interfering with railroad operations. Pejepscot, 297 F. Supp. 2d at 333. Accordingly, plaintiff's unjust enrichment claim is not preempted.

Finally, plaintiff's UDTPA claim is based in tort, not contract, and requires a showing of "substantial aggravating circumstances attending the breach of contract." Bob Timberlake Collection, Inc. v. Edwards, 176 N.C. App. 33, 42, 626 S.E. 2d 315, 323 (2006). Plaintiff's UDTPA claim seeks treble damages for defendants' allegedly "misleading," "unfair[,] and coercive" threats to abandon the Lee Creek rail line. Compl. ¶ 71. These allegations, if pursued, would directly interfere with the STB's exclusive jurisdiction over the abandonment of railroad tracks. Accordingly, plaintiff's UDTPA claim is preempted. See Friberg, 267 F.3d at 444; San Luis Cent. R. Co., 369 F. Supp. 2d at 177; Guckenberg, 178 F. Supp. 2d at 958.

In sum, section 10501(b) does not preempt plaintiff's breach of contract, breach of easement covenants, or unjust enrichment claims. However, section 10501(b) preempts plaintiff's UDTPA claim; therefore, the court grants NSRC's motion for summary judgment on plaintiff's UDTPA claim.

B.

Alternatively, NSRC is entitled to summary judgment on the UDTPA claim. Under North Carolina law, plaintiff cannot transform this ordinary contract dispute into a tort action. See Broussard, 155 F.3d at 345-47; Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 534-36 (4th Cir. 1989); see also Se. Shelter Corp. v. BTU, Inc., 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002);

14

Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). North Carolina allows an "independent tort" based on a breach of contract only in "carefully circumscribed" circumstances. Broussard, 155 F.3d at 346 (citation omitted). In order to curb litigants' tendency to add UDTPA claims to straightforward breach of contract claims and to prevent UDTPA treble damages awards from distorting commercial transactions, "North Carolina courts have repeatedly held that a mere breach of contract, even if intentional," does not rise to an unfair or deceptive trade practice. Id. at 347 (internal quotations and citations omitted). Here, defendants' threats to abandon the Lee Creek rail line do not rise to "substantial aggravating circumstances" surrounding nonperformance of the contract to support a UDTPA claim. See, e.g., Bob Timberlake Collection, 176 N.C. App. at 42, 626 S.E.2d at 323; Branch Banking & Trust Co., 107 N.C. App. at 62, 418 S.E.2d at 700. Likewise, defendants' arguments and other conduct concerning this contract dispute do not create a valid unfair or deceptive trade practice claim. See Broussard, 155 F.3d at 346. If defendants have failed to perform an enforceable contract, plaintiff's remedy lies in contract. As in Broussard, "[g]iven the contractual center of this dispute, plaintiff['s] U[D]TPA claims are out of place." Id. at 347.

Similarly, plaintiff cannot transform this contract dispute into an action for damages under an unjust enrichment theory. See id. at 346. Plaintiff claims that "[b]y forcing PCS to relocate the Lee Creek Rail Line in spite of the Defendants' contractual obligations to do so, the Defendants are accepting the benefits of services that PCS is providing . . . . [i.e.,] the relocation of the Lee Creek Rail Line at PCS expense . . . ." Compl. ¶ 67. In other words, plaintiff argues that defendants wrongfully interpreted the easement covenants as unenforceable and thereby forced plaintiff to unjustly enrich defendants by mitigating plaintiff's potential damages. Of course, a duty to mitigate does not arise until the other party is in breach of contract. See, e.g., Bombardier Capital, Inc., v.

15

Lake Hickory Watercraft, Inc., 178 N.C. App. 535, 538-39, 632 S.E.2d 192, 195 (2006). Thus, plaintiff's cause of action is premised on the enforceability of the easement covenants against defendants. As such, "the crux of this matter is and always has been a contract dispute." Broussard, 155 F.3d at 346. Because a contract between the parties governs the claim, "the law will not imply a contract." Booe, 322 N.C. at 570, 369 S.E.2d at 556. Accordingly, the court grants NSRC's motion for summary judgment as to plaintiff's unjust enrichment claim.

C.

Next, the court addresses plaintiff's breach of contract and breach of easement covenants claims. NSRC advances several theories for why the easement covenants are not enforceable against defendants. First, NSRC argues that the easement covenants are subject to a "reasonable time" rule and that plaintiff failed to enforce the covenants within such a reasonable time. NSRC cites several cases, including Edney v. Powers, 224 N.C. 441, 31 S.E.2d 372 (1944), which explained

> [w]hen there is substantial and reasonable doubt concerning whether a restriction is perpetual or of limited duration, the doubt will be construed against one claiming perpetual restriction; and such words as "at any time," "ever," "never," and "forever" appearing in restrictions must give way to a particular specification of their duration.

Id. at 443-44, 31 S.E.2d at 374. In other words, the reasonable time rule will apply "when no time of performance is specified." Buchele v. Pinehurst Surgical Clinic, P.A., 80 N.C. App. 256, 262, 341 S.E.2d 772, 777 aff'd, 318 N.C. 503, 349 S.E.2d 579 (1986). Unlike Edney, Buchele, and the other cases that plaintiff cites, there is no substantial and reasonable doubt as to the duration of the parties' contractual rights and duties. The easement covenants grant NSRC's predecessor easements and rights of way "for railroad purposes." See Pl.'s Mot. for Summ. J., Exs. 4-8. Moreover, the parties included provisions in the easement covenants that prevented the grantor from having the grantee

16

relocate the Lee Creek rail line for 10 years after the deeds' enactment. See id. This provision protected the grantee railroad's initial investment in constructing a new rail line to serve the phosphate plant. Beyond that 10-year period, the relocation provision protects the grantors' interest in mining the entire Aurora facility, including areas subject to the easement. As would be expected, the grantors and grantee reasonably anticipated that mining operations would continue well in excess of 10 years. See id., Ex. 9 at 3.

NSRC misunderstands the nature of the relocation provisions in the easement covenants. The relocation provisions are real covenants that, unlike personal covenants or basic contracts, run with the land and are enforceable against successors in interest. See Runyon v. Paley, 331 N.C. 293, 299, 416 S.E.2d 177, 182-83 (1992). A restrictive covenant in a deed is a real covenant that runs with the land if

> (1) the subject of the covenant touches and concerns the land, (2) there is privity of estate between the party enforcing the covenant and the party against whom the covenant is being enforced, and (3) the original covenanting parties intended the benefits and the burdens of the covenant to run with the land.

Id. at 299-300, 416 S.E.2d at 183. The relocation provisions meet these elements – the burden of relocating the rail line is inextricably related to plaintiff's ownership interest in the real property containing the Aurora facility, horizontal and vertical privity are present, and the contracting parties intended for the relocation obligation to run with the land in order to permit continued mining operations. Further, and contrary to NSRC's argument, an agreement in an easement obligating future performance by a grantee may constitute a real covenant. See, e.g., Weyerhaeuser Co. v. Carolina Power & Light Co., 257 N.C. 717, 719, 127 S.E.2d 539, 540-41 (1962).

NSRC also claims that enforcing the easement covenants would violate the common law rule against perpetuities. The rule against perpetuities provides:

17

> [n]o devise or grant of a future interest in property is valid unless the title thereto must vest, if at all, not later than twenty-one years, plus the period of gestation, after some life or lives in being at the time of the creation of the interest. If there is a possibility such future interest may not vest within the time prescribed, the gift or grant is void.

Rich, Rich & Nance v. Carolina Constr. Corp., 355 N.C. 190, 193, 558 S.E.2d 77, 79 (2002) (quotation omitted). The relocation provisions do not violate the rule against perpetuities. At the time the easement covenants became effective, the grantor retained a vested interest to require relocation of the rail line after 10 years expired. See, e.g., id. at 194, 558 S.E.2d at 81; Feldman v. Transcon. Gas Pipe Line Corp., 9 N.C. App. 162, 165, 175 S.E.2d 713, 715 (1970).

Having rejected defendants' arguments against the enforceablity of the relocation provisions, the court next examines whether the relocation provisions are valid and defendants are in breach. Plaintiff determined that its anticipated mining operations required relocation of the Lee Creek rail line and notified defendants of its intent to invoke the relocation provisions. Defendants failed to perform in accordance with the plain language in the contract and thereby breached the contract and the easement covenants. Thus, plaintiff is entitled to summary judgment as to liability for the breach of contract and for the breach of easement covenants. The damages amount under either theory is the same. See, e.g., Norwood v. Carter, 242 N.C. 152, 155, 87 S.E.2d 2, 4 (1955).

On the current record, the court cannot determine plaintiff's damages. Thus, to the extent that plaintiff seeks summary judgment on damages, that part of the plaintiff's motion for summary judgment is denied without prejudice. The court will hold a status conference concerning this case at 2:00 p.m. on October 12, 2007, in Courtroom 1, Seventh Floor, Terry Sanford Federal Building and Courthouse, Raleigh, North Carolina. At that conference, the court will discuss the issue of damages with the parties.

IV.

As explained above, NSC's amended motion to dismiss is DENIED; plaintiff's motion for summary judgment is GRANTED IN PART AND DENIED IN PART; and, NSRC's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Specifically, the court grants summary judgment to plaintiff as to liability on the breach of contract and breach of easement covenants claims and grants summary judgment to NSRC on the unjust enrichment and unfair and deceptive trade practices claims. The court DENIES without prejudice plaintiff's motion for summary judgment on damages. The court will hold a status conference at 2:00 p.m. on October 12, 2007, to discuss damages arising from the breach of contract and breach of easement covenants.

SO ORDERED. This 28 day of September 2007.

JAMES C. DEVER III
United States District Judge